No. 11-16401

## UNITED STATES COURT OF APPEALS

## FOR THE NINTH CIRCUIT

**TERESA SHEEHAN,**

Plaintiff - Appellant,

vs.

**CITY AND COUNTY OF SAN FRANCISCO, a municipal corporation; HEATHER FONG, in her capacity as Chief of Police for the City and County of San Francisco; KIMBERLY REYNOLDS and KATHERINE HOLDER, individually and in their capacities as a police officers for the City and County of San Francisco,**

Defendants – Appellees.

On Appeal from the United States District Court
For the Northern District Court
No. 3:09-cv-03889-CRB
Honorable Charles Breyer, Judge

---

## APPELLANT'S OPENING BRIEF

---

**JOHN L. BURRIS, Esq./ State Bar #69888
BENJAMIN NISENBAUM, Esq./State Bar #222173
LAW OFFICES OF JOHN L. BURRIS**
Airport Corporate Centre
7677 Oakport Street, Suite 1120
Oakland, California 94621
Telephone: (510) 839-5200
Fax:  (510) 839-3882

Attorneys for Plaintiff-Appellant

## *TABLE OF CONTENTS*

TABLE OF CONTENTS ........................................................1

TABLE OF AUTHORITIES ..................................................2

INTRODUCTION ..............................................................7

JURISDICTIONAL STATEMENT ........................................8

STATEMENT OF ISSUES ..................................................9

STATEMENT OF THE CASE ............................................10

STATEMENT OF FACTS ..................................................11

SUMMARY OF ARGUMENT ............................................20

ARGUMENT......................................................................21

    STANDARD OF REVIEW ..............................................21

    DEFENDANT OFFICERS' UNLAWFUL ENTRY INTO SHEEHAN'S HOME ....................................................................23

    DEFENDANT OFFICERS' USE OF EXCESSIVE FORCE .........................36

    DEFENDANT CITY'S MUNICIPAL LIABILITY........................................44

    AMERICANS WITH DISABILITIES ACT ....................................50

    SHEEHAN'S STATE LAW CLAIMS............................................56

CONCLUSION ..................................................................61

*TABLE OF AUTHORITIES*

## Cases

*Alexander v. City and Cnty. of San Francisco*, 29 F.3d 1355 (9th Cir. 1994) ........42

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505 (1986)..................20

*Austin v. Escondido Union School Dist.*, 149 Cal.App.4[th] 869 (2007)....................58

*Azevedo v. City of Fresno*, 2010 WL 2353526 (ED Cal. 2010) .............................47

*Barber v. City of Santa Rosa*, 2010 WL 5069868 .................................................42

*Barnes v. Gorman,* 536 U.S. 181, 122 S.Ct. 2097, 153 L.Ed.2d 230 (2002)..........51

*Bias v. Moynihan*, 508 F3d 1213 (9th Cir. 2007) ....................................................55

*Billington v. Smith*, 292 F.3d 1177 (9th Cir. 2002) ......................................... 32, 41

*Blankenhorn v. City of Orange,* 485 F.3d 463 (9th Cir. 2007)...............................46

*Bryan v. MacPherson,* 630 F.3d 805 (9th Cir. 2010) ..............................................21

*Chavez v. Martinez,* 538 U.S. 760, 123 S.Ct. 1994, 155 L.Ed.2d 984 (2003) ........30

*Chew v. Gates*, 27 F.3d 1432  (9th Cir. 1994) ........................................................31

*City of Canton v. Harris,* 489 U.S. 378 (1989)......................................................46

*City of St. Louis v. Praprotnik,* 485 U.S. 112 (1988) .............................................45

*Cole v. Doe 1 thru 2 Officers of City of Emeryville Police Dept.*, 387 F.Supp.2d
   1084 (N.D. Cal. 2005) ..........................................................................................58

*Davis v. Mason County*, 927 F.2d 1473 (9th Cir. 1991)..........................................32

*Deorle v. Rutherford,* 272 F.3d 1272 (9th Cir. 2001)..............................................36

*Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052 (9th Cir. 2003)20

*Edson v. City of Anaheim*, 63 Cal.App.4[th] 1269 (1998). .........................................57

*Espinosa v. City and Cnty. of San Francisco*, 598 F.3d 528 (9th Cir. 2010) .........42

*First Nat'l Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 290 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968) ...........................................................................................21

*Fisher v. City of San Jose*, 558 F.3d 1069 (9th Cir. 2009) ....................................29

*Fogel v. Collins,* 531 F.3d 824 (9th Cir. 2008) .........................................................45

*Fuller v. City of Oakland,* 47 F.3d 1522 (9th Cir. 1995) .........................................45

*Gillette v. Delmore,* 979 F.2d 1342 (9th Cir. 1992) .................................................45

*Gonzalez v. Paradise Valley Hospital*, 111 Cal.App.4th 735 (2003) .....................56

*Gorman v. Bartch,* 152 F.3d 907 (8th Cir. 1998) ....................................................51

*Graham v. Connor,* 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) . passim

*Gregory v. County of Maui*, 523 F3d 1103 (9th Cir. 2008) ....................................38

*Grudt v. City of Los Angeles*, 2 Cal.3d 575 (1970) .................................................57

*Hainze v. Richards*, 207 F.3d 795 (5th Cir. 2000) ................................ 50, 51, 52, 54

*Hogan v. City of Easton*, 2004 WL 1836992 (E.D. Pa. 2004) ...............................54

*Hopkins v. Bonvicino*, 573 F.3d 752 (9th Cir. 2009) ..............................................24

*Hopper v. City of Pasco,* 248 F.3d 1067 (9th Cir. 2001) ........................................21

*Jacobs v. Grossmont Hospital*, 108 Cal.App.4th 69 (2003) ...................................56

*LaLonde v. County of Riverside*, 204 F.3d 947 (9th Cir. 2000). ............................20

*Larez v. City of Los Angeles*, 946 F.2d 630 (9th Cir. 1991) ...................................32

*Lee v. City of Los Angeles,* 250 F.3d 668 (9th Cir. 2001)................................. 46, 50

*Long v. County of Los Angeles,* 442 F.3d 1178 (9th Cir. 2006) ........................ 44, 46

*Los Angeles Police Protective League v. Gates,* 907 F.2d 879 (9th Cir. 1990) .......45

*Lytle v. Carl,* 382 F.3d 978 (9th Cir. 2004) ........................................................ 44, 45

*Matsushita Elec. Indus. Co., v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348 (1986)................................................................................................21

*Mende v. Dun & Bradstreet, Inc.,* 650 F.2d 129 (9th Cir. 1982) ...........................21

*Miller v. Fairchild Industries, Inc.*, 797 F.2d 727(9th Cir. 1986) ...........................59

*Mincey v. Arizona*, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978) ..............25

*Monell v. Department of Soc. Servs.,* 436 U.S. 658 (1978)............................... 44, 47

*Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980)..........23

*Pearson v. Callahan*, 555 U.S. 223, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). .......22

*Pierce v. Multnomah County,* 76 F.3d 1032 (9th Cir. 1996)...................................30

*Price v. County of San Diego*, 990 F.Supp. 1230 (1998) ........................................56

*Price v. Sery,* 513 F.3d 962 (9th Cir. 2008)............................................................44

*Reynolds v. County of San Diego*, 84 F.3d 1162 (9th Cir. 1996) ................ 14, 38, 39

*Rhode v. City of Roseburg,* 137 F.3d 1142 (9th Cir. 1998) ....................................30

*Robbins v. City of Hanford*, 2006 WL 1716220......................................................42

*Robins v. Harum,* 773 F.2d 1004 (9th Cir. 1985) ...................................................30

*Santos v. Gates,* 287 F.3d 846 (9th Cir. 2002)................................................... 36, 37

*Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) ...............36

*Schreiner v. City of Gresham*, 681 F.Supp.2d 1270 (D. Or. 2010) ............ 52, 53, 54

*Smith v. City of Hemet*, 394 F.3d 689 (9th Cir. 2005) ....................................... 31, 35

*Stegall v. Citadel Broad, Inc.,* 350 F.3d 1061 (9th Cir. 2003) ...............................20

*Tennessee v. Garner*, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985).................36

*Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)................... 30, 36

*United States v. Cervantes*, 219 F.3d 882 (9th Cir. 2000).......................................23

*United States v. Martinez*, 406 F.3d 1160 (9th Cir. 2005).......................................23

*United States v. McConney*, 728 F.2d 1195 (9th Cir. 1984)...................................24

*United States v. Prescott*, 581 F.2d 1343 (9th Cir.1978).......................................23

*United States v. Sine,* 493 F.3d 1021 (9th Cir. 2007) ..............................................40

*United States v. Snipe*, 515 F.3d 947 (9th Cir. 2008) .............................................25

*United States v. Stafford*, 416 F.3d 1068 (9th Cir.2005) ........................................23

*US v. Black*, 482 F.3d 1035 (9th Cir. 2007)...................................................... 28, 34

*Vinson v. Thomas*, 288 F3d 1145 (9th Cir. 2002)....................................................50

*Wilkins v. City of Oakland,* 350 F.3d 949 (9th Cir. 2003)......................................36

*Willis v. Pacific Maritime Ass'n,* 244 F .3d 675 (9th Cir. 2001) ............................21

*Yeskey v. Commonwealth of Pennsylvania Dep't of Corrections,* 118 F.3d 168 (3d Cir. 1997).................................................................................................50

## Statutes

42 U.S.C. §12132...................................................................................................8, 50

Federal Rules Civil Procedure 56(e)........................................................................22

## Constitutional Provisions

U.S. Const. amend. IV ............................................................................................23

## California Statutes

Civil Code section 52.1 ...........................................................................................59

Welfare & Institutions Code section 5278.............................................................56

Welfare and Institutions Code §5150 ....................................................................12

Appellant's Opening Brief (11-16401)

## *INTRODUCTION*

The tragic events underlying this case, demonstrate how law enforcement agencies are expected and entrusted by the public to be trained to make correct choices when handling the special needs of our mentally disabled citizens. Plaintiff TERESA SHEEHAN, who suffers from schizo-affective disorder, urges that the CITY and County of San Francisco Defendant Police Officers KIMBERLY REYNOLDS and KATHERINE HOLDER violated her Fourth Amendment rights by twice entering her home without a warrant, subjecting her to excessive force by shooting her multiple times, violating the Americans with Disabilities Act by failing to take her mental illness into account when affecting her arrest, that the CITY is liable for failing to properly train its officers on how to deal with diminished capacity persons, and she asserts various California state law violations.  The Defendants assert that the Defendant Officers are entitled to qualified immunity for their actions and that absent any Constitutional violations on the part of the Defendant Officers the CITY is similarly not liable.  The District Court determined that based on the facts SHEEHAN presented, the Defendant Officers actions did not violate the Constitution and granted summary judgment in favor of the Defendants as to all of Plaintiff's claims.

## *JURISDICTIONAL STATEMENT*

Subject matter jurisdiction of the District Court was invoked pursuant to the provisions of 28 U.S.C. §§1331 and 1333 over claims of violation of civil rights under 42 U.S.C. §1983 and violation of the Americans with Disabilities Act under 42 U.S.C. §12132. Jurisdiction in this Court is based on 28 U.S.C. §1291, governing appeals from all district court final judgments. The final judgment is based on the District Court's Order Granting Defendants' Motion for Summary Judgment filed on May 6, 2011.

Notice of Appeal was timely filed on June 2, 2011, pursuant to Federal Rules of Appellate Procedure, Rule 4.

On June 3 2011, this Court set and issued the initial briefing schedule in this case. On August 18, 2011 this Court granted Appellant's Motion for an Extension of Time to file the Opening Brief up to October 24, 2011.

Appellant requests an award of attorneys' fees and costs incurred for this appeal under 42 U.S.C. § 2000e-5(k) and 42 U.S.C. § 1988(b).

### *STATEMENT OF ISSUES*

A. Whether the District Court impermissibly made factual and witness credibility determinations on summary judgment constituting reversible error;

B. Whether Defendant Officers violated Sheehan's rights upon entering her home without a warrant;

C. Whether Defendant Officers' use of deadly force against Sheehan was excessive force and unlawful;

D. Whether the Americans with Disabilities Act applies to arrests;

E. Whether Defendant Officers violated ADA by failing to take Sheehan's disability into account during her arrest;

F. Whether Sheehan's state law claims are barred under a California immunity statute;

G. Whether there was sufficient evidence to raise a genuine issue of material fact that the Defendant Officers' violated California state law.

### *STATEMENT OF THE CASE*

This case is borne out of civil rights violations and violations of the Americans with Disabilities Act brought by TERESA SHEEHAN (hereinafter "SHEEHAN") against the CITY and COUNTY of SAN FRANCISCO (hereinafter "CITY"), City and County of San Francisco Police Chief HEATHER FONG (hereinafter "CHIEF FONG"), City and County of San Francisco Police Officer KIMBERLY REYNOLDS (hereinafter "REYNOLDS"), and City and County of San Francisco Police Officer KATHERINE HOLDER (hereinafter "HOLDER"). On August 25, 2009, SHEEHAN filed her Complaint for violations of her Fourth Amendment rights, the ADA, and various state law causes of action. (Appellant's Excerpt of Record ("ER") @ 49-68.) Defendants filed their Answer to the First Amended Complaint on September 22, 2009. (ER @ 69-86.) On January 21, 2011, Defendants filed a Motion for Summary Judgment as to all of Plaintiff's claims. (ER @ 329.) SHEEHAN filed her Opposition to Defendants' Motion for Summary Judgment on February 4, 2011. (ER @ 329.)

On April 8, 2011, the United States District Court, Northern Division held a contested hearing where both parties presented their arguments regarding the Defendants' Summary Judgment Motion. (ER @ 24-48.) On May 6, 2011, the district court issued its Order granting Defendants' Motion for Summary

Judgment.  (ER @ 4-22.)  Judgment was entered on May 8, 2011.  (ER @ 3.)

SHEEHAN filed a Notice of Appeal on June 2, 2011.  (ER @ 1-2.)

## STATEMENT OF FACTS

### A. Subject Incident

On August 5, 2008, social worker Heath Hodge, then Program Director for

Conard House—an independent cooperative housing program for persons suffering

from chronic mental illness located at 1941 15th Street (hereinafter referred to as

"Conard House") in San Francisco—in which SHEEHAN was a resident, visited

the program to check on one of its other residents.  (ER @ 287:17-19, 293:6-20.)

While he was there, he also attempted to see SHEEHAN because he had

information that she was not eating, non-communicative, isolating herself in her

room, and possibly not tending to her hygiene.  (ER @ 293:21-294:14.)  Hodge

knocked on SHEEHAN'S door, and spoke to her through the door saying that he

was concerned for her and that he would come back to check on her if he did not

hear from her.  (ER @ 289-292.)  SHEEHAN was uncharacteristically non-

responsive which caused Hodge some concern.  (ER @ 295:3-296:5.)

On August 7, 2008, Hodge returned to Conard House to perform a welfare

check on SHEEHAN.  (ER @ 297:1-4.)  The Conard House maintenance man,

Mike Creeger, was also present to help Hodge access SHEEHAN'S residence with the key to her door.  (ER @ 298:10-14.)  Hodge knocked on SHEEHAN'S door three times announcing that he was there to check on her.  When she failed to answer, Creeger used the key to open her door, and Hodge entered SHEEHAN'S room.  (ER @ 299:25-301: 19.)  Hodge observed SHEEHAN laying face-up on her bed with a book resting on her face and her eyes opened.  (ER @ 301:16-302:17.) Hodge walked into SHEEHAN'S room and kept trying to engage her.  SHEEHAN jumped off the bed, yelled at Hodge that he did not have a right to be in her room, told him to get out of her room, and informed him that she had a knife and would kill him if she had to.  (ER @ 303:7-13.)  Hodge left the room and SHEEHAN shut the door behind him.  Hodge did not see a knife.  (ER @ 304:14-17.)

Hodge then instructed Creeger and the lone remaining resident in Conard House at that time, to leave the residence, and made sure that no one else was in the building.  (ER @ 305:1-12.)  Hodge then went to his car, filled out a §5150[1]

---

[1] California Welfare and Institutions Code §5150 provides, "[w]hen any person, as a result of mental disorder, is a danger to others, or to … herself, or gravely disabled, a peace officer…, or other professional person designated by the county may, upon probable cause, take, or cause to be taken, the person into custody and place … her in a facility designated … as a facility for 72-hour treatment and evaluation.  Such facility shall require an application in writing stating the circumstances under which the person's condition was called to the attention of the

application for SHEEHAN and called the police non-emergency number for police

assistance with transporting her to a mental health treatment facility.  (ER @

306:16-25.)  Specifically, Hodge informed the police dispatch that: he was

SHEEHAN'S social worker and she threatened him, she had a history of violent

behavior, and he needed police-assistance to affect a §5150 hold on SHEEHAN

and to transport her to the hospital.  (ER @ 288:8-18.)

Defendant San Francisco Police Officer Katherine HOLDER responded to

Hodge's call and quickly assessed that she needed her Sergeant's assistance

because she was unsure whether Hodge had the authority to affect a §5150  hold on

SHEEHAN.  (ER @ 307:19-308:8; 224:19-25.)  San Francisco Police Sergeant

REYNOLDS quickly arrived on the scene.  (ER @ 309:5-7, 225:1-3; 174:10-12.)

Prior to entering the Conard House, Hodge informed the Defendant Officers

that: he was trying to place SHEEHAN on a §5150 hold, that she suffered from

schizophrenia, she had not been taking her psychiatric medication for over a year,

she had been in a downward psychotic spiral, and that she had threatened to stab

him with a knife if he did not leave her room but that he did not see a knife.  (ER

---

officer…, or professional person, and stating that the officer…, or professional
person has probable cause to believe that the person is, as a result of metal
disorder, a danger to others, or to … herself, or gravely disabled."

@ 216:24-217:11, 218:25-219:7, 221:9-223:7; 315:4-15; 174:15-175:23.)  The

Defendant Officers testified that Hodge did not suggest or inform them that

SHEEHAN was suicidal or a danger to herself; indeed, she had not harmed anyone

at that point.  (ER @ 219:23-220:4; 314:6-315:15; 176:3-9.)  Although neither

Defendant Officer could recall, Hodge testified that he informed the officers that

no one else was inside the Conard House and that the only other entrance to

SHEEHAN'S residence was with a ladder through her window.  (ER @ 316:20-

318:20.)

        Hodge directed the Defendant Officers to SHEEHAN'S door which was on

the second floor of the building.  (ER @ 226:3-227:16; 177:3-6.)  Hodge gave

REYNOLDS the key to SHEEHAN'S residence.  (ER @ 177:8-13.)  REYNOLDS

knocked on SHEEHAN's door, announced that they were the police and there to

help, and then opened SHEEHAN's door with the key.  (ER @ 178:1-14; 228:2-

12.)  SHEEHAN, again, was lying on her bed face-up with a book on her chest; she

then raised up, grabbed a knife from a nearby plate of a couple of knives, walked

towards the officers with the knife pointed toward the officers, and yelled "get out

of here," and "I'm going to kill you," over and over again.  (ER @ 181:18-183:25;

229:12-231:5, 233:1-5; 310:12-311:3.)  SHEEHAN then closed the door and

locked it.  (ER @ 179:9-13, 185:1-9; 310:17-18.)  Defendant Officer HOLDER

claims that SHEEHAN had her arm raised and the knife near the top of her head as she approached them.  (ER @ 232:11-20.)  REYNOLDS claims that SHEEHAN made motions with the knife and did not hold it in a fixed position.  (ER @ 184:13-16.)  Hodge observed that SHEEHAN was not making stabbing motions with the knife and did not appear to be trying to stab either of the officers.  (ER @ 319:10-21.)

Hodge opined that once SHEEHAN slammed the door on the officers she did not appear to be a continuing threat to them.  (ER @ 320:5-13.)

The Defendant Officers called for back-up and informed dispatch of the situation.  (ER @ 234:11-24.)  Even though SHEEHAN had closed her door and created a barrier, the Defendant Officers testified that they believed the knife could still harm them by puncturing the door.  (ER @ 236:17-181:7, 187:10-13, 188:3-20.)  The Defendant Officers heard sirens blaring, and Defendant Reynolds instructed Hodge to open the front door to allow the back-up officers access to the building.  (ER @ 194:14-22; 313:3-17.)  The Defendant Officers then determined to get the door opened again and subdue SHEEHAN.  (ER @ 236:12-16; 188:21-189:1.)

The Defendant Officers testified that by the time SHEEHAN closed the door, they realized that she fit the §5150 criteria, but did not wait for the back-up or less lethal unit they knew were en route and nearby because, according to the Defendant Officers, SHEEHAN posed even more danger with the door closed. (ER @ 181:14-17, 186:11-18.) The Defendant Officers testified that they feared SHEEHAN could escape through the window, a fire escape or some other door access to the building and hurt someone else, and that SHEEHAN's mental illness was a secondary concern at this point. (ER @ 191:6-13, 192:5-13, 193:3-12; 245:4-13.) The Defendant Officers also acknowledged that at the time they forced SHEEHAN's door open a second time, they had called for back-up, could hear sirens, and had asked for back-up officers to cover the rear of the building. (ER @ 235:8-11, 245:20-246:10.)

REYNOLDS tried but could not get the door opened, she then instructed HOLDER to open the door who was able to shove it open with her shoulder. (ER @ 238:3-239:10; 190:15-191:2.) The Defendant Officers observed SHEEHAN standing at the foot of her bed and then advance toward Defendant HOLDER, saying "I'm going to kill you," with the knife either high in the air or in her hand down by her thigh. (ER @ 240:9-241:15; 195:7-25.) Just then Defendant REYNOLDS pepper sprayed SHEEHAN; however, she kept advancing towards

Defendant HOLDER, crossed the door threshold and took a step towards Defendant HOLDER.  (ER @ 241:17-242:4; 196:16-18, 197:25-198:3.)

Defendant Officer HOLDER then fired two to three shots at SHEEHAN'S center mass area, as SHEEHAN was 2-3 feet away from her.  (ER @ 242:6-15.) After Defendant HOLDER's shots, SHEEHAN paused and turned towards Defendant REYNOLDS, who also shot her two to three times.  (ER @ 243:8-20; 199:15-207:17, 201:6-14.)  REYNOLDS attempted to hit SHEEHAN at the center mass area.  (ER @ 200:18-25.)  SHEEHAN was 2-4 feet away when Defendant REYNOLDS fired the last shot which entered SHEEHAN's face.  (ER @ 202:12-203:2.)  According to Defendant Officer HOLDER, SHEEHAN was still standing for REYNOLDS' initial shots; however, SHEEHAN was on the ground when Defendant REYNOLDS fired her last shot.  (ER @ 244:4-13; 203:7-11.)  In her San Francisco Police, Homicide Division Interview, taken on the day of the shooting, Defendant HOLDER informed that SHEEHAN: was laying on the floor on her right side, raised the knife over her head, and then Defendant REYNOLDS shot her for the last time.  (ER @ 248:14-28, 249:23-252:2.)  However, according to Defendant REYNOLDS, SHEEHAN was still on her feet when she fired the last shot.  (ER @ 203:3-6.)  Forensic Science expert James L. Norris opined that

SHEEHAN sustained her head wound when she was no longer standing. (ER @ 126-128.)

SHEEHAN dropped to the ground still screaming that she felt like she was dying, clenching and waving the knife, and somewhat pinning Defendant HOLDER at the end of the hallway near an alcove. (ER @ 203:16-21, 204:2-10; 258:20-25, 259:10-12, 263:17-22.) Officer Zachos then approached, kicked the knife out of SHEEHAN's hand and freed Defendant Officer HOLDER. (ER @ 205:10-25; 260:24-262:10.)

## B. Sheehan's Testimony

SHEEHAN testified that she had stopped taking her psychotropic medication four to five months prior to the subject-incident because the side-effects from the medicines very unnerving for her. (ER @ 138:2-13.) Sheehan also testified just prior to the subject incident she was experiencing debilitating back pain, such that she did not want to do anything but go to the bathroom, including not get dressed, and that she had the flu for which she was taking over-the-counter medication. (ER @ 139:1-140:3.) SHEEHAN explained that she had missed two meetings with the Conard House counselor because she did not feel up to attending the meetings, and Hodge came to her door threatening to evict her and

indicating that she needed to go to the hospital.  (ER @ 140:4-22.)  SHEEHAN

testified that she felt threatened and harassed by Hodge.  (ER @ 141:14-18, 142:1-

2.)

SHEEHAN also testified that on the date of the subject-incident Hodge

knocked on her door, but never opened the door or entered her room.  (ER @

142:7-143:13.)  SHEEHAN maintains that she had a conversation with Hodge

through the closed and locked door in which she told him that she was armed and

to leave her alone but that she did not threaten to stab him.  (ER @ 143:16-145:2.)

SHEEHAN then testified that Hodge returned with the police who said "they were

there to §5150 me," and she responded that they did not have a search warrant and

that she had not broken any rules or laws.  (ER @ 146:7-11, 147:6-12.)

SHEEHAN testified that she opened the door for the officers, told them to leave

her alone and showed them that she had a knife.  (ER @ 148:13-21, 149:3-8,

150:19-151:9.)  The officers then sprayed her with pepper spray, causing her to be

blinded, fall and stagger into the hall where they shot her six times.  (ER @

150:11-17, 162:3-5, 163:1-7.)  SHEEHAN testified that she does not know how

her left cheek got damaged; however, she maintains that she was not shot in the

face.  (ER @ 160:25-161:6.)  SHEEHAN also testified that she believed she had a

right to defend herself and, to this day, she does not understand why the officers shot her.  (ER @ 157:5-11, 163:16-20.)

## *SUMMARY OF ARGUMENT*

A. The district court erred in making factual and credibility determinations and drawing inferences against SHEEHAN in granting Defendants' motion for summary judgment.

B. REYNOLDS and HOLDER violated SHEEHAN'S Fourth Amendment rights upon their warrantless entry of her home.

C. REYNOLDS and HOLDER'S second entry of SHEEHAN'S home did not fall under the emergency aid exception to the warrant requirement.

D. REYNOLDS and HOLDER erroneously created an exigency upon their warrantless entry of SHEEHAN'S home and unreasonably used deadly force as a result.

E. CITY is liable for failing: to properly train its officer's in responding to mentally disabled suspects, to have an adequate policy regarding responding to mentally disabled suspects, to enforce its policy regarding responding the mentally disabled suspects.

F.  The district court erred by making factual and credibility determinations in finding that the CITY was not liable pursuant to the American with Disabilities Act by failing to factor SHEEHAN'S disability into the context of her arrest.

G.  The district court erred by applying California state immunity bars REYNOLDS and HOLDER from liability in state law causes of action.

### *ARGUMENT*

## STANDARD OF REVIEW

This Court reviews a district court's grant of a motion for summary judgment de novo.  *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1054 (9th Cir. 2003).  The evidence must be viewed in the light most favorable to the nonmoving party, and all reasonable inferences must be drawn in favor of that party.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505 (1986); *Stegall v. Citadel Broad, Inc.,* 350 F.3d 1061, 1065 (9th Cir. 2003).  If conflicting inferences may be drawn from the facts, the case must go to the jury. *LaLonde v. County of Riverside*, 204 F.3d 947, 958 -959 (9th Cir. 2000).

In attempting to establish the existence of a factual dispute, the opposing party may not rely upon the mere allegations or denials of its pleadings, but is

required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. Fed. Rule Civ. Proc. 56(e); *Matsushita Elec. Indus. Co., v. Zenith Radio Corp.,* 475 U.S. 574, 586 n. 11, 106 S.Ct. 1348 (1986); *Willis v. Pacific Maritime Ass'n,* 244 F .3d 675, 682 (9th Cir. 2001). However, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *First Nat'l Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 290 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968); *Hopper v. City of Pasco,* 248 F.3d 1067, 1087 (9th Cir. 2001). Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita,* 475 U.S. at 587; *Mende v. Dun & Bradstreet, Inc.,* 650 F.2d 129, 132 (9th Cir. 1982).

Similarly, this Court reviews the district court's determination of qualified immunity de novo. *Bryan v. MacPherson,* 630 F.3d 805, 823 (9th Cir. 2010). In evaluating a police officer's assertion of qualified immunity, this Court makes two determinations. This Court decides, first, whether, "taking the facts in the light most favorable to the non-moving party, the officer's conduct violated a constitutional right; and second, if a violation occurred, whether the right was

clearly established in light of the specific context of the case." *Id*. (internal quotations marks omitted).  This Court has discretion "in deciding which of the two prongs of the qualified immunity analysis should be addressed first. *Pearson v. Callahan*, 555 U.S. 223, 236, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009).

Here, the district court opined that REYNOLDS and HOLDERS' actions did not violate the Constitution.  The district court, therefore, did not reach the second prong of the qualified immunity inquiry determining whether a reasonable officer could have believed her conduct was lawful under the clearly established governing law.  (ER @ 11:2-4.)

## DEFENDANT OFFICERS' UNLAWFUL ENTRY INTO SHEEHAN'S HOME

REYNOLDS and HOLDER violated SHEEHAN'S Constitutional rights when they entered her home without a warrant in violation of the Fourth Amendment.

The Fourth Amendment provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated...." U.S. Const. amend. IV.  The Fourth Amendment prohibits police officers from making a warrantless entry into a person's home, unless the officers have probable cause and are presented with exigent

circumstances. *Payton v. New York*, 445 U.S. 573, 590, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980); *United States v. Prescott*, 581 F.2d 1343, 1350 (9th Cir.1978) ("absent exigent circumstances, police who have probable cause to arrest a felony suspect must obtain a warrant before entering a dwelling to carry out the arrest"). "[S]earches and seizures inside a home without a warrant are presumptively unreasonable." *United States v. Martinez*, 406 F.3d 1160, 1163 (9th Cir. 2005) (internal quotation marks omitted) (quoting *Payton*, 445 U.S. at 586).

The presumption, however, is not irrebuttable. "There are two general exceptions to the warrant requirement for home searches: exigency and emergency." *United States v. Martinez*, *supra*, at 1164. These exceptions are "narrow" and their boundaries are "rigorously guarded" to prevent any expansion that would unduly interfere with the sanctity of the home. *United States v. Stafford*, 416 F.3d 1068, 1073 (9th Cir.2005). In general, the difference between the two exceptions is this: The "emergency" exception stems from the police officers' "community caretaking function" and allows them "to respond to emergency situations" that threaten life or limb; this exception does "not [derive from] police officers' function as criminal investigators." *United States v. Cervantes*, 219 F.3d 882, 889 (9th Cir. 2000) (emphasis added). By contrast, the "exigency" exception derives from the police officers' investigatory function; it

allows them to enter a home without a warrant if they have both probable cause to believe that a crime has been or is being committed and a reasonable belief that their entry is "necessary to prevent ... the destruction of relevant evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement efforts." *Hopkins v. Bonvicino*, 573 F.3d 752, 763 (9th Cir. 2009) (citing *United States v. McConney*, 728 F.2d 1195, 1199 (9th Cir. 1984) (en banc).

The district court did not address the Defendants' exigency argument and instead opined that the emergency aid exception was applicable because REYNOLDS and HOLDER "had an objectively reasonable basis for believing that [SHEEHAN] needed immediate medical assistance" based on the representations Hodge made in the §5150 application he filled out. (ER @ 14:16-19.)  The district court cited the following factors in support of finding the Defendant Officers had an objectively reasonable basis for entry, "[SHEEHAN]: 1) stopped taking her psychotropic medication for over a year; 2) manifested symptoms of mental illness for the last few weeks; 3) had not been seen by her house counselor for the last two weeks; 4) told housemates that she no longer needed to eat; 5) reportedly was wearing the same clothes for the last several days; and 6) threatened to kill Hodge with a knife at the last wellness check."  (ER @ 14:7-15.)

The emergency aid doctrine applies when police officers reasonably believe entry is necessary to "protect or preserve life or avoid serious injury." *Mincey v. Arizona*, 437 U.S. 385, 392, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978). The district court obviously opined that this exception was a better fit to the facts of this case because the Defendant Officers need not have probable cause to show a crime has been or is about to be committed; instead, "[t]here must be some reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched." *Hopkins, supra,* 573 F.3d at 764, n. 5. Here, however, there was no "objectively reasonable basis for concluding that there [wa]s an immediate need to protect others or themselves from serious harm." *United States v. Snipe*, 515 F.3d 947, 951–52 (9th Cir. 2008).

SHEEHAN maintains that the factors cited by the district court required determination of material question of facts as to whether the need for the warrantless entry was *immediate* and that the district court failed to construe the facts in a light favorable to her—the non-moving party. The district court's reasoning suggests that SHEEHAN baldly threatened to kill Hodge. When in fact SHEEHAN told Hodge: that he had no right to be in her room, to leave her room, that she had a knife (meaning she had access to a knife because Hodge did not observe SHEEHAN brandishing a knife or ever see the knife to which she was

referring (ER @ 304:14-17.)), and that she would kill him if she had to *if* he did not leave her room. (ER @ 303:7-13.) SHEEHAN'S threat to Hodge (and indeed all of her subsequent actions) were predicated on her defending her desire and right to be left alone in her room. Moreover, the other factors listed by the district court are all predicated on the passage of significant amounts of time, e.g., SHEEHAN was off her medication for over a year, failed to see a counselor for the last few weeks, and wearing the same clothes for the past few days—these factors do not indicate that Sheehan was in any *imminent* danger. Besides which, SHEEHAN provided reasonable explanations for these factors as she testified that: she had only failed to take her psychotropic medication for five months; she had been experiencing terrible back pain that rendered her incapable and unwilling to do anything including leave her room to meet with the counselor or even get dressed, and that she was suffering from a cold and had no appetite.[2] (ER @ 138:2-140:3.)

---

[2] Plaintiff urges that the district court's selective references to SHEEHAN'S deposition testimony further demonstrates that it did not construe the evidence in a manner favorable to her as the nonmoving party and ultimately illustrates why consideration of her testimony for purposes of establishing the reasonableness of the Defendant Officer's actions is improper.

For example, the district court did not cite this portion of SHEEHAN'S testimony in which she explains her behavior that Hodge cites as warranting a §5150 hold on her. However, the district court did cite SHEEHAN'S testimony regarding her actions and intentions in wielding a knife in front of the Defendant Officers.

Construing the facts in a light favorable to SHEEHAN, as long as she was in her room unmolested she was no *imminent* danger to herself or others and there was no immediate need for a warrantless entry.

However, even if SHEEHAN agrees that the Defendant Officers had a duty to investigate Hodge's § 5150 report and enter her room to determine if she was indeed "gravely disabled," REYNOLDS and HOLDER'S second entry into SHEEHAN'S home was not subject to either of the warrantless entry exceptions. Upon their initial entry, the Defendant Officers confirmed that SHEEHAN: was alone in her room with no other innocents in danger, wanted to be left alone in her room and that she would not display any aggression so long as she was left alone. Given that SHEEHAN had not left her room for weeks and did not attempt to escape or leave her room in the time ensuing between when Hodge entered the room (and informed her that she was going to be hospitalized (ER @ 140:4-22)) and when HOLDER arrived on the scene, the Defendant Officers had no

---

Plaintiff maintains that consideration of SHEEHAN'S deposition testimony as a means to bolster the reasonableness of the Defendant Officer's actions is improper because the Defendant Officers did not know what was in her mind and did not use this knowledge to inform their actions. Moreover, the conflicting and inconsistent nature of SHEEHAN'S testimony definitely requires credibility determinations that are required to be performed by a trier of fact.

reasonably objective basis for opining that this was an "immediate need" situation, as there was no indication that she would leave. The Defendant Officers knew that there were no innocents in SHEEHAN'S room or the rest of the residence for that matter, and confirmed this upon their initial entry. The district court's opinion that that Defendant Officers reasonably believed SHEEHAN might harm herself is not supported by the evidence and reveals that the court impermissibly made credibility determinations and drew inferences not favorable to the non-moving party. SHEEHAN was lying on her bed when Hodge entered her room and again upon the Defendant Officers' initial entry, and she did not have a history of being suicidal. SHEEHAN was clear that she wanted to be left alone and as long as she was left alone she was not a danger to anyone, including herself.

The district court's citation to *US v. Black*, 482 F.3d 1035 (9th Cir. 2007), is unavailing. (ER @ 14:19-23.) In *Black*, the suspect beat his girlfriend and threatened her with a gun. (*Id*. at 1039.) She called 911 for police assistance with retrieving her belongings from inside the apartment where she lived with Black. *Id*. When the police arrived on the scene, the girlfriend was nowhere to be found. *Id*. The police saw Black outside of the apartment. With his permission they searched him and found a key to the apartment, used the key to sweep the place where they found no one but did see a gun lying in the open, they closed the

apartment and sought a warrant for the gun. *Id.* This case is inapposite. In *Black*, the victim of domestic violence called 911 for emergency assistance and the police entered because they were worried that the victim was inside the apartment harmed. Here, Hodge, despite his encounter with SHEEHAN and his representation that her mental condition was "gravely disabled" for purposes of placing her on a §5150 hold, called a general police dispatch number (thereby not treating this as an emergent situation) and the Defendant Officers spoke with Hodge upon their arrival, so there was no question of him being inside SHEEHAN'S room harmed. (ER @ 306:16-25, 315:4-15.) As such, the District Court likening the subject-incident to that presented in *Black* is not supported by the evidence

Citing *Fisher v. City of San Jose*, 558 F.3d 1069 (9th Cir. 2009) (en banc), the District Court dismissed SHEEHAN'S argument regarding the Defendant Officer's unlawful second entry as meritless. (ER @ 15:7.) In *Fisher*, this court held that a 12-hour "armed standoff was a single Fourth Amendment event, a continuous process of formalizing [an] arrest." *Id.* at 1077.[3] Drawing a distinction

---

[3] SHEEHAN notes that *Fisher* is also inapposite in that over a 12-hour period the police tried a multiplicity of less-lethal techniques to resolve the armed-standoff without harming the obviously impaired and drunken suspect, including: clearing

between two consecutive and overlapping "seizures" is a common and longstanding practice in Fourth Amendment jurisprudence, as in the case of so-called "*Terry* stops," *see Terry v. Ohio,* 392 U.S. 1, 16–19, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *see also, e.g., Rhode v. City of Roseburg,* 137 F.3d 1142, 1144 (9th Cir. 1998), or of unconstitutionally excessive force, *see Chavez v. Martinez,* 538 U.S. 760, 773 n. 5, 123 S.Ct. 1994, 155 L.Ed.2d 984 (2003) (plurality opinion); *Graham v. Connor,* 490 U.S. 386, 388, 394, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); *Pierce v. Multnomah County,* 76 F.3d 1032, 1042 (9th Cir. 1996) (quoting *Robins v. Harum,* 773 F.2d 1004, 1010 (9th Cir. 1985)).  These longstanding precedents demonstrate that generally an individual who has already been seized can still be *further* seized for purposes of the Fourth Amendment—a proposition that is not inconsistent with *Fisher* 's holding that Fourth Amendment infringements suffered between the initiation of a seizure and the perfection, or

---

the apartment building of all other residents, luring the suspect's wife from inside the apartment and out of harm/danger, waiting for negotiators and a back-up tactical stand-off team, giving the suspect a throw-phone, having him speak with multiple negotiators (whom he threatened to kill if they entered his home), and utilizing the less-lethal options of tear-gas and a bean bag shot which ultimately subdued him enough to effect the arrest without subjecting him to more serious physical harm.

"formalizing," of that same seizure may not be analyzed independently for purposes of the warrant requirement. *Fisher*, 558 F.3d at 1077.

SHEEHAN urges that the district court failed to consider factors favorable to her position that are properly considered under the totality of the circumstances. This Court has held that "an additional factor [to] consider in [] *Graham* analysis is the availability of alternative methods of capturing or subduing a suspect." *Smith v. City of Hemet*, 394 F.3d 689, 703 (9th Cir. 2005) (citing *Chew v. Gates*, 27 F.3d 1432, 1441 n. 5 (9th Cir. 1994)). The Defendant Officers testified that they had called for back-up assistance and that upon their entry of SHEEHAN'S home they heard back-up officers arriving on the scene. The arrival of back-up officers with access to less-lethal means to subdue SHEEHAN, and the possible arrival of negotiator trained in communicating with suspects with diminished capacity are factors that the district court failed to consider here.

Similar to *Smith*, SHEEHAN argues that REYNOLDS and HOLDER'S conduct violated applicable police practice standards and that there were alternative techniques available for subduing her that presented a lesser threat of death or serious injury. SHEEHAN presented the report and testimony of police practice expert Lou Reiter, analyzing whether the Defendant Officers' conduct

comported with law enforcement standards. Reiter relied upon California's Peace Officer Standards and Training (POST), which are applicable to all state police officers and are a part of the CITY'S Department policy. (ER @ 94-96.) Reiter concluded that POST standards required the Defendant Officers to exercise patience, gather more information, and conduct themselves in a manner that did not further agitate SHEEHAN. (ER @ 97-98.) An expert's opinion on police actions is a factor to be considered in the totality of the circumstances and a rational jury could rely upon such evidence in assessing whether the officers' use of force was unreasonable. See *Billington v. Smith*, 292 F.3d 1177, 1189 (9th Cir. 2002) (holding "an expert's report that an officer's conduct leading up to a deadly confrontation was imprudent, inappropriate, or even reckless"); *Larez v. City of Los Angeles*, 946 F.2d 630, 635 (9th Cir. 1991) (as amended) (finding that testimony of "an expert on proper police procedures and policies" was relevant and admissible); *Davis v. Mason County*, 927 F.2d 1473, 1484–85 (9th Cir. 1991) (as amended) (testimony of plaintiffs' police practices expert that officers violated law enforcement standards properly received).

Moreover, the district court necessarily made credibility determinations in rejecting SHEEHAN'S argument that she no longer posed any danger to the Defendant Officers once she closed her door after their initial entry and in finding

that it was objectively reasonable for them to believe that SHEEHAN needed immediate medical assistance.  (ER @ 15:1-12.)  The Court opined that when SHEEHAN closed her door on REYNOLDS and HOLDER "they had no way of knowing whether she might escape through a back window or fire escape, whether she might hurt herself, or whether there was anyone else in her room whom she might hurt."  (ER @ 15:13-16.)  This opinion either belies the evidence that SHEEHAN proffered or draws inferences not in favor of SHEEHAN.  SHEEHAN had not left her room for several days and she did not attempt to leave after Hodge told her she had to be taken to the hospital pursuant to § 5150 hold; as such, believing that she would attempt to escape is not supported by the evidence.  In addition, SHEEHAN was vehemently protecting her right to be left alone in her home, such that it is not reasonable to believe that she would suddenly attempt to escape the confines of her room.  Moreover, the Defendant Officers had called for back-up assistance and heard approaching sirens when they first made contact with SHEEHAN, such that it was patently unreasonable for them to believe she would successfully escape.  Finally, Hodge told the Defendant Officers that SHEEHAN was not only alone in her room but also completely alone in the entire residence.  Despite the District Court's citation to the fact that Hodge had checked the "gravely disabled" and "danger to herself and others" boxes on the § 5150

application, there was no basis for the belief that SHEEHAN would harm herself. SHEEHAN had been hold-up in her room for weeks without actively dressing herself, all of her behaviors were slow deteriorations that would take time to actually manifest into physical harm, such as purportedly not eating and bathing. Moreover, the §5150 application cannot serve as the sole basis of the totality of the circumstances presented to the Defendant Officers. The Defendant Officers reliance on the §5150 application must also be informed by Hodge's verbal representations and upon their own observations.

Accordingly, the district court's analogy to *Black,* 482 F.3d at 1040, that the Defendant Officers "would [have been] harshly criticized had they not investigated" is misplaced here. (ER @ 15:12-16.) The district court was dismissive of SHEEHAN'S argument that the factors cited (i.e. risk of SHEEHAN'S escape, or hurting herself, or presence of someone else in the room) by the court are not supported by the record. And the district court's reliance on Hodge's representations on the §5150 application must be qualified by Hodge's verbal representations to the Defendant Officers and upon their own observations. As such, the district court erroneously granted summary judgment in favor of Defendants as to SHEEHAN's unlawful entry claims.

**DEFENDANT OFFICERS' USE OF EXCESSIVE FORCE**

The District Court granted summary judgment on SHEEHAN'S excessive force claims, opining that the Defendant Officers' use of deadly force shooting SHEEHAN multiple times was objectively reasonable. (ER @ 16:17-18, 17:1-2.) Again, the district court improperly granted summary judgment on this claim.

A Fourth Amendment claim of excessive force is analyzed under the framework set forth by the Supreme Court in *Graham v.* This analysis requires balancing the "nature and quality of the intrusion" on a person's liberty with the "countervailing governmental interests at stake" to determine whether the use of force was objectively reasonable under the circumstances. *Id.* at 396. The reasonableness-of-the-use-of-force inquiry is guided by the following factors: 1) the quantum of force used to effectuate the arrest; 2) whether the suspect posed a threat to the safety of the officers or others; 3) the severity of the crime at issue; 4) whether the individual resisted arrest or attempted to flee; and 5) the availability of alternative methods of capturing or subduing the suspect. *Smith v. City of Hemet*, 394 F.3d 689, 702-03 (9th Cir. 2005) (en banc)) With respect to deadly force, its use is reasonable only if necessary to prevent flight and the officer has probable cause to believe that the suspect poses a significant threat of death or serious bodily harm to others. *Id.* At 704 (citing *Tennessee v. Garner*, 471 U.S. 1, 3, 105

S.Ct. 1694, 85 L.Ed.2d 1 (1985)).  In all circumstances, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene rather than with the 20/20 vision of hindsight."  *Graham*, 490 U.S. at 396 (quoting *Terry v. Ohio*, 392 U.S. 1, 22-27, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1988)).)

Determining whether a police officer's use of force was reasonable or excessive therefore "requires careful attention to the facts and circumstances of each particular case" and a "careful balancing" of an individual's liberty with the government's interest in the application of force. *Id.; see Deorle v. Rutherford,* 272 F.3d 1272, 1279–81 (9th Cir. 2001). "Because such balancing nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom ... summary judgment or judgment as a matter of law ... should be granted sparingly" in cases involving claims of excessive force.  (*Santos v. Gates,* 287 F.3d 846, 853 (9th Cir. 2002) (citation omitted); *accord Wilkins v. City of Oakland,* 350 F.3d 949, 956 (9th Cir. 2003) ("Where the officers' entitlement to qualified immunity depends on the resolution of disputed issues of fact in their favor, and against the non-moving party, summary judgment is not appropriate."); *see also Saucier v. Katz,* 533 U.S. 194, 216, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) (Ginsburg, J., concurring) ("Of course, if an excessive force claim turns on

which of two conflicting stories best captures what happened on the street, *Graham* will not permit summary judgment in favor of the defendant official."). Thus, while it is true that police officers "'are often forced to make split-second judgments,' "it is equally true that "even where some force is justified, the amount actually used may be excessive." *Santos,* 287 F.3d at 853 (citations omitted) (emphasis added).

The district court found that the force REYNOLDS and HOLDER used was reasonable and that based on the totality of the circumstances, it was reasonable for the Defendant Officers to shoot SHEEHAN multiple times.  Again, the district court impermissibly made factual and credibility determinations that are the province of the trier of fact to come to this conclusion.

The district court cites the fact that SHEEHAN threatened to kill the officers with a knife in its reasonableness determination.  While it is undisputed that SHEEHAN brandished a knife, material questions of fact remain as to the threatening aspect.  SHEEHAN testified that she revealed a kitchen knife to the Defendant Officers to show them that she was armed, in response to feeling threatened and harassed by the officers, and symbolically to show that their fight was not equitable because all she had was a knife and they were armed with guns.

(ER @ 152:21-153:5, 154:22-155:15.)  SHEEHAN testified that she had the knife upraised but not pointed at anyone.  (ER @ 155:21-22.)  The Defendant Officers testified variously that SHEEHAN had the knife high in the air or in her hand down by her thigh not pointed at all.  (ER @ 240:9-241:15; 195:7-25.)  The Defendant Officers claim that SHEEHAN said, "I'm going to kill you" as she advanced toward them.  (*Id.*)  However, SHEEHAN testified that she said I'll kill you while the door was closed, told the officers to go away because she didn't need their help, and that when the door was opened she screamed "I can't see" (after being pepper sprayed) as she staggered and fell across the door threshold. (ER @ 158-159.)  In any event, SHEEHAN was clear that she felt threatened and harassed by the Defendant Officers and was trying to protect her right to be left alone in her home.

The district court's citation to this Court's decisions in *Gregory v. County of Maui*, 523 F3d 1103 (9th Cir. 2008) and *Reynolds v. County of San Diego*, 84 F.3d 1162 (9th Cir. 1996) are misplaced.  In *Gregory*, the suspect: was at a music studio with two other men, was behaving bizarrely (appearing high on drugs claiming that the devil was present), and assaulted one of the men.  *Gregory*, 523 F.3d at 1105-1106.  Gregory *pointed* a pen at officers when they arrived and refused to put the pen down when the officers asked him.  *Id.* at 1106.  The officers used their hands

to confine and disarm Gregory while he struggled—this encounter caused Gregory to have a heart attack and die. *Id.* Whereas in *Reynolds*, the suspect was acting erratically and armed with a knife outside of a gas service station which caused passersby to inform a nearby sheriff's deputy about his behavior and the gas station attendant to call 911. *Reynolds v. County of San Diego*, 84 F.3d at 1164. In subduing Reynolds, a sheriff's deputy told him not to move and to drop the weapon. *Id*. at 1164-1165. Reynolds complied with some of the deputy's commands, but as the deputy went to disarm him, he made a sudden swinging motion with the knife at the deputy who then shot and killed him. *Id*. at 1165. *Reynolds* is inapposite because the suspect was not in a confined area and he was a threat to innocents, as there were other people in the vicinity who he had indiscriminately antagonized. Reynolds also played a cat-and-mouse game with the deputy feigning compliance with being detained and then swung a knife at him. Neither of these situations where the suspects either assaulted people or posed actual threats to people in public places and continued the open threat to the responding officers is analogous to our situation.

In addition, the district court cites that the Defendant Officers were in immediate risk to officer safety; however, SHEEHAN has already shown that the Defendant Officers provoked the dangerous situation. To bolster this argument,

the District Court cites SHEEHAN'S testimony that she did not intend to put the knife down.  (ER @ 17:11-12.)  Plaintiff asserts that consideration of SHEEHAN'S testimony in this manner is improper.  The reasonableness of the Defendant Officers' actions depends on what was in *their* minds at the time of the subject-incident—not SHEEHAN'S unexpressed thoughts.  Also, crediting SHEEHAN'S testimony in this instance requires the credibility determination of a jury.  At the time of her Deposition, SHEEHAN admitted to being off her medication for months and testified that she had been diagnosed as schizophrenic when she was much younger, and while she appeared to have a vivid memory of the subject-incident there were obvious gaping inconsistencies in her testimony, such as, she recalled opening the door for the defendant officers, that there was a single entry by the officers, importantly, she had no memory of being shot in the face.  While some of her testimony was candid, e.g., her willingness to defend herself against the police with a knife knowing that they had guns, her testimony also smacks of irrationality that begs the question whether any of it is credible. *See, e.g., United States v. Sine,* 493 F.3d 1021, 1040 (9th Cir. 2007) ("The jury has the ultimate task of making credibility determinations about individual witnesses....").  Moreover, the district court did not categorically credit all other portions of SHEEHAN'S testimony.  For example, SHEEHAN testified that she

simply held the knife but did not point it at anyone where the officers testified that

she threatened them with the knife, she also testified that she was blinded by the

pepper spray and stumbled and staggered across the door threshold, whereas the

officers claimed that the pepper spray had no effect on SHEEHAN.  If

SHEEHAN'S testimony is credited, then she staggered blindly with a knife in her

hand and was in the process of falling when the Defendant Officers shot her and

she was not trying to or feigning to stab anyone.  The district court makes no

mention of SHEEHAN'S theory of the case that she was impacted by the pepper

spray and staggered blindly due to the spray; thus revealing that the court made

impermissible findings of fact in this point.

SHEEHAN urges that the Defendant Officers violated her Fourth

Amendment rights by unlawfully entering her home and ignoring her known

mental infirmities and thereby instigated the near-deadly encounter and

unnecessarily agitated the situation.  This Court allows "consideration of the events

leading up to a shooting" as a factor in the totality of the circumstances in

evaluating the reasonableness of a use of force; however, it does not, "permit a

plaintiff to establish a Fourth Amendment violation based merely on bad tactics

that result in a deadly confrontation that could have been avoided."  *Billington*, 292

F.3d at 1190.  "Where an officer intentionally or recklessly provokes a violent

confrontation, if the provocation is an independent Fourth Amendment violation,
[the officer] may be held liable for his otherwise defensive use of deadly force."
*Id.* at 1189; accord *Espinosa v. City and Cnty. of San Francisco*, 598 F.3d 528, 539
(9th Cir. 2010) (affirming denial of summary judgment where officer entered
victim's home unlawfully, thereby provoking deadly confrontation); *Alexander v.
City and Cnty. of San Francisco*, 29 F.3d 1355, 1366-67 (9th Cir. 1994) (finding
triable issue as to provocation where shooting admittedly was in self-defense, but
officers unlawfully entered home of individual whom they knew to be mentally ill
and who had committed no crime). "The basis of liability for the subsequent use
of force is the initial constitutional violation, which must be established under the
Fourth Amendment's reasonableness standard." *Id.* at 1190.

The district court found the mental illness factor inured to the benefit of the
Defendant Officers because SHEEHAN was known to be mentally ill, acting
irrationally, was not subdued by less forceful means, and HOLDER was trapped
with her back against the wall when she shot SHEEHAN.  (ER @ 17:17-20.)
SHEEHAN urges that her mental illness was not taken into account properly. [4]

---

[4] The district court's citation to *Robbins v. City of Hanford*, 2006 WL 1716220 and
*Barber v. City of Santa Rosa*, 2010 WL 5069868 are inapposite.  In *Robbins*, the
suspect had a long history of mental illness and of becoming violent and assaultive

She may have been behaving irrationally but she was not assaultive unless provoked. The Defendant Officers could only exacerbate the situation by re-entering SHEEHAN'S room when it was not necessary for them to do so.

As such, the district court erroneously found the Defendant Officers' use of deadly force was reasonable, particularly in light of their unlawful entry into SHEEHAN'S residence.

## DEFENDANT CITY'S MUNICIPAL LIABILITY

The district court found that since REYNOLDS and HOLDER did not commit any underlying constitutional violations, the CITY was not exposed to

---

with family members with whom he lived. The police were invited into the residence by the suspect's family. The suspect advanced on one of the officers, while making threatening movements with the knife until he backed the officer into a corner. In *Barber*, the police again were invited into a group home for mentally infirm to apprehend the suspect who was off his medication, screaming and acting irrationally and had threatened another resident with a butcher knife and was indiscriminately swinging the knife around. SHEEHAN did not assault or confront any of her fellow residents or occupied shared space with the other residents of Conard House.

SHEEHAN notes there is a common thread in the excessive force cases that the district court cites, that is very different from the instant matter. In those cases, the officers made provisions for the known mentally infirm suspects, e.g. investigating rear escape possibilities, allowing someone else to attempt to speak and calm the suspect, waited for back-up officer with less-lethal weapons.

municipal liability.  (ER @ 19-20.)  SHEEHAN asserts that there were underlying constitutional violations and that the CITY is liable for *Monell* violations.

Municipalities are considered "persons" under 42 U.S.C. § 1983 and therefore may be liable for causing a constitutional deprivation. *Monell v. Department of Soc. Servs.,* 436 U.S. 658, 690 (1978); *Long v. County of Los Angeles,* 442 F.3d 1178, 1185 (9th Cir. 2006).  Liability only attaches where the municipality itself causes the constitutional violation through "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Monell,* 436 U.S. at 694.  Municipal liability may be premised on: (1) conduct pursuant to an expressly adopted official policy; (2) a longstanding practice or custom which constitutes the 'standard operating procedure' of the local government entity; (3) a decision of a decision-making official who was, as a matter of state law, a final policymaking authority whose edicts or acts may fairly be said to represent official policy in the area of decision; or (4) an official with final policymaking authority either delegating that authority to, or ratifying the decision of, a subordinate. *See Price v. Sery,* 513 F.3d 962, 966 (9th Cir. 2008); *Lytle v. Carl,* 382 F.3d 978, 982 (9th Cir. 2004).

A "custom" for purposes of municipal liability is a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well-settled as to constitute a custom or usage with the force of law." *City of St. Louis v. Praprotnik,* 485 U.S. 112, 127 (1988); *Los Angeles Police Protective League v. Gates,* 907 F.2d 879, 890 (9th Cir. 1990). A "policy" is a deliberate choice to follow a course of action ... made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Fogel v. Collins,* 531 F.3d 824, 834 (9th Cir. 2008). In order to show ratification, a plaintiff must show that the "authorized policymakers approved a subordinate's decision and the basis for it." *Praprotnik, supra,* 485 U.S. at 127; *Lytle,* 382 F.3d at 987. Neither the mere failure to overrule a subordinate's actions, nor the mere knowledge of an unconstitutional act by themselves can constitute ratification. *Lytle, supra,* 382 F.3d at 987; *Gillette v. Delmore,* 979 F.2d 1342, 1348 (9th Cir. 1992). Instead, the "policymaker must have knowledge of the constitutional violation and actually approve of it." *Lytle,* 382 F.3d at 987. Although the plaintiff must establish that there is a genuine issue of material fact, generally "ratification is a question for the jury." *Fuller v. City of Oakland,* 47 F.3d 1522, 1534 (9th Cir. 1995).

Moreover, A municipality's failure to train its employees may create § 1983 liability where the "failure to train amounts to deliberate indifference to the rights of persons with whom the [employees] come into contact." *City of Canton v. Harris,* 489 U.S. 378, 388 (1989); *Lee v. City of Los Angeles,* 250 F.3d 668, 681 (9th Cir. 2001).  "The issue is whether the training program is adequate and, if it is not, whether such inadequate training can justifiably be said to represent municipal policy."  *Long, supra,* 442 F.3d at 1186.  A plaintiff alleging a failure to train claim police officers must show: (1) he was deprived of a constitutional right, (2) the municipality had a training policy that "amounts to deliberate indifference to the [constitutional] rights of the persons' with whom [its police officers] are likely to come into contact;" and (3) his constitutional injury would have been avoided had the municipality properly trained those officers. *Blankenhorn v. City of Orange,* 485 F.3d 463, 484 (9th Cir. 2007); *Lee, supra,* 250 F.3d at 681. A municipality is "deliberately indifferent" when the need for more or different action, "is so obvious, and the inadequacy [of the current procedure] so likely to result in the violation of constitutional rights, that the policymakers ... can reasonably be said to have been deliberately indifferent to the need." *City of Canton,* 489 U.S. at 390; *Lee,* 251 F.3d at 682.

As discussed supra, SHEEHAN has established that a constitutional violation occurred in that the Defendant Officers used excessive force on her.  In addition, SHEEHAN has presented the opinion testimony of Police Practice expert Lou Reiter.  See e.g., *Azevedo v. City of Fresno*, 2010 WL 2353526, *19 (ED Cal. 2010) (finding the opinion testimony of police practice expert sufficient to present a question of fact for the jury on *Monell* liability for failure to train and enact policy, thereby denying summary judgment.)  As discussed above, Reiter opined that the Defendant Officers consciously failed to employ reasonable and generally accepted police practices for dealing with SHEEHAN, someone they knew to be suffering from a mental illness who was obviously acting irrationally and with diminished capacity.  (ER @ 93-94.)  In addition, Reiter opined that these generally accepted police practices for dealing with persons who are emotionally disturbed are documented in training materials and written orders issued by CITY. (ER @ 95-96.)  Moreover, REYNOLDS and HOLDER acknowledged that they received training regarding the same materials upon which Reiter relies.  (ER @ 169:11-20; 213:14-214:24, 215:6-15.)  However, REYNOLDS also testified that the department training does not necessarily control an officer's actions in the field, and she admits that when they endeavored to open SHEEHAN's door the second time and subdue her, she was no longer considering SHEEHAN's mental

infirmity. (ER @ 170:25-171:6, 172:11-18,193:3-12, 206:1-10.) Officer Zachos testified that his memory of department training regarding dealings with mentally unstable people is that the main focus is officer safety and then quantum of force necessary based on the situation but not based on whether the person is stable. Based on the foregoing, a reasonable finder of fact could find *Monell* liability based on a failure to adequately train and ratification by CITY, particularly given that: CITY purports to adequately train its officers on their interaction with people who are mentally disabled, Reiter opined that the REYNOLDS and HOLDER openly defied the very training that CITY espouses as policy, REYNOLDS—an advanced officer—indicated that these "policies" are mere suggestions rather than policy an officer is required to follow, and both Defendant Officers defied CITY policy with impunity. Moreover, the Defendant Officers' decision-making is apparently and/or tacitly endorsed by CHIEF FONG and CITY.

A reasonable trier of fact could determine that these Defendants' failure to adequately train its officers on how to properly detain known mentally infirm suspects and/or admonish its officers when they fail to follow departmental policies regarding the interaction with the mental impaired, effectively rubber-stamps and leaves the citizenry vulnerable to the REYNOLDS and HOLDER'S violations of law and policy.

## AMERICANS WITH DISABILITIES ACT

In her fourth cause of action, SHEEHAN asserts claims pursuant to the Americans with Disabilities Act (ADA).  (ER @ 63-64.)  The district court granted summary judgment as to SHEEHAN'S ADA claims as to all Defendants, finding that her claims against the Defendant Officers fail as a matter of law and that she cannot state a claim against the CITY for actions taken by the Defendant Officers prior to her arrest.  (ER @ 21:7-12.)  SHEEHAN asserts that she properly states a claim for ADA violations against CITY and raises genuine issues of material fact on questions of whether the Defendant Officers failed to reasonably accommodate her disability.

The ADA prohibits a public entity from discriminating against an individual on the basis of a qualified disability.  42 U.S.C. §12132.  Title II of the ADA provides that: "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  The ADA, thus, not only prohibits public entities from discriminating against the disabled, it also prohibits public entities from *excluding* the disabled from participating in *or* benefitting from a public program, activity, or service "solely by reason of disability."  *Lee v. City of Los*

*Angeles*, 250 F.3d 668, 690-692 (9th Cir. 2001) (citations omitted). "[T]he ADA's broad language brings within its scope anything a public entity does," including the services of "local law enforcement agencies." *Id.* at p. 691.

In the Complaint, SHEEHAN styles her ADA claims as against "All Defendants." (ER @ 63:23.) SHEEHAN urges that CITY (not REYNOLDS and HOLDER in their individual capacities) violated her right to the protection of the ADA by failing to accommodate her disability during her arrest. In so arguing, Sheehan acknowledges that this Court has determined that "a plaintiff cannot bring an action under 42 U.S.C. § 1983 against a State official in their individual capacity to vindicate rights created by Title II of the ADA or section 504 of the Rehabilitation Act." *Vinson v. Thomas*, 288 F3d 1145, 1156 (9th Cir. 2002).

As noted by the district court, this Court has not addressed the question of whether the ADA extends to arrests. (ER @ 21, n. 15.) Instead the district court cites the Fifth Circuit decision in *Hainze v. Richards*, 207 F.3d 795 (5th Cir. 2000) as instructive on the issue.[5] (ER @ 20:15-21:4.) In *Hainze*, the suspect's aunt

---

[5] Other Circuits have found that the ADA applies to the context of arrests. *Yeskey v. Commonwealth of Pennsylvania Dep't of Corrections,* 118 F.3d 168, 170 (3d Cir.1997), *aff'd,* 524 U.S. 206, 118 S.Ct. 1952, 141 L.Ed.2d 215 (1998) (holding that Congress intended the terms "program" and "activity," as used in Title II of the ADA, to be "all-encompassing"); *Gorman v. Bartch,* 152 F.3d 907 (8th Cir.

called 911 for assistance in transporting her suicidal nephew to the hospital.  *Id*. at

797.  She advised the police of her nephew's history of depression, and that he was

then under the influence of alcohol, anti-depressants, carrying a knife, and

threatening to commit suicide-by-cop.  *Id*.  The defendant police officers found

Hainze in the parking lot a convenience store holding the knife and talking to

people in a car.  *Id*.  The officers then shot Hainze in the chest as he approached

them with the knife in his hand.  *Id*.  Based on these circumstances, the *Hainze*

Court determined that section 12132 "does not apply to an officer's on-the-street

responses to reported disturbances or other similar incidents, whether or not those

calls involve subjects with mental disabilities, prior to the officer's securing the

scene and ensuring that there is no threat to human life."  *Id*. at 801.  The court

reasoned that to require "officers to factor in whether their actions are going to

comply with the ADA, in the presence of exigent circumstances and prior to

securing the safety of themselves, other officers, and any nearby civilians, would

pose an unnecessary risk to innocents."  *Id*.  However, the *Hainze* Court also

---

1998), *rev'd on other grounds, Barnes v. Gorman,* 536 U.S. 181, 122 S.Ct. 2097,
153 L.Ed.2d 230 (2002) (finding that local police department fell within the ADA
definition of "public entity" and that a man injured while being transported to the
police station after his arrest could pursue a claim under the ADA)

determined that "[o]nce the area was secure and there was no threat to human safety, the [Defendant Officers] would have been under a duty to reasonably accommodate [the plaintiff's] disability in handling and transporting him to a mental health facility." *Id*. at 802.

The subject-incident is distinguished from *Hainze*. When the police encountered Hainze he was suicidal, he was in a public place, and talking to innocent bystanders while he was armed with a knife. Here, SHEEHAN was not suicidal, was located inside the confines of her one-room home and the Defendant Officers knew that there were no other innocent people in SHEEHAN'S room or anywhere nearby. The district court found the instant matter analogous to the facts presented in *Hainze* and distinguished it from *Schreiner v. City of Gresham*, 681 F.Supp.2d 1270 (D. Or. 2010). (ER @ 21 n. 15.) In *Schreiner*, police responded to a dispatch call requesting medical assistance for Schreiner who was suffering from a diabetic episode and was holding a syringe with a bent needle to her arm, attempting to inject herself with insulin that would have further deteriorated her situation. *Id*. at 1273. Due to her medical condition, Schreiner was unable comply with the officers' orders to drop the syringe and they tased her to force her compliance. The *Schreiner* Court denied summary judgment as to Schreiner's ADA and Rehabilitation Act claims opining that at the time the defendant officers

tased her, "the situation was under control and rather than inflicting pain upon her, they should have consulted with paramedics and administered medical treatment." *Id*. at 1279.

Here, the district court opined that unlike the situation in *Schreiner*, the subject-incident was not "under control" at the time REYNOLDS and HOLDER shot SHEEHAN.  Here again, the district court impermissibly makes factual determinations to reach this conclusion.  Construing the facts in the light favorable to SHEEHAN, at the time SHEEHAN closed her door on the Defendant Officers, the situation was "under control" in that she was not a danger to them or innocents, and she was clearly contained in her room which allowed for the passage of time allowing for the Defendant Officers to do all that POST requires of then when responding to the mentally disabled.  Indeed, there was no reason for the Defendant Officers not to follow the POST requirements as described by police practice expert Lou Reiter.[6]  (ER @ 94-96.)  The Defendant Officers had confirmed that SHEEHAN was in her room, as Hodge described—alone and in need of medical assistance and treatment.  This is analogous to *Schreiner* in that

---

[6] Reiter described the training on police dealing with person who may be emotionally disturbed through the acronym CCCT: Coordination, Containment, Communication, Time.  (ER @ 94-95.)

when the officers tased Schreiner she was still in close proximity to the syringe and still threatening to inject herself with it to her detriment; essentially, she was still in need of medical assistance but it was clear she did not pose a threat to innocents or the officers themselves. *Schreiner, supra,* at 1273. Similarly, at the time SHEEHAN closed the door on the Defendant Officers she was still in need of medical assistance (i.e. transport to a mental health facility) but she did not pose any harm to any innocents or to REYNOLDS and HOLDER—with her door closed. At this point the Defendant Officers were required to utilize POST approved methods of dealing with the mentally disabled, rather than escalate the situation in direct contravention of POST standards. A reasonable trier of fact could determine that the Defendant Officers re-instigated the confrontation by forcing SHEEHAN'S door open upon their second entry to her home. Accord, *Hogan v. City of Easton*, 2004 WL 1836992, *7 n. 3 (E.D. Pa. 2004) (finding *Hainze* inapplicable where "the situation was under control" and the mental disabled suspect was calmed upon the arrival of the police.)[7] This action was

---

[7] Similarly in *Hogan*, the police, in responding to an assistance call for a suspect with borderline personality disorder, entered into an armed standoff with a suspect that was protecting his right to be left alone in his home. The police further exacerbated and agitated the suspect thrusting him further into emotional deterioration by having a barking canine officer on site, refusing to allow people the suspect trusts attempt to call him down and end the standoff, cursed him,

especially unreasonable given that the Defendant Officer's had heard the arrival of back-up officers with means to deploy less-lethal weapons and methods of diffusing the situation.

As such, the district court erroneously granted summary judgment as to SHEEHAN'S ADA claims.

## SHEEHAN'S STATE LAW CLAIMS

Citing *Bias v. Moynihan*, 508 F3d 1213, 1221 (9th Cir. 2007), the district court granted summary judgment as to SHEEHAN'S state law causes of action finding that the Defendant Officers were entitled to immunity pursuant to California Welfare & Institutions Code section 5278.  (ER @ 21.)  SHEEHAN urges that Section 5278 is not invoked here and this case is distinguished from *Bias v. Moynihan*, 508 F.3d 1212 (9th Cir. 2007), where the police officer based upon his own observations instituted the section §5150 hold.  *Id*. at 1220-1221.  Here, the Defendant Officers did not detain SHEEHAN pursuant to section §5150; Hodge, who was fully authorized to do so, instituted the section §5150 hold on SHEEHAN.  The Defendant officers were there to assist and did not make out the section §5150 application or have anything to do with it.

treated him in a demeaning manner, which all culminated in the police shooting the suspect several times.

Section 5278 provides that individuals authorized to detain a person for a 72-hour treatment and evaluation pursuant to section 5150 shall not be held either criminally or civilly liable for exercising this authority in accordance with the law. However, California Courts have not found this immunity to be absolute and have allowed negligence claims stemming from actions arising during the period of confinement. *Jacobs v. Grossmont Hospital*, 108 Cal.App.4th 69, 79 (2003) (concluding that in enacting section 5278, the Legislature did not intend to immunize health care providers from liability for breaches of the applicable standards of care during the period of confinement); *Gonzalez v. Paradise Valley Hospital*, 111 Cal.App.4th 735, 741 (2003) (affirming *Jacobs* holding that section 5278 is inapplicable to actions for negligence stemming from acts or omissions in evaluation or treatment during 72-hours holds). Similarly, SHEEHAN asserts that, at the very least, the Defendant Officers are not immunized from their negligent conduct in detaining her pursuant to §5150 hold.

**Negligence**

To prevail on her negligence claim, SHEEHAN must show that the Defendant Officers acted unreasonably and that the unreasonable behavior harmed her. See *Price v. County of San Diego*, 990 F.Supp. 1230, 1245 (1998). The Defendant Officers owed a duty of care not to use deadly force unreasonably.

*Grudt v. City of Los Angeles*, 2 Cal.3d 575, 587 (1970) (holding "[a]t the very least, the evidence favorable to plaintiff raised a reasonable doubt whether [the officers] acted in a manner consistent with their duty of due care when they originally decided to apprehend Grudt, when they approached his vehicle with drawn weapons, and when they shot him to death"). Although it is an accurate statement of the law that officers are immune from negligence liability for their tactical decisions preceding a use of force, it is far from complete.

Here, Plaintiff has established that the Defendant Officers acted unreasonably under Fourth Amendment standards and that there is a basis for respondeat superior liability against CITY.

**Assault and Battery**

SHEEHAN properly states claims for assault and battery. A peace officer who uses unreasonable or excessive force in making a lawful arrest or detention commits a battery upon the person being arrested or detained as to such excessive force. In a battery action against a police officer, the plaintiff has the burden of proving unreasonable force as an element of the tort. *Edson v. City of Anaheim*, 63 Cal.App.4[th] 1269, 1272 (1998). Certainly, the Defendant Officer's use of deadly force in shooting SHEEHAN multiple times upon their unlawful entry into her home was excessive and unreasonable.

## Civil Code Section 52.1

California Civil Code section 52.1 provides for the institution of a civil action against a person who "interferes by threats, intimidation, or coercion, or attempt to interfere by threats, intimidation, or coercion, with the exercise or enjoyment by any individual . . . of rights secured by the Constitution or laws of the United States, or . . . of this state."  To establish a claim under California Civil Code section 52.1, a plaintiff needs to establish that the defendants "interfered with the plaintiff['s] constitutional rights by the requisite threats, intimidation, or coercion."  *Austin v. Escondido Union School Dist.*, 149 Cal.App.4th 869, 882 (2007).  The word "interferes" under this statute means "violates."  *Id.* at p. 883. "The essence of [this] claim is that the defendant, by the specified improper means (i.e., "threats, intimidation or coercion'), tried to or did prevent the plaintiff from doing something that he or she had the right to do under the law or force the plaintiff to do something that he or she was not required to do under the law."  *Id.* Use of law enforcement authority to effectuate a seizure and a search can constitute interference by "threats, interference, or coercion" if the police officer lacked a justification to seize and search a person.  *Cole v. Doe 1 thru 2 Officers of City of Emeryville Police Dept.*, 387 F.Supp.2d 1084, 1102-1103 (N.D. Cal. 2005).

Although arrest or threat of arrest does not necessarily involve violence, this situation was rife with violence from the outset of the Defendant Officers' involvement. Once the Defendant Officers had SHEEHAN in her room alone where she was not in imminent danger, they forced their way back into her room further agitating her emotional demise, they then pepper sprayed her causing her to stumble forward and repeatedly shot her, thereby violating her state constitutional rights. This use of gratuitous violence satisfies the elements required by California Civil Code section 52.1.

**Intentional Infliction of Emotional Distress**

To establish a prima facie case for intentional infliction of emotional distress, a plaintiff must show: (1) outrageous conduct by the defendant; (2) an intention of causing or reckless disregard of the probability of causing emotional distress; (3) that the plaintiff has suffered severe or extreme emotional distress; and (4) actual and proximate causation of emotional distress by the defendant's outrageous conduct. *Miller v. Fairchild Industries, Inc.*, 797 F.2d 727, 736 (9th Cir. 1986)

SHEEHAN testified that she was distraught at the actions of the Defendant Officers, given that they were armed with guns and threatening her when she did nothing wrong. Indeed, SHEEHAN became embroiled in a fight for her life and

rightfully feared for her life given the behavior of the Defendant Officers. This testimony creates a question of fact that must be determined a finder of fact. See *Id.,* at 737 (holding "fright, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, or worry" are "reactions" that satisfy California's requirement that emotional distress, for purposes of IIED claim, be "severe").


### *CONCLUSION*

In granting summary judgment, it is apparent that the district court made factual and witness credibility determinations which is the province of the trier of fact and failed view the evidence in a light most favorable to SHEEHAN, including selectively crediting some of her testimony as veracious while completely ignoring other portions of her testimony. Heath Hodge was in a predicament that many of the citizenry finds themselves in, i.e., calling on the police for assistance with mentally disabled persons who are in their care. As a person with chronic mental illness, SHEEHAN was in the predicament of needing the officers who encounter her to act as their training and departmental policies demand, i.e. adhering to guidelines set out for handling persons with diminished capacity. As discussed at length, when REYNOLDS and HOLDER observed that no one involved (including themselves, innocents, or SHEEHAN) was in imminent

danger upon their initial entry to SHEEHAN'S residence, there was no reason for

them to act contrary to departmental guidelines, utilize patience and effect an arrest

considering her mental infirmity.  Both Defendant Officers admit that

consideration of SHEEHAN'S mental illness as the subject-incident unfolded

quickly dissipated.

Based on the evidence proffered by SHEEHAN a reasonable trier of fact

could determine that the Defendant Officers unlawfully entered SHEEHAN'S

residence without a warrant, unreasonably used deadly force, failed to factor her

mental disability during her arrest in violation of her civil rights as well as in

violation of American's with Disabilities Act, that the CITY is also liable by either

failing to have a policy for handling persons with mental infirmities or by failing to

enforce their policy, and that their actions violated multiple state laws as well.

This Court should reverse the district court's judgment and find that material issues of fact exist precluding summary judgment on SHEEHAN'S claims.


Dated:  October 23, 2011          **THE LAW OFFICES OF JOHN L. BURRIS**


/s/ Benjamin Nisenbaum
Benjamin Nisenbaum, Esq.
Attorney for Plaintiff TERESA SHEEHAN

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, Plaintiff is not aware of any related cases pending before this Court.

Dated:  October 23, 2011                    **The Law Offices of John L. Burris**


                                            /s/ Benjamin Nisenbaum
                                            Benjamin Nisenbaum, Esq.
                                            Attorney for Plaintiff

## CERTIFICATE OF COMPLIANCE WITH

## FEDERAL RULE OF APPELLATE PROCEDURE 32(A)

Pursuant to Federal Rules of Appellate Procedure, Rule 32(a), and Ninth Circuit Rule 32, Counsel for Appellant TERESA SHEEHAN hereby certifies that this brief contains 12,531 words, excluding the parts of the brief exempted by F.R.A.P. 32(a). This brief complies with the typeface requirements of F.R.A.P. 32(a)(5) and the type style requirements of F.R.A.P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word, Version 10.0, in 14-point Times New Roman font.

Dated:  October 23, 2011                    **The Law Offices of John L. Burris**


                                            /s/ *BenjaminNisenbaum*
                                             Benjamin Nisenbaum, Esq.
                                            Attorney for Plaintiff

CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on October 24, 2011.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Arlene Branch
 Arlene Branch