IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| TERESA SHEEHAN, | No. 11-16401 |
| Plaintiff/Appellant, | U.S. District Court No. C09-03889 CRB |
| vs. | |
| CITY AND COUNTY OF SAN FRANCISCO, et al., | |
| Defendants/Appellees. | |

**APPELLEES' ANSWERING BRIEF**

On Appeal from the United States District Court
for the Northern District of California

The Honorable Charles R. Breyer

DENNIS J. HERRERA, City Attorney
JOANNE HOEPER, Chief Trial Deputy
BLAKE P. LOEBS, State Bar #145790
PETER J. KEITH, State Bar ##206482
Deputy City Attorneys
1390 Market Street, 6th Floor
San Francisco, California 94102-5408
Telephone:  (415) 554-3908
Facsimile:  (415) 554-3837
E-Mail:       peter.keith @sfgov.org

Attorneys for Defendants and Appellees
CITY AND COUNTY OF SAN
FRANCISCO, HEATHER FONG,
KIMBERLY REYNOLDS, and
KATHRINE HOLDER

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................iv

INTRODUCTION ....................................................................................1

STATEMENT OF THE ISSUES................................................................2

JURISDICTIONAL STATEMENT ............................................................3

STATEMENT OF THE CASE...................................................................3

FACTS ....................................................................................................4

    I.      THE AUGUST 7, 2008 INCIDENT ..................................................4

          A.      Officer Holder And Sergeant Reynolds Responded To A Social Worker's Request For Assistance In Detaining And Transporting A Violent Teresa Sheehan For Psychiatric Evaluation ...............................................................4

          B.      When The Officers Attempted To Contact Sheehan, Sheehan Attacked Them With An Eleven-Inch Knife ..............6

          C.      After The Officers Pepper-Sprayed Sheehan, Sheehan Continued To Advance On Officer Holder With Her Knife – And Both Officers Fired Their Weapons .....................7

          D.      Even After Sheehan Fell To The Ground, She Refused To Drop Her Knife, Trapping Officer Holder Against The Wall Until A Backup Officer Finally Charged Up And Kicked The Knife Out of Sheehan's Hand ........................9

    II.     THE CRIMINAL PROSECUTION OF SHEEHAN.........................10

SUMMARY OF ARGUMENT .................................................................10

ARGUMENT ........................................................................................12

    I.      SHEEHAN'S SECTION 1983 CLAIMS AGAINST THE INDIVIDUAL OFFICERS FAIL ........................................................12

          A.      The Qualified Immunity Standard .............................................12

          B.      Sheehan's Federal Search Claim Fails......................................13

               1.      The Officers' Search Was Justified Under The Emergency Aid Exception.............................................13

2.    The Officers' Entry Was Also Justified By Exigent Circumstances ...............................................................18

3.    After Sheehan Forced Her Door Closed, The Officers Did Not Violate The Fourth Amendment By Re-Entering Her Room To Continue Their Search ..........................................................................19

C.    Sheehan's Federal Force Claim Fails ......................................23

1.    The Legal Standard.......................................................23

2.    There Is No Dispute of Material Fact That Sheehan Attacked The Officers With A Knife While Threatening To Kill Them, And Therefore Deadly Force Was Justified As A Matter Of Law .....................24

3.    Officers May Lawfully Use Deadly Force Against A Person Who Assaults Them With A Knife, Even If The Person Is Mentally Ill...........................................28

4.    Sergeant Reynolds' Final Shot Was Reasonable, And Qualified Immunity Applies ...................................30

5.    The Officers Did Not Violate The Fourth Amendment Under A "Provocation" Theory ................33

II.    SHEEHAN HAS NO VIABLE MUNICIPAL LIABILITY CLAIMS UNDER SECTION 1983 ....................................................34

III.    SHEEHAN HAS NO VIABLE CLAIM UNDER THE AMERICANS WITH DISABILITIES ACT ......................................35

IV.    SHEEHAN HAS NO VIABLE STATE LAW CLAIMS..................38

A.    Under Welfare & Institutions Code Section 5278, The Existence Of Probable Cause To Detain Sheehan Under Section 5150 Confers Immunity From All Of Sheehan's State Law Claims ....................................................................38

B.    Several Additional Immunities, Privileges, And Bars Apply To Sheehan's State Law Claims ...................................40

1.    Under Government Code Section 821.6, Sheehan Cannot Maintain Any Claim Arising From The Officers' Entry, Lawful Or Not ......................................40

        2.     Under The California Penal Code, Sheehan Cannot
                   Maintain Any Claim Arising From Sheehan's
                   Arrest – And Those Claims Are Barred By
                   Collateral Estoppel, Concession, And Waiver ...............41

        3.     Under The California Penal Code, Sheehan Cannot
                   Maintain Any Claim Arising From The Officers'
                   Force ............................................................................41

CONCLUSION ....................................................................................42

STATEMENT OF RELATED CASES ...................................................43

CERTIFICATE OF COMPLIANCE.......................................................43

ADDENDUM (NINTH CIRCUIT RULE 28-2.7) ...................................44

# TABLE OF AUTHORITIES

**State Cases**

*Baughman v. State of California*
   38 Cal.App.4th 182 (1995).................................................................40

*Edson v. City of Anaheim*
   63 Cal.App.4th 1269 (1998).............................................................41

*Gonzalez v. Paradise Valley Hosp.*
   111 Cal.App.4th 735 (2003)............................................................40

*Heater v. Southwood Psychiatric Center*
   42 Cal.App.4th 1068 (1996)............................................. 14, 38, 39

*Horwich v. Superior Court (Acuna)*
   21 Cal.4th 272 (1999)...................................................................38

*Jacobs v. Grossmont Hosp.*
   108 Cal.App.4th 69 (2003).......................................................... 39, 40

*Martinez v. County of Los Angeles*
   47 Cal.App.4th 334 (1996).............................................................27

*O'Toole v. Superior Court*
   140 Cal.App.4th 488 (2006)...........................................................41

*People v. Hamilton*
   105 Cal.App.3d 113 (1980).............................................................20

*People v. Triplett*
   144 Cal.App.3d 283 (1983).............................................................14

**State Statutes & Codes**
California Government Code
   § 815.2 ......................................................................................38

California Government Code
   § 821.6 ......................................................................................40

California Penal Code
   § 196 .........................................................................................41

California Penal Code
§ 245 ..............................................................................21

California Penal Code
§ 422 ....................................................................... 18, 21

California Penal Code
§ 835 ..............................................................................41

California Penal Code
§ 836.5 ...........................................................................41

California Penal Code
§ 847 ..............................................................................41

California Welfare & Institutions Code
§ 5008 ..................................................................... 14, 16

California Welfare & Institutions Code
§ 5150 .................................................................... passim

California Welfare & Institutions Code
§ 5150.05 .......................................................................17

California Welfare & Institutions Code
§ 5150.2 .........................................................................17

California Welfare & Institutions Code
§ 5157 ............................................................................16

California Welfare & Institutions Code
§ 5278 ............................................................ 12, 38, 39, 40

**Federal Cases**
*Anderson v. Creighton*
483 U.S. 635 (1987) .......................................................13

*Anderson v. Liberty Lobby, Inc.*
477 U.S. 242 (1986) .......................................................25

*Ashcroft v. Al-Kidd*
131 S. Ct. 2074 (2011) ...................................................13

*Bahrampour v. Lampert*
  356 F.3d 969 (9th Cir. 2004) ................................................................17

*BankAmerica Pension Plan v. McMath*
  206 F.3d 821 (9th Cir. 2000) ................................................................15

*Barber v. City of Santa Rosa*
  No. C-08-5649 MMC, 2010 WL 5069868 (N. D. Cal. Dec. 7, 2010) .......... 19, 30

*Bates v. Chesterfield County*
  216 F.3d 367 (4th Cir. 2000) ................................................................36

*Berube v. Conley*
  506 F.3d 79 (1st Cir. 2007) ..................................................................31

*Bias v. Moynihan*
  508 F.3d 1212 (9th Cir. 2007) .......................................................... 38, 39

*Billington v. Smith*
  292 F.3d 1177 (9th Cir. 2002) .......................................................... 23, 33

*Blanford v. Sacramento County*
  406 F.3d 1110 (9th Cir. 2005) .......................................................... 24, 29

*Board of County Comm'rs of Bryan County v. Brown*
  520 U.S. 397 (1997) ............................................................................35

*Brigham City v. Stuart*
  547 U.S. 398 (2006) ....................................................................... 14, 23

*Brosseau v. Haugen*
  543 U.S. 194 (2004) ....................................................................... 12, 24

*Buchanan v. Maine*
  417 F.Supp.2d 45 (D. Me. 2006)............................................................36

*Christian Legal Soc. Chapter of Univ. of Calif., Hastings College of Law v. Wu*
  626 F.3d 483 (9th Cir. 2010).................................................................15

*City of Canton v. Harris*
  489 U.S. 378 (1989) ....................................................................... 34, 35

*City of Los Angeles v. Heller*
  475 U.S. 796 (1986) ...................................................................34

*City of Phoenix v. Com/Systems, Inc.*
  706 F.2d 1033 (9th Cir. 1983) ...................................................28

*City of St. Louis v. Praprotnik*
  485 U.S. 112 (1988) ...................................................................35

*Deorle v. Rutherford*
  272 F.3d 1272 (9th Cir. 2001) ...................................................29

*Drummond v. City of Anaheim*
  343 F.3d 1052 (9th Cir. 2003) ...................................................29

*Duarte v. Begrin*
  No. 07-15584, 299 Fed. Appx. 711, 2008 WL 4831482 (9th Cir. Nov. 6, 2008)
  ...................................................................................... 17, 19

*Duran v. City of Maywood*
  221 F.3d 1127 (9th Cir. 2000) ...................................................23

*Duvall v. County of Kitsap*
  260 F.3d 1124 (9th Cir. 2001) ...................................................37

*Estate of Larsen v. Murr*
  511 F.3d 1255 (10th Cir. 2008) .................................................27

*Estate of Merchant v. C.I.R.*
  947 F.2d 1390 (9th Cir. 1991) ...................................................18

*Fisher v. City of San Jose*
  558 F.3d 1069 (9th Cir. 2009) ........................................ 19, 20, 22

*Galvin v. Hay*
  374 F.3d 739 (9th Cir. 2004) .....................................................41

*Glenn v. Washington County*
  No. 10-35636, --- F.3d ---, 2011 WL 6760348 (9th Cir. Dec. 27, 2011).............29

*Gohier v. Enright*
  186 F.3d 1216 (10th Cir. 1999) .................................................36

*Graham v. Connor*
  490 U.S. 386 (1989) .................................................................. 24, 32

*Gregory v. County of Maui*
  523 F.3d 1103 (9th Cir. 2008) ............................................................29

*Hainze v. Richards*
  207 F.3d 795 (5th Cir. 2000) ....................................................... 36, 37

*Johnson v. County of Los Angeles*
  340 F.3d 787 (9th Cir. 2003) ............................................................41

*Kentucky v. Graham*
  473 U.S. 159 (1985) ............................................................................34

*Ker v. California*
  374 U.S. 23 (1963) .............................................................................22

*Kim v. City of Santa Clara*
  No. 10-16335, 2011 WL 3841294 (9th Cir. Aug. 31, 2011)...............30

*Lee v. City of Los Angeles*
  250 F.3d 668 (9th Cir. 2001) ............................................................36

*Long v. City and County of Honolulu*
  511 F.3d 901 (9th Cir. 2007) ....................................................... 29, 34

*Maag v. Wessler*
  960 F.2d 773 (9th Cir. 1991) ............................................................14

*MacEachern v. City of Manhattan Beach*
  623 F. Supp. 2d 1092 (C. D. Cal. 2009)............................................27

*Malley v. Briggs*
  475 U.S. 335 (1986) ...................................................................... 13, 32

*Maradiaga v. Wilson*
  518 F. Supp. 2d 760 (D.S.C. 2007) ...................................................31

*McDade v. West*
  223 F.3d 1135 (9th Cir. 2000) ..........................................................35

*Michigan v. Fisher*
   130 S. Ct. 546, 588 U.S. _____ (2009) ............................................. 13, 16, 17, 22

*Michigan v. Tyler*
   436 U.S. 499 (1978) ........................................................................................19

*Pearson v. Callahan*
   555 U.S. 223 (2009) ........................................................................................12

*Price v. Sery*
   513 F.3d 962 (9th Cir. 2008) ..........................................................................23

*Reynolds v. County of San Diego*
   84 F.3d 1162 (9th Cir. 1996) ..........................................................................28

*Robbins v. City of Hanford*
   No. CIV F 04-6672 AWI SMS, 2006 WL 1716220 (E. D. Cal. June 19, 2006)
   ....................................................................................................................30

*Rodgers v. Smith*
   No. 05-1382, 88 Fed. Appx. 175, 2006 WL 1843435 (4th Cir. June 26, 2006)
   ....................................................................................................................30

*Ryburn v. Huff*
   No. 11-208, 2012 WL 171121 (Jan. 23, 2012) ........................................... 17, 23

*Sanders v. City of Minneapolis*
   474 F.3d 523 (8th Cir. 2007) ..........................................................................36

*Saucier v. Katz*
   533 U.S. 194 (2001) ........................................................................................13

*Scott v. Harris*
   550 U.S. 372 (2007) ........................................................................................23

*Smith v. City of Hemet*
   394 F.3d 689 (9th Cir. 2005) ..................................................................... 24, 28

*Taylor v. List*
   880 F.2d 1040 (9th Cir. 1989) ........................................................................34

*Thompson v. Williamson County*
219 F.3d 555 (6th Cir. 2000) ................................................................36

*Torres v. City of Los Angeles*
548 F.3d 1197 (9th Cir. 2008) ..............................................................16

*U.S. v. Black*
482 F.3d 1035 (9th Cir. 2007) ..............................................................16

*U.S. v. Hensley*
469 U.S. 221 (1985) ............................................................................16

*U.S. v. McConney*
728 F.2d 1195 (9th Cir. 1984) ..............................................................18

*U.S. v. Santana*
427 U.S. 38 (1976) ..............................................................................22

*U.S. v. Snipe*
515 F.3d 947 (9th Cir. 2008) ................................................................16

*United States v. Echegoyen*
799 F.2d 1271 (9th Cir. 1986) ..............................................................19

*United States v. Russell*
436 F.3d 1086 (9th Cir. 2006) ..............................................................23

*Waller v. City of Danville*
556 F.3d 171 (4th Cir. 2009) ................................................................36

*Webb v. Raleigh County Sheriff's Department*
761 F. Supp. 2d 378 (S. D. W. Va. 2010) ...........................................31

**Federal Statutes**
42 U.S.C.
§ 1983 ................................................................................ 1, 3, 12

Americans with Disabilities Act
Title II .............................................................................................35

# INTRODUCTION

Plaintiff Teresa Sheehan, a resident of a group home, threatened to stab Heath Hodge, a social worker checking on her, with a knife.  Having determined that Sheehan needed to be involuntarily detained in a medical facility for psychiatric evaluation and treatment, Hodge called San Francisco police for help.  Defendants Officer Kathrine Holder and Sergeant Kimberly Reynolds responded.  After Hodge provided them with evidence of his authority to order the psychiatric evaluation, and informed them about Sheehan's history and condition, and her recent threat, the officers knocked on Sheehan's bedroom door and told her they were there to help.  When the officers opened her door, Sheehan threatened to kill them and charged at them with an 11-inch knife.  When the officers retreated, Sheehan closed the door.  When the officers reopened the door, Sheehan advanced again with the knife, while screaming that she was going to kill them.  Even though Sergeant Reynolds pepper-sprayed her, Sheehan was able to trap Officer Holder against a wall.  Both officers fired.  Even after Sheehan fell, she kept swinging her knife, with Officer Holder still trapped.  A third officer arrived, and kicked the knife out of Sheehan's hand.  Paramedics transported Sheehan to the hospital.  She survived.

Sheehan has already abandoned her false arrest and malicious prosecution claims.  However, Sheehan still claims that the officers illegally entered her bedroom and used excessive force.  But the Officers properly entered Sheehan's room because Sheehen needed medical assistance and she posed a danger to others, both as a matter of common sense and under California Welfare & Institutions Code section 5150.  Likewise, the Officers were justified in shooting Sheehan when she threatened and assaulted them with an 11-inch knife.  Accordingly, Sheehan's claims under 42 U.S.C. § 1983 fail, and the officers are entitled to

qualified immunity. Sheehan's claims against the City and County of San Francisco also fail, as do her California tort law claims.

## STATEMENT OF THE ISSUES

1.     Were the officers entitled to enter Sheehan's room under the emergency aid or exigent circumstances exceptions to the warrant requirement, such that Sheehan cannot maintain a Fourth Amendment search claim? Was the law clearly established otherwise? Did Sheehan concede or waive her challenge to this search?

2.     Did Sheehan concede or waive her false arrest and malicious prosecution claims, or alternatively are they barred on the merits?

3.     Could a reasonable officer conclude that Sheehan posed a threat of serious physical harm when she threatened to kill police officers and attacked them with an 11-inch knife, such that Sheehan cannot maintain a Fourth Amendment deadly force claim? Was the law clearly established otherwise?

4.     When a municipality provided appropriate training to police officers, and the plaintiff's claim is that officers did not comply with that training in a single incident, is that sufficient evidence to establish municipal liability?

5.     When San Francisco police officers used force to protect themselves against an attack by an armed individual who was mentally ill, did the City and County of San Francisco violate Title II of the Americans With Disabilities Act?

6.     Are Sheehan's California law tort claims arising from this incident barred by California statutory immunities and privileges?

Pertinent statutes are set forth in the attached Addendum.

# JURISDICTIONAL STATEMENT

Appellees agree with Sheehan's jurisdictional statement.  However, Sheehan is not entitled to attorneys' fees and costs on appeal, AOB8, because success on appeal would not make Sheehan a "prevailing party."

## STATEMENT OF THE CASE

Plaintiff Teresa Sheehan filed this action in the United States District Court for the Northern District of California.  Sheehan named as defendants the City and County of San Francisco, Police Chief Heather Fong, Officer Kathrine Holder, and Sergeant Kimberly Reynolds.  Sheehan alleged violations of the Fourth Amendment under 42 U.S.C. § 1983, violations of the Americans With Disabilities Act, and various state law torts.

After discovery, all defendants moved for summary judgment.  Sheehan did not oppose summary judgment as to her false arrest and malicious prosecution claims, and even conceded the lawfulness of the officers' initial entry into Sheehan's room.  SER33, 496-497.  Instead, Sheehan argued that the officers violated the Fourth Amendment by re-opening the door after Sheehan forced them to retreat, and ultimately by using deadly force against Sheehan.  SER491-494.  After a hearing, SER23-49,[1] the District Court rejected Sheehan's arguments and granted the motion.  SER1-22.[2]  After entry of judgment for the defendants, ER3, Sheehan appealed, ER1-2.

---

[1] Because of the poor copy quality of the hearing transcript in Sheehan's Excerpts of Record, another copy is included in the Supplemental Excerpts of Record.

[2] The copy of the District Court Order in Sheehan's Excerpts of Record is incomplete.  ER4-22.  It does not include the photographs and diagram that the District Court attached to its Order.  Therefore, the Supplemental Excerpts of Record contains a complete copy of the Order, including these exhibits.  SER1-22. The District Court explained that these exhibits showed the "cramped quarters" where Sheehan trapped Officer Holder and "confirm the officers' perception of a dire and escalating threat."  SER3, 16.

## FACTS

I.   **THE AUGUST 7, 2008 INCIDENT**

   A.   **Officer Holder And Sergeant Reynolds Responded To A Social Worker's Request For Assistance In Detaining And Transporting A Violent Teresa Sheehan For Psychiatric Evaluation**

On August 7, 2008, Officer Kathrine Holder and Sergeant Kimberly Reynolds responded to a call for assistance originating from an address on the 1900 block of 15th Street in San Francisco. SER102. The reporting party was Heath Hodge, a social worker. SER100-106. The computer automated dispatch (CAD) information provided to the officers stated: "Social w[or]ker just went inside to c[hec]k on his patient, subj[ect] is known to make violent threats, told rp [reporting party] to get out or she'll knife him (no weapon seen) // name is Teresa Sheehan/Eurasian, early 50's, wearing striped shirt/pants." *Id.*; SER157.

The uniformed officers met Hodge outside the 15th Street location. SER130-131. Hodge was a supervisor of the counseling staff at Conard House, which provided supportive housing at that location to mentally ill persons. SER160-161. Hodge showed the officers a card issued by the City and County of San Francisco that identified him as a person authorized to initiate a 72-hour detention under California Welfare & Institutions Code section 5150 ("W&I § 5150") for purposes of evaluating and treating a mentally ill person. SER195. Hodge told the officers he needed police assistance in placing a W&I § 5150 hold on Sheehan, because Sheehan might resist and would not willingly go to the hospital for a psychiatric evaluation. Hodge told them that he tried to check on Sheehan's welfare, but Sheehan told Hodge she had a knife and threatened to stab him if he did not leave her alone; Hodge did not see the knife. SER196-199.

In addition to describing how Sheehan had threatened to stab him with a knife, Hodge also told the officers about Sheehan's history. He explained that Sheehan had been off of her medication for about a year and a half. He explained

she had been in a downward psychotic spiral, especially during the last couple of months. He told them she had not eaten, changed her clothes, or bathed in a long time, perhaps weeks. SER119-120, 196-199.

Hodge showed the officers the W&I § 5150 detention form that he had completed before their arrival, which stated the facts supporting his determination that she needed to undergo an involuntary psychiatric evaluation. The form read:

> Client has been without psychotropic meds times one and a half years. Has been presenting with increased symptoms for several weeks. Client has not been seen by the house counselor times two weeks. Housemates reported that client has been coming and going at odd hours and reportedly said she had stopped eating. It was also reported that client has been wearing the same clothing for several days. Writer conducted outreach to client and she was not responsive. Made no sound behind her closed door. Writer and property management keyed in for wellness check. Upon opening the door, client was found lying in her bed with a book over her face, eyes open and was not responsive. Addressed client several times and she did not move or answer. Client then suddenly got up, threw the covers, and yelled at writer violently, "Get out of here! You don't have a warrant! I have a knife and I'll kill you if I have to!" Client then slammed her door and locked it behind her.

SER162-165 (Hodge reading form and explaining abbreviations); SER180 (form). Hodge also wrote that Sheehan was both "gravely disabled" and "a danger to others," and told the officers all of this information. *Id.*

Based on this information, Sergeant Reynolds decided to contact Sheehan to confirm Hodge's assessment of her condition. SER198-199. Sergeant Reynolds obtained authorization from her lieutenant to proceed. SER206-207. Then, the officers and Hodge went up the outside set of stairs to the front door, SER293 (photo), and then through the front door and up a second flight of stairs to the flat itself. SER201; SER294 (photo). They walked down a hallway past several closed doors. SER282-283; SER295 (photo), SER299 (diagram).[3] At the end of the

---

[3] The District Court attached this diagram to its Order. SER22.

hallway was a closed door, which Hodge identified as the door to Sheehan's room. SER129; SER296 (photo with door open).  As the officers faced Sheehan's door, there was a closed door to the right, and an alcove to the left with another closed door.  *Id.* (photo); SER303-304.

### B.  When The Officers Attempted To Contact Sheehan, Sheehan Attacked Them With An Eleven-Inch Knife

The officers knocked and told Sheehan they were police officers and there to help her.  They repeated themselves, unlocked the door with a key that Hodge provided them, and opened the door.  SER200, 203-204.  They saw Sheehan lying on her bed.  SER208-209.

Sheehan immediately got up, reached out and grabbed an 11-inch-long knife, with a 6-inch fixed blade.  She advanced toward the officers and threatened to kill them, while holding and moving her knife in a threatening manner.  SER139 (Holder), SER210-212 (Reynolds); SER171-172 & 181(photo of knife) (Hodge).[4] The officers were in fear for their lives.  SER247-248, 306-307.  A knife can pose a greater threat to a police officer than a gun, because unlike a bullet a knife can pass through an officer's Kevlar vest and can cause a large wound that bleeds uncontrollably.  SER261-262.  The officers ordered Sheehan to drop her knife. SER139.  She did not; she advanced on the officers with her knife, forcing them to retreat for their own safety and getting the door closed.  SER214.

There is no dispute that Sheehan reacted violently to the officers.  Sheehan herself admitted grabbing and brandishing a knife at the officers.  SER312-20.  She also admitted threatening to kill the officers.  SER327-328.

---

[4] Although Hodge described the knife as "small" at his deposition, the knife he identified measured 280 millimeters (11+ inches), with a fixed blade of 155 millimeters (6+ inches).  SER285-286, 297-298 (photos of knife).

### C.  After The Officers Pepper-Sprayed Sheehan, Sheehan Continued To Advance On Officer Holder With Her Knife – And Both Officers Fired Their Weapons

Standing outside the now-closed door, the officers drew their weapons. SER222-223.  With the door closed, they could not see Sheehan.  The officers were concerned.  Sheehan could open the door at any time and continue her attack. She could be arming herself with another weapon.  SER144-145, 154-155, 215-220.  Or Sheehan could be escaping through the back window or a fire escape, and could harm someone else.  SER132-133, 154-155, 219-220.  Or another person could be in Sheehan's room and in danger.  SER127-128, 221.[5]  The officers decided that given these risks, they needed to get the door open as soon as possible. SER127-128, 132-133, 142-145, 154-155, 219-220.

Sergeant Reynolds told Hodge to go downstairs to let in backup officers, and the officers attempted to re-open the door to Sheehan's room.  SER243-244. Ultimately, the door opened.  SER146-147.[6]

Sergeant Reynolds was standing by in the hall, with pepper spray in one hand and her service firearm in the other.  SER223.  Right after the door opened, Sheehan again screamed that she was going to kill the officers and advanced on them with her knife.  SER148-150, SER223.  Sheehan admitted her violent

---

[5] Although Hodge told Sergeant Reynolds that he had previously asked everyone else to leave the building, the officers felt a duty to confirm that no one was trapped in Sheehan's room, given her violence.  SER127-128, 221.

[6] Sheehan recalls how her door became open somewhat differently from the officers and Hodge.  Sheehan testified that she yelled at them to leave her alone through the closed door, and threatened to kill them if they did not.  She then heard the officers attempting to open the door with force.  Before they succeeded, she opened the door for them and brandished her knife.  According to Sheehan, the officers never opened her door, either by force or with a key – she was the only one who opened her door, and the door opened only once.  SER323-328, 332-334.

Sheehan's arguments in the District Court and on appeal relied on the officers' opening Sheehan's door twice, per the officers' testimony.  Because Sheehan treats the officers' account as more favorable to Sheehan, the appellees will likewise accept it.

conduct: "I was in the room, I stepped my foot on the threshold.  I had my knife upraised with my right hand."  SER327-328.

Sergeant Reynolds used her pepper spray when Sheehan reached the threshold of the door.  SER148-150, SER228-230.  Sheehan testified that she was blinded by the pepper spray.  SER327-328.  From the officers' perspective, the pepper spray had no apparent effect.  Even assuming, however, that Sheehan could not see, her conduct was undisputed:  Sheehan continued to advance toward Officer Holder.  SER223-224.  Sheehan herself admitted that after she was pepper sprayed, she came out the door and kept her knife upraised.  SER328.

Sheehan, knife upraised, yelled again that she was going to kill the officers.  SER149-151.  Sheehan cornered Officer Holder in the alcove just outside Sheehan's room, with Officer Holder's back "literally against the wall."  SER443.  When Sheehan was almost within arm's reach of Officer Holder, Officer Holder fired at Sheehan two or three times.  SER149-151, 226-236, 305.  She testified:

> A.      Okay, She turned toward me with the knife raised, and I
> observed this she was a threat to my safety.  And I could not put
> my arm up to take aim because she was too close and she would
> have been able too – how do I say that?  She would have been
> able to stab my arm if I had my arm all the way out at that
> point.  So I fired from the hip.  . .
> Q.      Now why is it you fired your gun?
> A.      I thought she was going to kill me.

SER306-307.  Despite being shot, Sheehan did not relent.  SER413, 444.  Instead, Sheehan turned toward Sergeant Reynolds, who was next to the bathroom door opposite the alcove.  SER151, 231-233.  By now, Sergeant Reynolds had dropped her pepper spray and was aiming her firearm at Sheehan.  SER231-232.  With Officer Holder still cornered and Sheehan still holding her knife, Sergeant Reynolds fired two or three times, with the last bullet striking Sheehan in the face.

SER151-152, 232-235.[7]  Sheehan was only two to four feet from Sergeant Reynolds.  SER235-236.

### D. Even After Sheehan Fell To The Ground, She Refused To Drop Her Knife, Trapping Officer Holder Against The Wall Until A Backup Officer Finally Charged Up And Kicked The Knife Out of Sheehan's Hand

The testimony was mixed about Sheehan's body position when Sergeant Reynolds fired her last shot.  Sergeant Reynolds testified that Sheehan was standing but then fell after she was struck by the final bullet.  SER235-236. Sheehan testified that she was struck by the last bullet just before or as she fell against the wall, but was not yet to the floor.  SER340.  Officer Holder testified that Sheehan stabbed toward Sergeant Reynolds' leg while falling, and reached the floor by the time Sergeant Reynolds fired her last shot.  SER152-153, 308-310, 444-445.  The officers and the District Court accepted Officer Holder's version as most favorable to Sheehan, and accept it here.

Regardless of any dispute about Sheehan's position when Sergeant Reynolds fired her last shot, however, it was undisputed that even after Sheehan was on the floor, she did not drop her knife and continued "flailing" with the knife.  SER238- 239.  Sheehan herself testified that, even after being shot and falling to the floor, she continued to hold on to the knife so that she could use it as a weapon against the officers.  SER336.  It was undisputed that even after Sheehan was on the floor, she remained armed with the knife, trapping Officer Holder in the corner, with no way for Officer Holder to safely get away.  SER236-241, 310-311, 446; AOB18.

As the shots were fired, a backup officer, Constantine Zachos, arrived at the front door of the building.  SER263.  Officer Zachos rushed up the interior stairs.

---

[7] It was undisputed that regardless of each of the officers' uncertainty whether they fired two or three shots, a total of five shots were fired.  ER128.

When he looked down the hall, he saw Sheehan on the ground waving her knife back and forth at both officers, with Officer Holder trapped and within striking distance. SER266-271. Officer Zachos held his fire, but only to avoid accidentally shooting another officer. SER273-277. Instead, at great risk to his own safety, Officer Zachos ran down the hall and kicked the knife out of Sheehan's hand and into her bedroom. SER273-281. Then, he grabbed Officer Holder and moved her out of the corner. SER281. Paramedics arrived and transported Sheehan to San Francisco General Hospital. Sheehan survived.

## II.   THE CRIMINAL PROSECUTION OF SHEEHAN

Sheehan was prosecuted for her criminal offenses in San Francisco Superior Court. There was a contested preliminary hearing to determine whether probable cause existed to hold Sheehan for trial. SER357-467. Officer Holder, Sergeant Reynolds, and Hodge testified and were subject to extended cross-examination. SER357-450. The Superior Court ruled that probable cause existed to prosecute Sheehan for violations of California Penal Code sections 245(a) (two counts of assault with a deadly weapon), 245(c) (two counts of assaulting a police officer with a deadly weapon), and 422 (making terrorist threats against Hodge). SER353-354. At trial, the jury hung on the four assault counts and acquitted Sheehan of the section 422 count. SER355. The District Attorney dismissed those counts, opting not to re-try them. SER356.

## SUMMARY OF ARGUMENT

On the undisputed facts, Sheehan cannot prevail on any of her claims arising from this incident. Accordingly, this Court should affirm the judgment.

Sheehan cannot prevail on her Fourth Amendment search claim. The officers' decision to enter Sheehan's bedroom was justified under the emergency aid and exigent circumstances exceptions – and qualified immunity would apply,

because no cases clearly established that these exceptions would not apply on the facts the officers faced.  As Sheehan conceded, the officers plainly needed to detain Sheehan under W&I § 5150, as gravely disabled and a danger to others.  Sheehan likewise conceded in the District Court that the officers' initial entry to make a W&I § 5150 detention was lawful.  Rather, Sheehan complained only about the officers' continuing their efforts by re-opening Sheehan's door after she forced it closed for a moment.  Sheehan cannot argue on appeal a claim that she already conceded below.  And Sheehan cannot show that it was unlawful for the officers to persist in their efforts to detain her, let alone clearly unlawful.

Sheehan also cannot maintain any claims for false arrest and malicious prosecution, having conceded those claims below and waived them here.  This concession was proper.  On the merits, probable cause existed to arrest and prosecute Sheehan for her crimes and to detain Sheehan under W & I § 5150.  Likewise, collateral estoppel bars relitigation of the probable cause issue.

And it was reasonable under the Fourth Amendment for the officers to use deadly force under these circumstances.  Sheehan threatened to kill the officers, was armed with a knife, and advanced to within two to four feet of Officer Holder, cornering her.  Because Sheehan's acts posed a risk of serious physical harm or death, deadly force was justified.  There were no material disputes about the threat Sheehan posed.  And officers are authorized to use deadly force against an assaultive armed person, even if the person's violent conduct is caused by a mental illness.  Qualified immunity protects the officers, because the law was not clearly established that they could not use deadly force under these circumstances.

Sheehan's section 1983 municipal liability claims likewise fail, not only because there was no constitutional violation but also because it was undisputed

that San Francisco's policies and training concerning police interactions with mentally ill individuals were adequate and not the cause of any violation.

Nor can Sheehan proceed under the Americans With Disabilities Act. When officers used force in response to Sheehan's violent conduct, they were not discriminating against her or denying her access to programs or services. Other Courts of Appeals recognize that the ADA does not limit officers' authority to use force to control a violent assaultive person who also happens to be mentally ill.

Finally, state law immunities and privileges – most significantly, the immunity under Welfare & Institutions Code section 5278 – preclude liability under California law.

## ARGUMENT

## I.    SHEEHAN'S SECTION 1983 CLAIMS AGAINST THE INDIVIDUAL OFFICERS FAIL

Sheehan cannot prevail on her section 1983 claims against Officer Holder and Sergeant Reynolds because their conduct did not violate the Fourth Amendment, let alone clearly established Fourth Amendment law. In addition, Sheehan's search claim is barred by waiver, and her false arrest and malicious prosecution claims are barred by waiver and collateral estoppel.

### A.    The Qualified Immunity Standard

The defense of qualified immunity applies to all of Sheehan's section 1983 claims against the officers. The first question in the qualified immunity analysis is whether a constitutional right was violated at all. The second question is whether a reasonable officer could have believed her conduct to be lawful under the clearly established governing law. *Pearson v. Callahan*, 555 U.S. 223, 243 (2009). The purpose of qualified immunity is to ensure that officers, before they are held liable for constitutional violations, have "fair notice that [their] conduct was unlawful." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004). The inquiry whether conduct

violates clearly established law "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

The "clearly established law" standard is very deferential to officials. The Supreme Court recently re-emphasized, in *Ashcroft v. Al-Kidd*, 131 S. Ct. 2074 (2011), just how forgiving the qualified immunity standard is, when it is "properly applied," *id.* at 2085: "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Id.* at 2083 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)) (internal quotation marks and brackets omitted). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions. When properly applied, it protects all but the plainly incompetent or those who knowingly violate the law." *Ashcroft*, 131 S. Ct. at 2085 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)) (internal quotation marks omitted).

### B. Sheehan's Federal Search Claim Fails

#### 1. The Officers' Search Was Justified Under The Emergency Aid Exception

The very facts that establish the need to detain a person under W&I § 5150 – a person being a danger to herself or others or gravely disabled due to a mental disorder – also provide a factual basis for the emergency aid exception to the warrant requirement, so that officers may enter the person's residence in order to actually make a needed W & I § 5150 detention. In *Michigan v. Fisher*, 130 S. Ct. 546, 588 U.S. _____ (2009), the Supreme Court explained that "[o]fficers do not need ironclad proof of 'a likely serious, life-threatening' injury to invoke the emergency aid exception." *Id.* at 549. Rather, an entry into a home is proper

where there is "an objectively reasonable basis for believing that medical assistance was needed, or persons were in danger." *Id.* (quoting *Brigham City v. Stuart*, 547 U.S. 398, 406 (2006)) (internal quotation marks omitted). The criteria that justify a W&I § 5150 detention for involuntary psychiatric treatment and evaluation, also support the emergency aid exception. That statute provides, in pertinent part:

> When any person, as a result of mental disorder, is a danger to others, or to himself or herself, or gravely disabled, a peace officer ... or other professional person designated by the county may, upon probable cause, take or cause to be taken, the person into custody and place him or her in a facility designated by the county and approved by the State Department of Mental Health as a facility for 72-hour treatment and evaluation.

W & I § 5150 (see Addendum, *infra*, for full statutory text). "Gravely disabled" means "unable to provide for his or her basic personal needs for food, clothing or shelter." *Id.* § 5008(h)(1)(A). The Fourth Amendment imposes a requirement of probable cause to support a W & I § 5150 detention. *Maag v. Wessler*, 960 F.2d 773, 775 (9th Cir. 1991). "To constitute probable cause to detain a person pursuant to section 5150, a state of facts must be known to the peace officer (or other authorized person) that would lead a person of ordinary care and prudence to believe, or to entertain a strong suspicion, that the person detained is mentally disordered and is a danger to himself or herself or is gravely disabled." *Heater v. Southwood Psychiatric Center*, 42 Cal.App.4th 1068, 1080 (1996) (quoting *People v. Triplett*, 144 Cal.App.3d 283, 287-288 (1983)).

Sheehan conceded in the District Court that probable cause existed to believe that Sheehan was a danger to others or gravely disabled and needed to be treated and evaluated, and also conceded that the officers needed to open Sheehan's door to detain Sheehan. Having conceded these issues in the District Court, and cannot now challenge the validity of the officers' initial entry.

*BankAmerica Pension Plan v. McMath*, 206 F.3d 821, 826 (9th Cir. 2000). Sheehan conceded that probable cause existed to believe she needed to be detained under W&I § 5150, and abandoned her claims of false arrest and malicious prosecution. SER496-97.[8]  Sheehan likewise conceded in the District Court that at least the *first* time the officers entered Sheehan's room, they did so lawfully.  She did so at oral argument in the District Court:  "I don't have a quarrel with the first door opening."  SER33.  Sheehan also did so in her papers:  "Plaintiff acknowledges that the Defendant Officers were lawfully summoned to Conard House to assist Hodge in affecting a § 5150 hold on Plaintiff.  And by extension, they lawfully sought to verify Hodge's information in an effort to assist in the § 5150 hold."  SER496-497.  The District Court recognized this concession in its Order.  SER12.  Having conceded this issue in the District Court, Sheehan cannot now argue that the officers' initial entry into her bedroom lacked legal justification.

Nevertheless, on appeal Sheehan argues the merits of the officers' initial entry, AOB23-27, even while echoing her concession below, AOB28.  Even if Sheehan had not conceded this issue below, her argument would fail on the merits.

Probable cause supported the officers' detaining Sheehan pursuant to W&I § 5150 – and making an entry to do it.  The officers first received information from their dispatcher about Sheehan's violent history and threats.  At the scene, the officers confirmed this information with a reliable source, Hodge.  Hodge, an

---

[8] Sheehan conceded her false arrest and malicious prosecution claims by not arguing them below, *BankAmerica Pension Plan*, 206 F.3d at 826, and waived them by not raising them in her opening brief, *Christian Legal Soc. Chapter of Univ. of Calif., Hastings College of Law v. Wu*, 626 F.3d 483, 487-88 (9th Cir. 2010).

Moreover, Sheehan never argued against the independent collateral estoppel bar to these claims.  SER480-504.  The District Court ruled collateral estoppel applies, SER8-10, and Sheehan does not challenge that independent ruling on appeal.

authorized mental health professional, made a determination that Sheehan was "gravely disabled," *i.e.*, "unable to provide for his or her basic personal needs for food, clothing or shelter," Cal. Welf. & Inst. Code § 5008(h)(1)(A), and was a danger to others due to her mental illness, refusal to take her medication, and recent threat to stab him. Hodge provided the officers with detailed additional information about Sheehan's history. The officers understood that Sheehan lived in a group home in which she could make – and carry out – the same threat against her housemates. These facts established an objectively reasonable basis that satisfied either requirement of *Michigan v. Fisher* – that "medical assistance was needed," or "persons were in danger." The officers had to make contact with Sheehan, for her welfare and the safety of others. "Erring on the side of caution is exactly what we expect of conscientious police officers" who are making "a 'welfare search' where rescue is the objective, rather than a search for crime." *U.S. v. Black*, 482 F.3d 1035, 1040 (9th Cir. 2007); *see also U.S. v. Snipe*, 515 F.3d 947 (9th Cir. 2008) (officers' subjective motive irrelevant to welfare search).

Moreover, even if the officers' information fell short of probable cause – which it did not – they would be entitled to rely solely on Hodge's determination that probable cause existed for a W&I § 5150 detention. Officers cannot be held civilly liable for making a search or seizure pursuant to the facially valid direction of another official or agency. *U.S. v. Hensley*, 469 U.S. 221, 231 (1985); *Torres v. City of Los Angeles*, 548 F.3d 1197, 1212 (9th Cir. 2008). Hodge's direction was facially valid. Hodge was "a person designated by the county" to make a W&I § 5150 detention, and he presented the officers with a card documenting his authority as well as statutory documentation stating several specific facts that supported his determination that Sheehan was a danger to others and was gravely disabled. Cal. Welf. & Inst. Code § 5157. This documentation included "relevant information

about the historical course of the person's [Sheehan's] mental health disorder." *Id.* § 5150.05. Hodge's request that the officers assist him in transporting Sheehan involuntarily was specifically authorized by statute. *Id.* § 5150.2. The Fourth Amendment does not demand – and it is not clearly established – that police officers must second-guess the evaluation of an authorized and knowledgeable mental health worker.

Likewise, qualified immunity applies. The Supreme Court recently re-emphasized the deference that courts must give to officers' on-the-scene decisions whether a danger exists justifying a Fourth Amendment search. *Ryburn v. Huff*, No. 11-208, 2012 WL 171121, at *5 (Jan. 23, 2012). There is no law stating that officers may not enter a residence to make a W&I § 5150 hold, where probable cause exists for the hold. To the contrary, in an unpublished decision this Court expressly found that the need to make a W&I § 5150 hold was an exigency permitting a warrantless entry. *Duarte v. Begrin*, No. 07-15584, 299 Fed. Appx. 711, 2008 WL 4831482, at **1 (9th Cir. Nov. 6, 2008). [9]

Sheehan is incorrect to claim that the undisputed facts did not support a conclusion that "medical assistance was needed" or "persons were in danger" under *Michigan v. Fisher*. AOB23-27. Sheehan contends that she was in no "imminent" danger, because Hodge's (and the officers') determination that Sheehan posed a danger to others was based in part on longer-term behaviors by Sheehan, like refusing to take her medication, refusing to see her counselor, and not changing her clothes for several days; and Sheehan subjectively only wanted to be left alone. AOB27. Sheehan's argument is unsound, for two reasons. First, it ignores the undisputed facts about Sheehan's short-term behavior that put Sheehan

---

[9] Unpublished decisions may be considered for qualified immunity purposes. *Bahrampour v. Lampert*, 356 F.3d 969, 977 (9th Cir. 2004).

and those around her in imminent danger: Sheehan threatened to stab her social worker when he tried to perform a welfare check on her.  Sheehan's subjective motivation for threatening to stab her social worker did not make her any less of a danger.  Second, long-term behaviors can and do cause deteriorations in mental and physical health that require immediate intervention; these are not mutually exclusive.

Sheehan offers no other arguments against affirmance.  And she identifies no clearly established law that would lead *every* reasonable officer to conclude that the emergency aid doctrine would not apply.

### 2.     The Officers' Entry Was Also Justified By Exigent Circumstances

Exigent circumstances are "those circumstances that would cause a reasonable person to believe that entry ... was necessary to prevent physical harm to the officers or other persons, the destruction of relevant evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement efforts."  *U.S. v. McConney*, 728 F.2d 1195, 1199 (9th Cir. 1984) (en banc), *overruled on other grounds, Estate of Merchant v. C.I.R.*, 947 F.2d 1390 (9th Cir. 1991).  Exigent circumstances existed here, based on Hodge's report that Sheehan threatened to stab him with a knife – a violation of California Penal Code § 422[10] – and based on Hodge's report of Sheehan's mental state.  If Sheehan's apprehension were delayed to obtain a warrant, Sheehan could have hurt Hodge, a housemate, herself, or a member of the public, or destroyed or hid evidence (her knife).  In light of Sheehan's reported threats and mental illness, the law did not

---

[10] The full statutory text is in the Addendum.  As already discussed above, Sheehan abandoned and waived any argument about the existence of probable cause regarding this offense, and also abandoned and waived any argument against collateral estoppel on this probable cause issue.

require the officers to obtain a warrant to enter, and certainly there was no clearly established law imposing such a requirement.

Qualified immunity applies, given that courts have found exigent circumstances in similar W & I § 5150 situations. *E.g.*, *Duarte*, 2008 WL 4831482, at **1; *Barber v. City of Santa Rosa*, No. C-08-5649 MMC, 2010 WL 5069868, at *9 (N. D. Cal. Dec. 7, 2010) (employee of a group home for the mentally ill reported to police officers that a resident was off his medication and in his room armed with a knife).

Sheehan makes the same argument against exigent circumstances that she makes against the emergency aid exception. AOB23-27. Those arguments are just as unsound here.

### 3.   After Sheehan Forced Her Door Closed, The Officers Did Not Violate The Fourth Amendment By Re-Entering Her Room To Continue Their Search

Sheehan's attack forced the officers to retreat, which allowed Sheehan to momentarily close her bedroom door. SER210-214. For three independent reasons, re-opening that door did not violate the Fourth Amendment.

1.   As a matter of law, this was a single search. Where two warrantless entries occur in close succession and are justified by the same emergency, there is no separate warrant requirement for the later entry. *See, e.g.*, *Michigan v. Tyler*, 436 U.S. 499, 510-11 (1978); *Fisher v. City of San Jose*, 558 F.3d 1069, 1076-77 (9th Cir. 2009) (en banc) (explaining that *Tyler* rule applies to all exigencies, not just fire investigations). Rather, when a search arising from the same exigency involves more than one entry, courts will uphold the entire search because the latter entries are merely a "continuation of the initial lawful entry." *United States v. Echegoyen*, 799 F.2d 1271, 1280 (9th Cir. 1986). Thus, officers are "not required to periodically reassess whether the exigency persisted" during a standoff.

*Fisher v. City of San Jose*, 558 F.3d at 1076-77. This principle applies here, where officers facing an exigency were forced to momentarily retreat for their own safety; under these circumstances, officers may persist in their search without leaving to obtain a warrant. *People v. Hamilton*, 105 Cal.App.3d 113, 117-18 (1980). As this Court has recognized, a contrary rule would reward persons who violently attack police officers and force a retreat. *Fisher v. City of San Jose*, 558 F.3d at 1080 ("We reject the notion that trained officers, who put themselves in harm's way when handling a dangerous armed standoff, essentially increase the constitutional rights of suspects who, by their actions, both provoke and prolong the need for continuing police action.").

Sheehan argues that the officers' two entries, separated by moments, must be treated as two separate searches. Sheehan relies on courts' sometimes conducting separate analyses of "consecutive and overlapping 'seizures.'" AOB30-32. But that approach is not appropriate here. That approach is tailored to claims involving a series of seizures that constitute progressive and increasing impingements on Fourth Amendment liberty interests, and which therefore must satisfy progressively more stringent legal tests. For example, a brief investigative detention is a "seizure" requiring reasonable suspicion; a full arrest is a "seizure" requiring probable cause; and the degree of force used to make a "seizure" must be reasonable based on the totality of the circumstances. Each separate seizure involves a different legal standard. That is not the case here, where each of the officers' two entries were part of a single search that was caused by the same exigency and resulted in identical impingements on Sheehan's Fourth Amendment privacy interest, namely, opening her door twice. Finally, treating this as a single search is consistent with controlling Supreme Court precedent and this Court's decision in *Fisher v. City of San Jose*.

2.      Even assuming – contrary to the law – that the officers had to reassess exigent circumstances or the emergency aid exception after Sheehan got her door closed, those exceptions did still apply.  All of the facts that existed at the inception of the encounter – which rendered Sheehan a danger to others, gravely disabled, and a dangerous felon – still existed when Sheehan forced the officers' retreat.  Those facts justified the initiation of the search, and they no less justified continuing that search.  Moreover, the factual bases for exigent circumstances and the emergency aid exception only became stronger when Sheehan attacked the officers.  Not only did Sheehan just commit more violent felonies by threatening and assaulting the officers with a deadly weapon (Cal. Penal Code §§ 245(a), 245(c), 422),[11] she also further proved that she was indeed a danger to others.  Her behavior made it even more necessary to bring her into custody.

Sheehan ignores these undisputed facts.  AOB28-29.  Instead, she contends that her response to the officers showed that she "would not display any aggression so long as she was left alone."  AOB28.  But officers cannot simply leave a mentally ill person alone in a group home to freely attack any innocent person who might disturb her.  And Sheehan's argument is pure speculation:  Sheehan's response to Hodge and the officers showed that she was ready, willing, and able to kill those around her, even if – like Hodge and the officers – they were trying to provide her with the help she needed.  Likewise, Sheehan's claim that no one else was in the room is based on 20/20 hindsight.  These officers were not omniscient, nor were they able to confirm that no one was in fact in Sheehan's room, because they were busy fending off Sheehan's assault.  SER390.

---

[11] The full statutory text is in the Addendum.  Moreover, Sheehan likewise conceded and waived any argument as to probable cause for these offenses.

3.      Sheehan's attack on the officers with a knife, her threats against the officers, and her flight back into her room gave rise to a new independent legal basis for a second entry: hot pursuit.  After a person attacks officers with a knife, officers may pursue and apprehend the person in the person's home to prevent escape, *U.S. v. Santana*, 427 U.S. 38, 42-43 (1976), and to prevent lost evidence (*i.e.*, the knife), *Ker v. California*, 374 U.S. 23, 40 (1963).  This Court recognized as much in *Fisher v. City of San Jose*, 558 F.3d at 1082 ("Fisher cannot undermine his lawful warrantless arrest – nor can he increase his constitutional protections – by hiding within the four walls of his residence, readying his arsenal as a means to resist officers' reasonable efforts to take him into full physical custody.").

And qualified immunity applies to the officers' persistence in their attempts to detain Sheehan in the face of her violent response.  No law clearly established that when a person violently attacks police officers and forces a momentary retreat for the officers' own safety, the Fourth Amendment forbids officers from persisting in trying to make a detention.  Sheehan does not identify any.  And the great weight of authority is to the contrary.  Indeed, *Fisher v. City of San Jose* expressly authorizes officers to persist in their efforts to detain a suspect who acts violently and then attempts to retreat to her home.

Sheehan's two arguments to the contrary are without merit. First, Sheehan complains that the District Court did not draw inferences in her favor, such as an inference that Sheehan just wanted to be left alone and that Sheehan would not have attacked her housemates or the public.  AOB33-35.  This argument misunderstands the legal standard.  The exigent circumstances and emergency aid exceptions require objective facts that establish only a *risk* of harm – not a *certainty* that harm *will* occur.  "Officers do not need ironclad proof of a likely serious, life-threatening injury to invoke the emergency aid exception." *Michigan*

*v. Fisher*, 130 S. Ct. at 549 (internal quotation marks omitted); *accord United States v. Russell*, 436 F.3d 1086, 1091-92 (9th Cir. 2006). The possibility that Sheehan *might not* attack anyone else did not negate exigent circumstances. And the possibility that Sheehan's deteriorating mental and physical health *might* suddenly reverse course did not negate the emergency aid exception.

Second, Sheehan argues that it was tactically unreasonable to re-enter her room. AOB32-33. But this argument ignores the governing law: a warrantless entry is lawful if the facts known to the officers gave them a recognized legal justification. "An action is 'reasonable' under the Fourth Amendment ... as long as the circumstances, viewed objectively, justify the action." *Brigham City*, 547 U.S. at 404 (internal quotation marks and brackets omitted). If an entry is justified under the emergency aid or exigent circumstances exceptions, it is not made unlawful by a plaintiff's ability to find an expert to opine that the entry was *tactically* unreasonable. *Billington v. Smith*, 292 F.3d 1177, 1189 (9th Cir. 2002); *Duran v. City of Maywood*, 221 F.3d 1127, 1130-31 (9th Cir. 2000). And even if this were so, it was not unreasonable for the officers to re-enter. Sheehan could have further harmed herself, hidden her knife, gathered more weapons, suddenly attacked, or escaped and evaded arrest or harmed someone. Sheehan's argument is the type of hindsight second-guessing that the Supreme Court forbade in *Ryburn*.

### C.    Sheehan's Federal Force Claim Fails
#### 1.    The Legal Standard

In *Price v. Sery*, 513 F.3d 962 (9th Cir. 2008), this Court stated the rule for deadly force cases: "Our case law requires that a reasonable officer under the circumstances believe herself or others to face a threat of serious physical harm before using deadly force." *Id.* at 971 (interpreting *Scott v. Harris*, 550 U.S. 372, 382-83 (2007)). This reasonableness standard is deferential to officers' need to

make decisions based on uncertain information, and adopts the officer's perspective. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Graham v. Connor*, 490 U.S. 386, 396-97 (1989). The reasonableness of the force is not judged from the position of an arrestee, from hindsight, or from omniscience: "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396.

In determining whether an officer has qualified immunity for using deadly force, a court must analyze the case law that governed the use of deadly force in factually similar situations. *Brosseau*, 543 U.S. at 200-01. Where "the result depends very much on the facts of each case," or the results of the case law are mixed, the legal prohibitions are not clearly established, and qualified immunity applies. *Id.* at 201; *Blanford v. Sacramento County*, 406 F.3d 1110, 1115 (9th Cir. 2005).

**2.    There Is No Dispute of Material Fact That Sheehan Attacked The Officers With A Knife While Threatening To Kill Them, And Therefore Deadly Force Was Justified As A Matter Of Law**

It is well-established that "where a suspect threatens an officer with a weapon such as a gun or a knife, the officer is justified in using deadly force." *Smith v. City of Hemet*, 394 F.3d 689, 704 (9th Cir. 2005) (en banc). Here, Sheehan admitted that she threatened to kill the officers, advanced toward the officers with her 11-inch knife, and was 2 to 4 feet away from a cornered Officer Holder. AOB38-39. These undisputed facts unquestionably justified deadly force.

Nevertheless, Sheehan contends that the District Court resolved material factual disputes against her, and that the result would be different on the facts most favorable to Sheehan. AOB38-42. That contention is incorrect. Initially, Sheehan misunderstands what constitutes a material fact. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Contrary to Sheehan's assertion, the District Court resolved all of the factual disputes identified by Sheehan in her favor; then, it simply concluded that none of those disputes was material to the central question: whether a reasonable officer would perceive that Sheehan posed a threat of serious physical injury. Likewise, these alleged disputes are not material to the central question in a qualified immunity analysis: whether *every* reasonable officer would conclude that deadly force was unlawful under these circumstances. As explained below, the District Court was correct.

1.    Sheehan cites the subjective reasons why she felt justified in resorting to violence against police officers. AOB38. These are immaterial. Sheehan's subjective beliefs did not change the danger she posed by her objective conduct. Indeed, the fact that Sheehan subjectively felt justified in attacking Sergeant Reynolds and Officer Holder apparently only increased her resolve.[12]

_____

[12] Sheehan criticizes the District Court for relying on Sheehan's testimony that "she had no intention of dropping the knife even after she was shot" and felt justified in continuing her resistance, SER5, 14. AOB41. Appellees agree that Sheehan's intentions did not change her objective conduct – she refused to drop her knife and continued to threaten the officers. However, Sheehan's testimony does *disprove* any contention that the officers may have misinterpreted Sheehan's intentions. The law does not yet require officers to correctly read the minds of violent suspects, but if it did, Sheehan's testimony shows that the officers did so.

2.      Sheehan claims that "The officers then sprayed her with pepper spray, causing her to be blinded, fall and stagger into the hall where they shot her six times." AOB19; AOB42 (claiming that Sheehan testified that she "stumbled and staggered across the door threshold"). This claim is a distortion of the record. It is true that the officers sprayed Sheehan with pepper spray, that Sheehan testified that she could not see, and that Sheehan was ultimately shot several times (five times rather than six). But the remainder of this statement is false and is not supported by the record. Sheehan did not fall after she was pepper sprayed. She admittedly continued to advance on the officers, not only after she was pepper sprayed but even after she was *shot*. SER328-330 (Sheehan testimony). Sheehan finally fell only after she had been shot several times. *Id.*; *supra* p. 9. And no one, not even Sheehan, testified that Sheehan "staggered" or "stumbled" into the hallway. Those words belong to Sheehan's counsel. Sheehan also claims, inaccurately, that "[t]he district court makes no mention of SHEEHAN's theory of the case that she was impacted by the pepper spray and staggered blindly due to the spray; thus revealing that the court made impermissible findings of fact on this point." AOB42. Sheehan is absolutely wrong. The District Court accepted as true Sheehan's subjective testimony that she could not see. SER4. However, the District Court found this fact immaterial, given Sheehan's undisputed actions. As the District Court correctly observed, "In both Plaintiff's account and the officers' accounts, Plaintiff was pepper-sprayed while advancing toward the officers with the knife, and continued to advance with the knife after she was pepper-sprayed." *Id.*

3.      Sheehan argues that she did not pose a threat because of the way she was holding her knife when the officers finally fired, citing her testimony that her "knife [was] upraised but not pointed at anyone" and supposed inconsistencies in the officers' testimony about how she was holding her knife. AOB39. Even

supposing the officers had different recollections of exactly how Sheehan was holding her knife when they fired – and they did not[13] – that would be immaterial. Given that Sheehan threatened to kill the officers[14] and was advancing on them with a knife, and she was only two to four feet away from Officer Holder when the officers fired, it is immaterial exactly how Sheehan was holding her knife – up high, or near her hip. Courts agree that when a suspect is threatening police officers with a knife, that is what is material – not disputes about the specific motions made with the knife. *E.g.*, *Martinez v. County of Los Angeles*, 47 Cal.App.4th 334, 345 (1996); *see also, e.g.*, *Estate of Larsen v. Murr*, 511 F.3d 1255, 1261-62 (10th Cir. 2008) (reasonable for officer to shoot knife-wielding suspect, and immaterial whether the suspect was seven feet away or twenty feet away or somewhere in between); *MacEachern v. City of Manhattan Beach*, 623 F. Supp. 2d 1092, 1104 (C. D. Cal. 2009) (immaterial whether suspect had knife in

---

[13]Sheehan misrepresents the record in claiming there was a factual conflict regarding how Sheehan was holding her knife when she was shot. Sheehan cites testimony from the officers regarding how Sheehan was holding her knife at *different* times. AOB39 (citing ER195, 240-41). Officer Holder testified that she saw Sheehan holding her knife down by her hip *earlier*, when Sheehan was standing next to her bed. ER240-241. Sergeant Reynolds testified that Sheehan was holding her knife upraised *later* – when Sheehan was coming out of her room toward the officers. ER195. Sergeant Reynolds' testimony about how Sheehan held her knife at this *later* point in time – that Sheehan had her knife upraised – was in fact *consistent* with both Officer Holder's (ER242-43) and Sheehan's (SER327-328) testimony.

[14]On appeal, Sheehan does not dispute that she threatened to kill the officers – but Sheehan misleadingly suggests that there is a factual dispute about the number and timing of these threats – specifically, whether Sheehan threatened to kill the officers *after* her door was opened as well as *before*. AOB39. But Sheehan never denied making this threat after the door was open. Rather, Sheehan testified that she threatened to kill the officers through the closed door; she *also* testified that she was "not sure" whether she repeated those words a "second time" after the door opened. SER333. Thus, Sheehan never contradicted the officers' testimony about the later threats. In any case, any such dispute would be immaterial; either way, Sheehan verbally threatened to kill the officers and took physical action consistent with this threat.

left or right hand). Indeed, Sheehan's own expert witness agreed that it was not unreasonable for the officers to start firing. SER477.

4.      Sheehan argues that her own testimony is unreliable, due to her mental illness. AOB41-42. But Sheehan never objected to the admissibility of her testimony in the District Court, on competency or any other grounds, and has therefore waived this argument. *City of Phoenix v. Com/Systems, Inc.*, 706 F.2d 1033, 1038-39 (9th Cir. 1983). More to the point, however, this argument does not even support reversal. In the absence of Sheehan's testimony, the officers' testimony about Sheehan's actual actions would remain undisputed. That testimony still supports the conclusion that Sheehan posed a risk of serious physical harm warranting deadly force.

### 3.      Officers May Lawfully Use Deadly Force Against A Person Who Assaults Them With A Knife, Even If The Person Is Mentally Ill

Sheehan also contends the officers' use of force was excessive because of Sheehan's mental illness. AOB43-44. But neither the law nor reason supports Sheehan contention. While a suspect's mental illness can be relevant to the force analysis, it is far from dispositive. Rather, under the law, the dispositive factor is whether a suspect – mentally ill or not – poses a threat of death or serious physical injury. *Smith*, 394 F.3d at 702 ("most important single element" is "whether the suspect poses an immediate threat to the safety of the officers or others").

When a mentally ill person has announced her intention to kill police officers and is advancing on them with a knife, officers are entitled to use deadly force to respond to the threat she poses. Thus, the Ninth Circuit has held that deadly force is proper when a mentally disturbed suspect threatens and assaults officers with a knife. *Reynolds v. County of San Diego*, 84 F.3d 1162, 1168 (9th Cir. 1996) (suspect was reported to be behaving in a "strange" and "erratic"

manner and suddenly picked up his knife).[15]  Even when an individual appears
mentally disturbed, officers have an "overriding" concern to secure that
individual's deadly weapon.  *See Blanford*, 406 F.3d at 1117-18; *Long v. City and
County of Honolulu*, 511 F.3d 901, 906 (9th Cir. 2007) (armed suspect's "agitated"
behavior contributed to reasonableness of force).  *Even Sheehan's own expert
agreed that at the point a subject poses a deadly threat, her mental illness is
irrelevant to the reasonableness of the force.*  SER470-471, 477-478.

    Three Ninth Circuit decisions have criticized the use of force against
mentally ill persons – but under factual circumstances very different from this case.
In *Drummond v. City of Anaheim*, 343 F.3d 1052, 1058 (9th Cir. 2003) and *Deorle
v. Rutherford*, 272 F.3d 1272, 1282-83 (9th Cir. 2001), the mentally ill individuals
were not armed and not assaulting anyone.  This Court has previously
distinguished these two cases on those grounds.  *Gregory v. County of Maui*, 523
F.3d 1103, 1108-09 (9th Cir. 2008); *Blanford*, 406 F.3d at 1117-18.  And in *Glenn
v. Washington County*, No. 10-35636, --- F.3d ---, 2011 WL 6760348 (9th Cir.
Dec. 27, 2011), the mentally ill individual had a pocketknife, but he was suicidal
and held the knife to his own neck, rather than threatening serious physical harm
against anyone else.  *Id.* at *7.  The present case is nothing like these cases.

    Moreover, qualified immunity would apply, because under existing case law
it would not be clearly established to every reasonable officer that deadly force was

---

[15]Contrary to Sheehan's claim, AOB39-40, *Reynolds* is similar to this case.
There, a violent erratic person attacked an officer with a knife.  Sheehan claims
that *Reynolds* is different from this case because "Reynolds was a threat to
innocents" and was not "in a confined area."  AOB40.  But surely the officers in
*Reynolds*, like Officer Holder and Sergeant Reynolds, were justified in protecting
*themselves* from a knife attack.  And Sheehan did actually threaten to kill an
"innocent," Hodge.  Finally, Sheehan's being "in a confined area" provided
*greater* justification for the force, because Sheehan trapped Officer Holder in that
"confined area."

impermissible.  A number of court cases – in addition to the published Ninth
Circuit cases discussed above – have authorized the use of deadly force and found
qualified immunity in similar cases involving violent and armed mentally ill
persons.  *E.g.*, *Kim v. City of Santa Clara*, No. 10-16335, 2011 WL 3841294, at
*1-*2 (9th Cir. Aug. 31, 2011) (deadly force used against an assaultive knife-
wielding disturbed person who barricaded himself behind a closed door); *Barber*,
2010 WL 5069868, at *2, *6, *8 (Taser and then deadly force used against knife-
wielding disturbed person who was off his medication, threatened officers, and
brandished a knife and advanced on officers); *Robbins v. City of Hanford*, No. CIV
F 04-6672 AWI SMS, 2006 WL 1716220, at *15 (E. D. Cal. June 19, 2006)
(deadly force used when officers were making a W&I § 5150 hold on mentally ill
person who refused to drop his knife and cornered an officer).

### 4.    Sergeant Reynolds' Final Shot Was Reasonable, And Qualified Immunity Applies

Even assuming that Sheehan reached the ground before Sergeant Reynolds
fired her final shot, it was reasonable and lawful for Sergeant Reynolds to use
deadly force at that moment.  SER15-16 (District Court Order).  And in any event,
qualified immunity applies.

The threat posed by an armed person does not end the moment the person is
shot, or the moment the person makes contact with the ground.  Thus, the law
recognizes that it is reasonable for an officer to continue firing at a suspect who has
already been shot and falls to the ground, where the officer has not conclusively
determined that the person has been disarmed.  For example, in *Rodgers v. Smith*,
No. 05-1382, 188 Fed. Appx. 175, 2006 WL 1843435 (4th Cir. June 26, 2006), the
defendant officer shot a suspect twice, after which the suspect dropped his gun and
fell to the ground.  *Id.* at **2.  After a two-second delay, the defendant officer shot

the suspect three more times while he was on the ground, because the officer could not tell that the suspect dropped his weapon. *Id.* at **2. The court held these shots reasonable "to ensure the neutralization of a deadly threat." *Id.* at **6-7. Likewise, in *Maradiaga v. Wilson*, 518 F. Supp. 2d 760 (D.S.C. 2007), the plaintiff claimed that he fell to the ground between the sixth and seventh time he was shot by police officers, and that the seventh shot – separated by a two-second gap from the sixth – constituted excessive force. The court rejected the argument, reasoning that the officers' seventh shot was reasonable to eliminate the threat posed by the plaintiff, and that the plaintiff may still have been armed at that point. *Id.* at 768-69. The fact that the plaintiff continued to pose a threat to the officers even after the seventh shot further supported the reasonableness of the seventh shot. *Id.* at 769. And in *Webb v. Raleigh County Sheriff's Department*, 761 F. Supp. 2d 378 (S. D. W. Va. 2010), the court held that qualified immunity shielded a deputy who shot a man a third time after the man had fallen to the ground, where the deputy could not see that the man dropped his gun. *Id.* at 392-93.

Moreover, officers do not have to be omniscient and determine the exact moment that the need to use deadly force has ended. Courts recognize that in a fast-moving situation involving a deadly threat posed by an armed and violent individual, a police officer is not held to a 20/20 hindsight standard in determining the exact moment the threat ends, in order for deadly force to be reasonable. For example, in *Berube v. Conley*, 506 F.3d 79 (1st Cir. 2007), the First Circuit declined to hold an officer liable under the Fourth Amendment for continuing to shoot even after, in hindsight, the threat posed by a hammer-wielding suspect may have ended. In that case, the plaintiff Berube had gone to a police yard to "raise a little hell" and was using a hammer to smash the windows of police cars. Berube charged at Officer Conley while holding a hammer. Officer Conley shot him

several times. *Id.* at 81. The court held it immaterial that Officer Conley may have continued to fire at Berube, even while he was on the ground:

> It may well be true that Conley continued to fire as Berube fell to or lay on the ground. But it is clear from the very brief time that elapsed that she made a split-second judgment in responding to an imminent threat and fired a fusillade in an emergency situation. Conley's actions cannot be found unreasonable because she may have failed to perfectly calibrate the amount of force required to protect herself.

*Id.* at 85. The court applied this same principle to the qualified immunity determination, giving even greater leeway to an officer to make a possibly incorrect decision about when to stop using deadly force:

> We cannot say that any reasonable officer, confronted with the necessity to subdue an apparent attacker, would not have made the same choice. While one might regret Conley's failure to stop shooting as soon as Berube went down, immunity encompasses "mistaken judgments."

*Id.* (quoting *Malley*, 475 U.S. at 343).

All of these decisions logically apply *Graham*'s principle that "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97. This principle compels a finding that Sergeant Reynolds' final shot was reasonable. Assuming that Sheehan had reached the ground when she was struck by Sergeant Reynolds' final bullet, it remains undisputed that all of these events happened very quickly. SER411. It is also undisputed that Sheehan was still armed after she reached the ground, still had Officer Holder cornered, and still posed a threat. That fact made the case for using deadly force even stronger here than in the decisions cited above, where the suspect was actually disarmed, but the officer did not yet know it. Here, it was not until Sheehan was actually disarmed – by Officer Zachos, who arrived after

Sergeant Reynolds' final shot – that the threat she posed finally ended. Thus, Sergeant Reynolds' final shot was reasonable.

In any event, qualified immunity applies. Even if the threat posed by Sheehan had ended when Sergeant Reynolds fired her last shot – which it had not – it cannot be said that every reasonable officer would have made a different choice under those tense, dangerous, and fast-moving circumstances.

### 5.  The Officers Did Not Violate The Fourth Amendment Under A "Provocation" Theory

Sheehan also argues that when the Officers opened Sheehan's door a second time, they "recklessly provoked" Sheehan. Thus, Sheehan argues, the officers are liable even for using reasonable force against Sheehan. AOB42-43. Sheehan cites the case *Billington v. Smith*, 292 F.3d 1177 (9th Cir. 2002) to support this theory. However, this theory is not available to Sheehan. *Billington* requires, among other things, that the claimed recklessly provocative entry be "an independent Fourth Amendment violation." *Id.* at 1189. As discussed above, *supra* Section I.B.3., the Officers' re-opening Sheehan's door did not violate the Fourth Amendment.

Even if this Court were to accept Sheehan's argument that a lawful but "reckless entry" creates liability, there was nothing "reckless" about the officers' decision to open Sheehan's door; it was based on the substantial risks involved if they delayed taking action. *See supra* Section I.B.3. & p. 7; SER15.

In any case, qualified immunity would bar liability premised on Sheehan's theory. Here, Sheehan contends that these officers can be held liable under the Fourth Amendment for a search that is lawful under the Fourth Amendment. That would be a drastic and unprecedented expansion of police officer liability. Such a theory does not rely on clearly established law, so qualified immunity would apply.

## II.    SHEEHAN HAS NO VIABLE MUNICIPAL LIABILITY CLAIMS UNDER SECTION 1983

Initially, where – as here – there is no underlying federal constitutional violation, there is no federal municipal liability. *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986); *Long*, 511 F.3d at 907. And where – as here – there is no showing of personal involvement in a section 1983 violation, there can be no federal supervisory liability for Chief Fong. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989); SER16 n. 13. But even if Sheehan could overcome these barriers, her municipal liability claim would still fail.[16]

Sheehan asserts on appeal that the City and County of San Francisco is liable for deliberate indifference and for "ratifying" constitutional violations by Officer Holder and Sergeant Reynolds. AOB44-49. Even if a constitutional violation occurred, however, Sheehan cannot maintain these claims. As the District Court observed, SER17 n.14, Sheehan presented no evidence of deliberate indifference on the part of San Francisco.

To the contrary, Sheehan conceded below and on appeal that San Francisco's training of its officers in dealing with mentally ill individuals is proper. This conceded fact bars any claim of deliberate indifference. A municipality may be held liable only when a "failure to train amounts to deliberate indifference to the rights of persons with whom the [public employees] come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). Here, Sheehan admits that San Francisco's training conforms with "generally accepted police practices for dealing with persons who are emotionally disturbed." AOB48. Therefore, there was no deliberate indifference on the part of San Francisco.

---

[16] Sheehan's official-capacity lawsuit against Chief Fong is just another way of suing San Francisco. *Kentucky v. Graham*, 473 U.S. 159, 165 (1985).

Sheehan nevertheless contends that San Francisco is liable because the officers did not comply with this training. AOB48-49. Assuming *arguendo* that the officers departed from their training, this would not establish indifference to the need to train. "[A]dequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable." *City of Canton*, 489 U.S. at 391; *accord McDade v. West*, 223 F.3d 1135, 1141 (9th Cir. 2000).

Finally, a municipal liability claim requires evidence of causation – specifically, that "deliberate conduct" by the municipality was the "moving force" behind a violation. *Board of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 404 (1997). Here, Sheehan claims that the officers did not follow instructions even though they received proper training. That hardly shows that a training deficiency caused a violation.

Finally, Sheehan argues that San Francisco and Chief Fong "tacitly endorsed" the officers' decision-making. AOB49. But Sheehan presented no evidence that any policymaker approved the Officers' decisions and the basis for them. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988). Therefore, she cannot proceed under this theory.

## III.   SHEEHAN HAS NO VIABLE CLAIM UNDER THE AMERICANS WITH DISABILITIES ACT

Sheehan concedes that Title II of the Americans with Disabilities Act does not permit claims against the individual defendants, AOB51, but she nevertheless argues that the City and County of San Francisco violated her rights by "failing to accommodate her disability during her arrest." AOB50-56. The District Court correctly rejected this argument. SER17-18. The ADA does not prohibit police officers from using force in response to violent conduct by individuals who happen

to be mentally ill.  While this Court has not expressly decided this question, the majority has adopted this rule, it is the correct rule, and it bars Sheehan's claim here.

Under the ADA, it is not discriminatory for officers to arrest or to use force against a  mentally ill person based on that person's violent or threatening conduct. The ADA does not require police officers who must defend themselves against a mentally ill person assaulting them with a knife to determine what "reasonable accommodations" or "program" access could be achieved for that person.  *Hainze v. Richards*, 207 F.3d 795, 800-02 (5th Cir. 2000) ("Title II does not apply to an officer's on-the-street responses to reported disturbances or other similar incidents, whether or not those calls involve subjects with mental disabilities, prior to the officer's securing the scene and ensuring that there is no threat to human life."); *accord Waller v. City of Danville*, 556 F.3d 171, 175-76 (4th Cir. 2009) (rejecting claim that ADA constrained officers' tactical discretion during standoff with mentally ill person); *Thompson v. Williamson County*, 219 F.3d 555 (6th Cir. 2000); *Bates v. Chesterfield County*, 216 F.3d 367, 372 (4th Cir. 2000); *Gohier v. Enright*, 186 F.3d 1216, 1222 (10th Cir. 1999); *Buchanan v. Maine*, 417 F.Supp.2d 45, 73 (D. Me. 2006) (collecting cases).[17]  And the use of force against an armed violent person who is mentally ill does not deny access to any "programs."  *E.g., Thompson*, 219 F.3d at 558 ("[I]f the decedent was denied access to medical services it was because of his violent, threatening behavior, not because he was mentally disabled."); *accord Sanders v. City of Minneapolis*, 474 F.3d 523, 527 (8th Cir. 2007).

---

[17] This is not to say that the ADA does not apply to law enforcement agencies – it does.  *Lee v. City of Los Angeles*, 250 F.3d 668, 691 (9th Cir. 2001). But that is not the salient question in this case.

Under this rule, Sheehan cannot maintain a claim under the ADA.  Sheehan appears to accept the rule established in *Hainze*, a rule that has been adopted by the Fourth, Fifth, Sixth, Eighth, and Tenth Circuits: the ADA does not apply to police officers' responses to violent individuals who happen to be mentally ill, where officers have not yet brought the violent situation under control.  Any duty to supply programs or accommodate disabilities does not attach until officers have elimined the threat of violence posed by an individual.

Sheehan argues that when she attacked police officers with a knife and succeeded in forcing a momentary retreat, the situation was "under control" within the meaning of *Hainze*.  AOB51-56.  That is an unusual – and incorrect – interpretation of "under control."  As the District Court correctly ruled, SER18, this situation was not "under control" as long as Sheehan remained out of police custody.

Similarly, Sheehan misunderstands the scope of ADA liability in arguing that merely unreasonable conduct can establish an ADA violation.  AOB55-56.  A damages claim under Title II of the ADA requires a showing of deliberate indifference.  *Duvall v. County of Kitsap*, 260 F.3d 1124, 1139 (9th Cir. 2001).  But the concept of "deliberate indifference" is entirely unsuited to the kinds of decisions officers must make during dangerous assaults like Sheehan's.  When Sheehan threatened to stab Hodge and then attacked the officers with a knife, that was not a request for accommodation to be weighed and considered in an interactive process.  The ADA's culpability standard is a poor fit for officers' force decisions.  This further underscores that the ADA does not provide an appropriate federal remedy in situations like this one.

## IV.    SHEEHAN HAS NO VIABLE STATE LAW CLAIMS

Sheehan sued the officers under state law for their entry into her room, her arrest, and the use of force against her.  Several statutory immunities and privileges apply to these claims.  When such an immunity or privilege applies, it is a completely bar to state law liability, regardless of the legal theory asserted. *Horwich v. Superior Court (Acuna)*, 21 Cal.4th 272, 285 (1999) (privilege barred liability regardless of legal theory).  These defenses also bar respondeat superior liability for the City and County of San Francisco.  Cal. Gov. Code § 815.2.

### A.    Under Welfare & Institutions Code Section 5278, The Existence Of Probable Cause To Detain Sheehan Under Section 5150 Confers Immunity From All Of Sheehan's State Law Claims

As discussed above, W&I § 5150 authorizes officers and other designated persons (like Hodge) to detain for 72-hour treatment and evaluation persons who are a danger to themselves or others or are gravely disabled.  When such a detention is lawful – as it was here – California provides for immunity from *any* civil liability related to the exercise of authority to make that detention. "Individuals authorized under this part to detain a person for 72-hour treatment and evaluation . . . shall not be held either criminally or civilly liable for exercising this authority in accordance with the law."  Cal. Welf. & Inst. Code § 5278 (*see* Addendum, *infra*); *id.* § 5150 ("peace officer" authorized to make detention).

This statute confers immunity from *all* of Sheehan's California claims – and not just her false imprisonment claim.  *Bias v. Moynihan*, 508 F.3d 1212, 1221 (9th Cir. 2007) (rejecting state law claims including battery, intentional infliction of emotional distress, and Civil Code violations).  Provided a W & I § 5150 detention was lawful, the force officials use to make the detention cannot be challenged through a state law battery claim; nor can the officers' other decisions and actions in connection with making the detention be a basis for civil liability.  *Heater*, 42

Cal.App.4th at 1083 ("[S]ection 5278 means precisely what it says it means, and that civil liability, whether for battery,[or] for false imprisonment ... is precluded insofar as the detention is 'in accordance with the law.' ")). Thus, California courts hold that where the "detention was lawful," all claims of civil liability "must be rejected." *Id.*; *accord Jacobs v. Grossmont Hosp.*, 108 Cal.App.4th 69, 78 (2003) ("If there is probable cause for the detention, the statute therefore provides immunity for the decision to detain as well as for the detention and its inherent attributes….")

Sheehan's makes two arguments against this immunity, but neither argument has merit. First, Sheehan argues that only Hodge enjoys the immunity, not the officers, because Hodge filled out the W & I § 5150 paperwork. AOB56. But the immunity is not limited to persons who fill out paperwork. To the contrary, the cases recognize immunity for every defendant in a lawsuit that challenges a valid W& I § 5150 detention. *See Bias*, 508 F.3d at 1222 (immunity applied to police chief and to employing public entity); *Heater*, 42 Cal.App.4th at 1068 (immunity applied to all defendants).

Second, Sheehan argues that this immunity is not "absolute" and does not apply to her negligence claim. AOB57. Sheehan cites two cases in which negligence claims were permitted to proceed notwithstanding a claim of section 5278 immunity. But those cases do not mean, as Sheehan argues, that a plaintiff can avoid the immunity simply by pleading that officials were negligent. Rather, those cases held that section 5278 immunity does not foreclose liability arising from events that occur *after* the exercise of authority to make the detention, such as professional negligence or a slip-and-fall in a health facility during later evaluation and treatment. Those cases did not apply the immunity, because the alleged negligence occurred well after the exercise of authority to make the detention

itself.  *Gonzalez v. Paradise Valley Hosp.*, 111 Cal.App.4th 735, 741 (2003) ("The protected conduct is confined to the exercise of statutory authority to detain, evaluate and treat against the patient's wishes, and does not extend to the manner in which evaluation and treatment are carried out.").  Facts connected with making the actual detention, however, cannot give rise to liability.  *Jacobs*, 108 Cal.App.4th at 78 ("the scope of section 5278 immunity extends to claims based on facts that are inherent in an involuntary detention pursuant to section 5150").  Here, Sheehan's claims against the officers arise from their exercise of authority to detain her, so the immunity applies and bars her California claims.

### B.    Several Additional Immunities, Privileges, And Bars Apply To Sheehan's State Law Claims

#### 1.    Under Government Code Section 821.6, Sheehan Cannot Maintain Any Claim Arising From The Officers' Entry, Lawful Or Not

Section 821.6 of the California Government Code bars claims arising from searches that occur in the course of investigations in preparation for judicial or administrative proceedings.  "A public employee is not liable for an injury caused by his instituting or prosecuting any judicial or administrative proceeding within the scope of his employment, even if he acts maliciously and without probable cause."  Cal. Gov. Code § 821.6.  This immunity applies regardless of the legality of a search, and it applies even to an allegedly unlawful search during an investigation.  *Baughman v. State of California*, 38 Cal.App.4th 182, 192-93 (1995).  This immunity therefore bars any claim by Sheehan arising from the officers' search, even if it was unlawful.

### 2. Under The California Penal Code, Sheehan Cannot Maintain Any Claim Arising From Sheehan's Arrest – And Those Claims Are Barred By Collateral Estoppel, Concession, And Waiver

Sheehan has likewise conceded and waived her state law false imprisonment claims. *See supra* p. 15. In any case, on the merits, the California Penal Code confers privilege to make an arrest if the officer "had reasonable cause to believe the arrest was lawful." See Cal. Pen. Code §§ 836.5, 847(b). The test whether this privilege applies is the same as for federal qualified immunity. *Galvin v. Hay*, 374 F.3d 739, 758 (9th Cir. 2004); *accord O'Toole v. Superior Court*, 140 Cal.App.4th 488, 510-13 (2006). Under this standard, her claim fails. Moreover, collateral estoppel precludes any state law claim arising from Sheehan's arrest.

### 3. Under The California Penal Code, Sheehan Cannot Maintain Any Claim Arising From The Officers' Force

Officers are privileged under California law to use reasonable force to make an arrest, prevent an escape, overcome resistance, or otherwise in discharge of their duties. Cal. Pen. Code §§ 196, 835a. This privilege applies when force was reasonable under the Fourth Amendment. *See, e.g., Edson v. City of Anaheim*, 63 Cal.App.4th 1269, 1274 (1998); *accord Johnson v. County of Los Angeles*, 340 F.3d 787, 794 (9th Cir. 2003). Because the officers' force was reasonable under the Fourth Amendment, it was privileged under state law.

## CONCLUSION

This Court should affirm.


Dated:  January 24, 2012                    Respectfully submitted,

                                            DENNIS J. HERRERA
                                            City Attorney
                                            JOANNE HOEPER
                                            Chief Trial Deputy
                                            BLAKE P. LOEBS
                                            PETER J. KEITH
                                            Deputy City Attorneys


                                            By:_____*/s/  Peter J. Keith*_____
                                                   PETER J. KEITH

                                            Attorneys for Defendants and Appellees
                                            CITY AND COUNTY OF SAN
                                            FRANCISCO, HEATHER FONG,
                                            KIMBERLY REYNOLDS, and
                                            KATHRINE HOLDER

## STATEMENT OF RELATED CASES

There are no related cases pending in this Court.


## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief has been prepared using proportionately double-spaced 14 point Times New Roman typeface. According to the "Word Count" feature in my Microsoft Word for Windows software, this brief contains 12,902 words up to and including the signature lines that follow the brief's conclusion.

I declare under penalty of perjury that this Certificate of Compliance is true and correct and that this declaration was executed on January 24, 2012.

DENNIS J. HERRERA
City Attorney
JOANNE HOEPER
Chief Trial Deputy
BLAKE P. LOEBS
PETER J. KEITH
Deputy City Attorneys


By:_____ */s/ Peter J. Keith*_____
　　　PETER J. KEITH

Attorneys for Defendants and Appellees
CITY AND COUNTY OF SAN FRANCISCO

# ADDENDUM (NINTH CIRCUIT RULE 28-2.7)

## **TABLE OF CONTENTS**

I.      California Welfare & Institutions Code § 5150:................................45

II.     California Welfare & Institutions Code § 5278:................................45

III.    California Penal Code § 245(a)(1) .....................................................46

IV.     California Penal Code § 245(c):.........................................................46

V.      California Penal Code § 422: ............................................................46

The following statutory provisions are pertinent to this appeal.

**I.     CALIFORNIA WELFARE & INSTITUTIONS CODE § 5150:**

> When any person, as a result of mental disorder, is a danger to others, or to himself or herself, or gravely disabled, a peace officer, member of the attending staff, as defined by regulation, of an evaluation facility designated by the county, designated members of a mobile crisis team provided by Section 5651.7, or other professional person designated by the county may, upon probable cause, take, or cause to be taken, the person into custody and place him or her in a facility designated by the county and approved by the State Department of Mental Health as a facility for 72-hour treatment and evaluation.

> Such facility shall require an application in writing stating the circumstances under which the person's condition was called to the attention of the officer, member of the attending staff, or professional person, and stating that the officer, member of the attending staff, or professional person has probable cause to believe that the person is, as a result of mental disorder, a danger to others, or to himself or herself, or gravely disabled. If the probable cause is based on the statement of a person other than the officer, member of the attending staff, or professional person, such person shall be liable in a civil action for intentionally giving a statement which he or she knows to be false.

**II.     CALIFORNIA WELFARE & INSTITUTIONS CODE § 5278:**

> Individuals authorized under this part to detain a person for 72-hour treatment and evaluation pursuant to Article 1 (commencing with Section 5150) or Article 2 (commencing with Section 5200), or to certify a person for intensive treatment pursuant to Article 4 (commencing with Section 5250) or Article 4.5 (commencing with Section 5260) or Article 4.7 (commencing with Section 5270.10) or to file a petition for post-certification treatment for a person pursuant to Article 6 (commencing with Section 5300) shall not be held either criminally or civilly liable for exercising this authority in accordance with the law.

### III.     CALIFORNIA PENAL CODE § 245(A)(1)

(a)(1) Any person who commits an assault upon the person of another with a deadly weapon or instrument other than a firearm or by any means of force likely to produce great bodily injury shall be punished by imprisonment in the state prison for two, three, or four years, or in a county jail for not exceeding one year, or by a fine not exceeding ten thousand dollars ($10,000), or by both the fine and imprisonment.

### IV.     CALIFORNIA PENAL CODE § 245(C):

(c) Any person who commits an assault with a deadly weapon or instrument, other than a firearm, or by any means likely to produce great bodily injury upon the person of a peace officer or firefighter, and who knows or reasonably should know that the victim is a peace officer or firefighter engaged in the performance of his or her duties, when the peace officer or firefighter is engaged in the performance of his or her duties, shall be punished by imprisonment in the state prison for three, four, or five years.

### V.     CALIFORNIA PENAL CODE § 422:

Any person who willfully threatens to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement, made verbally, in writing, or by means of an electronic communication device, is to be taken as a threat, even if there is no intent of actually carrying it out, which, on its face and under the circumstances in which it is made, is so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat, and thereby causes that person reasonably to be in sustained fear for his or her own safety or for his or her immediate family's safety, shall be punished by imprisonment in the county jail not to exceed one year, or by imprisonment in the state prison.

For the purposes of this section, "immediate family" means any spouse, whether by marriage or not, parent, child, any person related by consanguinity or affinity within the second degree, or any other person who regularly resides in the household, or who, within the prior six months, regularly resided in the household.

"Electronic communication device" includes, but is not limited to, telephones, cellular telephones, computers, video recorders, fax machines, or pagers. "Electronic communication" has the same meaning as the term defined in Subsection 12 of Section 2510 of Title 18 of the United States Code.

# <u>CERTIFICATE OF SERVICE</u>

I, COLLEEN M. GARRETT, hereby certify that I electronically filed the following document(s) with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on January 24, 2012.

## APPELLEES' ANSWERING BRIEF

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Executed January 24, 2012, at San Francisco, California.


*/s/  Colleen M. Garrett*
**COLLEEN M. GARRETT**