LAW OFFICES OF
# JOHN L. BURRIS
www.johnburrislaw.com

John L. Burris
Ben Nisenbaum
Adanté D. Pointer
Steven R. Yourke
DeWitt M. Lacy

VIA ECF FILING

john.burris@johnburrislaw.com
bnisenbaum@gmail.com
adante.pointer@johnburrislaw.com
steven.yourke@johnburrislaw.com
dewitt.lacy@johnburrislaw.com

September 17, 2013

Ms. Molly C. Dwyer
Clerk
United States Court of Appeals for the Ninth Circuit
95 Seventh Street
San Francisco, CA 94204-1526

Re:    *Teresa Sheehan vs. City and County of San Francisco, et al.*, No. 11-16401
       Citation of Supplemental Authorities, pursuant to FRAP 28(j) and Circuit Rule 28-6

Dear Ms. Dwyer:

 Pursuant to Federal Rules of Appellate Procedure, Rule 28(j) and Ninth Circuit Rule 28-6, Appellant Teresa Sheehan hereby gives notice to the Court and Appellees of the recent decision of the California Supreme Court in *Hayes v. County of San Diego* (August 19, 2013) California Supreme Court Docket No. S193997, Ninth Circuit Docket No. 09-55644. This case is relevant to matters the Court has taken under submission on Plaintiffs' common law negligence claim.

 A true and accurate copy of said decision is attached.

Dated: September 17, 2013

      */s/ Benjamin Nisenbaum*
      Benjamin Nisenbaum
      Attorney for Appellant/Plaintiff

cc: Peter J. Keith, Deputy City Attorney
  Blake Loebs, Deputy City Attorney

---

AIRPORT CORPORATE CENTRE • 7677 OAKPORT STREET, SUITE 1120 • OAKLAND, CA 94621 • TEL (510) 839-5200 • FAX (510)839-3882

Filed 8/19/13

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| CHELSEY HAYES, a Minor, etc., | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S193997 |
| v. | ) | |
| | ) | 9th Cir. No. 09-55644 |
| COUNTY OF SAN DIEGO et al., | ) | |
| | ) | S.D. Cal. No. |
| Defendants and Appellants. | ) | 3:07-cv-01738-DMS-JMA |
| _____ | ) | |

Sheriff's deputies shot and killed Shane Hayes when he came toward them with a large knife in his raised right hand.  The deputies had come to the home in response to a call from a neighbor who said she had heard screaming.  When the deputies arrived, Shane's girlfriend, Geri Neill, told them that earlier in the evening, Shane had tried to kill himself.  The deputies entered the house, and the incident that led to this lawsuit then transpired.

Shane's daughter brought this action in federal district court, alleging both federal and state claims for relief.  On appeal from a grant of summary judgment for defendants, the United States Court of Appeals for the Ninth Circuit (see Cal. Rules of Court, rule 8.548) asked us to decide a matter of state law:  "Whether under California negligence law, sheriff's deputies owe a duty of care to a suicidal person when preparing, approaching, and performing a welfare check on him." (*Hayes v. County of San Diego* (9th Cir. 2011) 658 F.3d 867, 868.)  In granting the Ninth Circuit's request, we restated the issue as "[w]hether under California

EXHIBIT 1

negligence law, liability can arise from tactical conduct and decisions employed by law enforcement preceding the use of deadly force." Our response, which is based on long-established state law, is that such liability can arise if the tactical conduct and decisions leading up to the use of deadly force show, as part of the totality of circumstances, that the use of deadly force was unreasonable. Our task here is limited to deciding a purely legal question; the federal courts will resolve, as a factual matter, whether a finding of liability is appropriate on the facts presented.

## I

San Diego County Sheriff's Deputy Michael King arrived at Shane's residence in Santee shortly after 9:00 p.m. on September 17, 2006, in response to a neighbor's call. Shane's girlfriend, Geri Neill, met Deputy King at the front door. Neill said that Shane had tried to kill himself earlier that evening by inhaling exhaust fumes from his car, Shane had tried to harm himself on other occasions, and she was concerned for his safety. She said no guns were in the house. Deputy King did not ask whether Shane was under the influence of alcohol or drugs.

A few minutes later, Deputy Sue Geer arrived and learned from Deputy King that a potentially suicidal man was in the house. The two deputies entered to determine whether Shane was a danger to himself. They were unaware that Shane had been drinking heavily and that four months earlier he had been taken into custody after a suicide attempt with a knife. With their guns holstered, the deputies walked into the living room and saw Shane standing in the kitchen.

Deputy King ordered Shane to show his hands. As Shane did so, he walked toward the deputies, holding in his raised right hand a large knife. The deputies simultaneously drew their guns and fired two shots each at Shane, who was then between two and eight feet away. Shane died from the gunshot wounds.

Plaintiff Chelsey Hayes is Shane's daughter, who was 12 years old when the shooting took place and did not observe the shooting. On September 4, 2007, acting through a guardian ad litem, she filed in federal district court a complaint alleging three federal law claims and two state law claims. The three federal claims were against the County of San Diego and Deputies Geer and King, asserting in various ways a violation of Shane's right under the federal Constitution's Fourth Amendment "to be secure . . . against unreasonable searches and seizures" and a violation of plaintiff's own right under the federal Constitution's Fourteenth Amendment not to be "deprive[d of] . . . liberty . . . without due process of law" (specifically, her liberty interest in the continuing companionship of her father). Of the two state claims, one was against the County of San Diego and Deputies Geer and King, alleging negligence as regards the confrontation with Shane; the other state claim was against the County of San Diego only, alleging negligent hiring, training, retention, and supervision of its employees.

The federal district court granted summary judgment in favor of defendants on all claims. The court ruled that plaintiff had standing to assert her federal claims, but that she could not prevail on those claims. The court noted the agreement of all eyewitnesses that, at the time of the shooting, Shane was walking toward the deputies while holding a large knife in a threatening manner. These witnesses placed Shane no further than eight feet away from the deputies, and perhaps much closer. In the federal district court's view, "it was objectively reasonable for the Deputies to conclude that [Shane] posed a significant threat of death or serious physical injury to themselves or others," and therefore "their use of deadly force was reasonable and did not violate the Fourth Amendment." In addition, the court found that the deputies' *preshooting* conduct did not "rise[] to the level of an independent Fourth Amendment violation." The court next rejected

3

plaintiff's assertion that the deputies violated her due process right under the federal Constitution's Fourteenth Amendment, as it found no evidence of "a purpose to harm that was unrelated to legitimate law enforcement objectives." Finally, in light of its rulings as to Deputies King and Geer, the federal district court rejected plaintiff's related federal claims against the County of San Diego.

The federal district court then turned to plaintiff's state claims. The court ruled as a matter of law that the deputies' use of deadly force against Shane was reasonable in light of Shane's threatening conduct with the large knife, and that therefore the deputies were not negligent in using such force. In rejecting plaintiff's argument that the deputies negligently provoked the dangerous situation in which the use of deadly force was justified, the federal district court ruled that the deputies owed plaintiff no duty of care with regard to their preshooting conduct and decisions. The court relied on two California appellate decisions: *Adams v. City of Fremont* (1998) 68 Cal.App.4th 243 (*Adams*) and *Munoz v. City of Union City* (2004) 120 Cal.App.4th 1077 (*Munoz*). Those two cases, in turn, relied on this court's decision in *Rowland v. Christian* (1968) 69 Cal.2d 108 (*Rowland*), which set forth factors to be considered in deciding whether a defendant owes a duty of care in a particular situation. The state Court of Appeal in *Adams* applied this court's *Rowland* test and concluded that law enforcement personnel owe no duty of care with regard to efforts they undertake to prevent a suicide. In *Munoz*, the same appellate panel extended that holding, concluding that law enforcement personnel owe no duty of care with regard to preliminary conduct and decisions that later give rise to a dangerous situation in which the use of deadly force is justified.

The federal district court next considered plaintiff's second state claim, which sought to hold the County of San Diego liable for negligent hiring, training, and retention of Deputies King and Geer. Citing a state appellate decision in *de*

4

*Villers v. County of San Diego* (2007) 156 Cal.App.4th 238, the federal district court stated that plaintiff had failed to identify any statute that supported such a theory of recovery against a governmental entity, and it therefore rejected the claim.

Plaintiff appealed.  The Ninth Circuit issued a decision that it later withdrew (*Hayes v. County of San Diego* (9th Cir. 2011) 638 F.3d 688), and then it asked us to determine whether the state Court of Appeal decisions in *Adams*, *supra*, 68 Cal.App.4th 243, and in *Munoz*, *supra*, 120 Cal.App.4th 1077, remain good law in light of our later decision in *Hernandez v. City of Pomona* (2009) 46 Cal.4th 501 (*Hernandez*).  (See *Hayes v. County of San Diego*, *supra*, 658 F.3d at p. 873.)

## II

In Part A of this section, we discuss the existence of a duty by peace officers to act reasonably when using deadly force, including their duty to act reasonably with regard to their preshooting conduct.  In Parts B and C, we summarize the two California Court of Appeal decisions on which the federal district court relied in concluding that in regard to their preshooting conduct, the officers here owed no duty to plaintiff, whose father was killed in the shooting.  In Part D, we discuss the applicability here of those two state appellate decisions.

### A.  Existence of a Duty

Except when otherwise provided by law, public employees in California are statutorily liable to the same extent as private persons for injuries caused by their acts or omissions, subject to the same defenses available to private persons.  (Gov. Code, § 820.)  Also, public entities are generally liable for injuries caused by the negligence of their employees acting in the scope of their employment.  (*Id.*, § 815.2.)  Finally, close relatives and dependents of a negligently killed person can

5

recover damages for their loss.  (Code Civ. Proc., § 377.60.)  Under those state statutes, general principles of tort law, in particular the law of negligence, govern this case.

"[I]n order to prove facts sufficient to support a finding of negligence, a plaintiff must show that [the] defendant had a duty to use due care, that he breached that duty, and that the breach was the proximate or legal cause of the resulting injury." (*Nally v. Grace Community Church* (1988) 47 Cal.3d 278, 292; see *Conroy v. Regents of University of California* (2009) 45 Cal.4th 1244, 1250.) Thus, duty is a critical element of negligence liability.

This court has long recognized that peace officers have a duty to act reasonably when using deadly force.  (*Munoz v. Olin* (1979) 24 Cal.3d 629, 634 (*Olin*); *Grudt v. City of Los Angeles* (1970) 2 Cal.3d 575, 587 (*Grudt*).)  The reasonableness of an officer's conduct is determined in light of the totality of circumstances.  (See *Grudt*, *supra*, at pp. 585-588 [police shooting case]; see also *Shin v. Ahn* (2007) 42 Cal.4th 482, 499 [discussing totality-of-the-circumstances rule, but not in the context of peace officers using deadly force]; *John B. v. Superior Court* (2006) 38 Cal.4th 1177, 1191 [same]; *Kahn v. East Side Union High School Dist.* (2003) 31 Cal.4th 990, 996 [same]; *Commercial U.A. Co. v. Pacific G. & E. Co.* (1934) 220 Cal. 515, 522 [same].)

Instructive here is our decision in *Grudt*, *supra*, 2 Cal.3d 575.  In *Grudt*, a police officer in plain clothes, carrying a double-barreled shotgun, approached a car, possibly causing the driver to think he was being robbed or attacked.  The driver accelerated the car toward a second plainclothes officer, and then both officers opened fire on the driver, killing him.  (*Id.* at pp. 581-582.)  This court held that the trial court erred in barring a claim of negligence against the officers. (*Id.* at pp. 585-588.)  Significantly, the shooting in *Grudt* appeared justified *if examined in isolation*, because the driver was accelerating his car toward one of

the officers just before the shooting.  Nevertheless, we concluded that the totality of the circumstances, including the preshooting conduct of the officers, might persuade a jury to find the shooting negligent.  (*Ibid*.)  In other words, preshooting circumstances might show that an otherwise reasonable use of deadly force was in fact unreasonable.

Here, the federal district court granted summary judgment for defendants.  Applying two decisions of the California Court of Appeal, the federal district court ruled that the officers owed plaintiff (victim Shane's daughter) no duty with respect to their *preshooting* conduct.  In other words, the court concluded that the officers could not be held liable for the conduct plaintiff alleged:  entering Shane's home without making additional inquiries or seeking expert psychiatric assistance, thus negligently provoking a dangerous situation in which the use of deadly force against Shane was justified.  Plaintiff challenged that decision on appeal to the Ninth Circuit, which asked us to decide "[w]hether under California negligence law, sheriff's deputies owe a duty of care to a suicidal person when preparing, approaching, and performing a welfare check on him."  (*Hayes v. County of San Diego*, *supra*, 658 F.3d at p. 868.)  We have rephrased the issue as "[w]hether under California negligence law, liability can arise from tactical conduct and decisions employed by law enforcement preceding the use of deadly force."  Our reasons for rephrasing the issue follow.

The Ninth Circuit's phrasing of the issue focuses in isolation on events that preceded the shooting of Shane ("preparing, approaching, and performing a welfare check on [a suicidal person]"), not on the shooting itself.  Thus, it implicitly divides the encounter with Shane into two parts, suggesting that defendants here might have breached *two separate duties*.  The first duty would be to prepare, approach, and perform a welfare check on a suicidal person in a reasonable manner, a duty that may or may not exist.  The second duty would be

to use deadly force in a reasonable manner, a duty we have long recognized in California.  (*Olin*, *supra*, 24 Cal.3d at p. 634; *Grudt*, *supra*, 2 Cal.3d at p. 587.)

Here, however, the only injury plaintiff alleged is the loss of her father; she did not allege an additional injury as a result of the conduct of law enforcement personnel *preceding* her father's shooting.  Therefore, this case involves only a single indivisible cause of action, seeking recovery for a single wrong — *the shooting itself*.

We explained in *Crowley v. Katleman* (1994) 8 Cal.4th 666, 681:  "[A] 'cause of action' is comprised of a 'primary right' of the plaintiff, a corresponding 'primary duty' of the defendant, and a wrongful act by the defendant constituting a breach of that duty.  [Citation.]  The most salient characteristic of a primary right is that it is indivisible:  *the violation of a single primary right gives rise to but a single cause of action*.  [Citation.]"  (Italics added.)  Although "the phrase 'causes of action' is often used indiscriminately . . . to mean *counts* which state differently the same cause of action" (*Eichler Homes of San Mateo, Inc. v. Superior Court* (1961) 55 Cal.2d 845, 847), its more precise meaning "is the right to obtain redress for a harm suffered" (*Boeken v. Philip Morris USA, Inc.* (2010) 48 Cal.4th 788, 798).  " 'Even where there are multiple legal theories upon which recovery might be predicated, *one injury gives rise to only one claim for relief*.' "  (*Ibid.*, quoting *Slater v. Blackwood* (1975) 15 Cal.3d 791, 795, italics added.)

Here, the one injury plaintiff alleged is the loss of her father.  Thus, this case involves a single primary right (plaintiff's right not to be deprived of her father by an improper use of deadly force), which necessarily corresponds to a single duty (the duty not to use deadly force in an improper manner), and the breach of that duty gives rise to a single indivisible cause of action.  Plaintiff's many claims for relief are merely different legal and factual theories on which she seeks to recover on that one cause of action.

Because plaintiff did not allege a separate injury from the preshooting conduct of law enforcement personnel, the preshooting conduct is only relevant here to the extent it shows, as part of the totality of circumstances, that the shooting itself was negligent. Thus, a final determination that the shooting was not negligent would preclude plaintiff from pursuing a separate theory of liability based on the preshooting conduct alone. Moreover, because plaintiff did not allege a separate preshooting injury, this case does not raise the question of what independent duty, if any, law enforcement personnel owe with regard to their preshooting conduct, and we have no reason here to decide that question.

In granting the Ninth Circuit's request that we resolve a question of state law, we restated the issue as "[w]hether under California negligence law, liability can arise from tactical conduct and decisions employed by law enforcement preceding the use of deadly force." Through that restatement, we sought to avoid any misleading reference to a separate preshooting duty (not at issue here), and we put the focus on whether liability for the unreasonable use of deadly force by a peace officer can be based on preshooting conduct.

Here, the federal district court ruled (based on two California appellate decisions — *Adams*, *supra*, 68 Cal.App.4th 243, and *Munoz*, *supra*, 120 Cal.App.4th 1077) that the sheriff's deputies owed plaintiff no duty of care with regard to their preshooting conduct, and therefore that they could not be held liable for negligently provoking a dangerous situation in which the use of deadly force was then justified. That conclusion overlooks the long-established principle of California negligence law that the reasonableness of a peace officer's conduct must be determined in light of the totality of circumstances. (See *Grudt*, *supra*, 2 Cal.3d at pp. 585-588 [police shooting case]; see also *Shin v. Ahn*, *supra*, 42 Cal.4th at p. 499; *John B. v. Superior Court*, *supra*, 38 Cal.4th at p. 1191; *Kahn v. East Side Union High School Dist.*, *supra*, 31 Cal.4th at p. 996; *Commercial U.A.*

9

*Co. v. Pacific G. & E. Co.*, *supra*, 220 Cal. at p. 522.) Moreover, our holding in *Grudt* clarifies that preshooting conduct is included in the totality of circumstances surrounding an officer's use of deadly force, and therefore the officer's duty to act reasonably when using deadly force extends to preshooting conduct. (*Grudt*, at pp. 585-588.) But in a case like this one, where the preshooting conduct did not cause the plaintiff any injury independent of the injury resulting from the shooting, the reasonableness of the officers' preshooting conduct should not be considered in isolation. Rather, it should be considered in relation to the question whether the officers' ultimate use of deadly force was reasonable.

Also, as the nation's high court has observed, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." (*Graham v. Connor* (1989) 490 U.S. 386, 396.) In addition, "[a]s long as an officer's conduct falls within the range of conduct that is reasonable under the circumstances, there is no requirement that he or she choose the 'most reasonable' action or the conduct that is the least likely to cause harm and at the same time the most likely to result in the successful apprehension of a violent suspect, in order to avoid liability for negligence." (*Brown v. Ransweiler* (2009) 171 Cal.App.4th 516, 537-538.) Although preshooting conduct is included in the totality of circumstances, we do not want to suggest that a particular preshooting protocol (such as a background check or consultation with psychiatric experts) is always required. Law enforcement personnel have a degree of discretion as to how they choose to address a particular situation. Summary judgment is appropriate when the trial court determines that, viewing the facts most favorably to the plaintiff, no reasonable juror could find negligence. (See *Hernandez*, *supra*, 46 Cal.4th at p. 521.)

Here, in granting summary judgment for defendants, the federal district court ruled that the two sheriff's deputies owed plaintiff no duty of care with regard to their preshooting conduct.  Because that court's analysis focused on two California Court of Appeal decisions — *Adams*, *supra*, 68 Cal.App.4th 243, and *Munoz*, *supra*, 120 Cal.App.4th 1077 — we discuss those cases in detail.

### B. *Adams*

*Adams*, *supra*, 68 Cal.App.4th 243, involved a person who was suicidal. Patrick Adams, who lived in Fremont in Alameda County, suffered from periodic bouts of depression and became belligerent when he drank hard liquor.  (*Id.* at p. 249.)  One evening, Patrick lost his temper and pushed his wife to the floor. (*Ibid*.)  The wife telephoned her daughter, who came to the house.  When the daughter heard Patrick discharge a firearm, she went to a neighbor's house and telephoned the police.  (*Id*. at p. 250.)

Several officers, with weapons drawn, entered the Adams home.  They later discovered Patrick crouched in the bushes in the backyard.  Patrick was aiming a gun at his own chest.  He refused to put down the gun and told the officers to leave him alone.  (*Adams*, *supra*, 68 Cal.App.4th at pp. 251-253.)  The officers sought cover.  Several officers aimed guns at Patrick, and two officers approached Patrick with a barking police dog.  (*Id.* at pp. 252-253.)  When one of the officers, a trained negotiator, began talking to Patrick, he told her to leave and became angry. (*Id.* at pp. 253-254.)  The officers then heard Patrick discharge his gun.  Believing that Patrick had fired at them, several police officers fired back.  As it turned out, Patrick had shot at himself, not at the officers.  Although Patrick's body had a number of bullet wounds, it was a single *self-inflicted* wound, which had penetrated the heart and liver, that was fatal.  The self-inflicted wound was from

11

the initial shot, fired by Patrick, that led the police to return fire.  (*Id.* at p. 262, fn. 16.)

Patrick's wife and daughter sued the City of Fremont and various police officers, alleging negligence, wrongful death, and certain intentional torts. (*Adams*, *supra*, 68 Cal.App.4th at p. 249.)  The jury awarded damages to the plaintiffs.  (*Id.* at pp. 259-260.)  Answers to special interrogatories indicated that the jury based its finding of police negligence on the events leading up to the shooting, not on the actual shooting itself.  (*Id.* at p. 260.)

A divided panel of the California Court of Appeal reversed the judgment for the plaintiffs in *Adams*.  On the issue of negligence, the court concluded that the police officers owed the plaintiffs no duty of care with respect to their preshooting efforts to resolve the situation.  (*Adams*, *supra*, 68 Cal.App.4th at p. 276.)  In reaching that conclusion, the court applied the test set forth in *Rowland*, *supra*, 69 Cal.2d 108, in which we discussed exceptions "to the general principle that a person is liable for injuries caused by his failure to exercise reasonable care in the circumstances."  (*Id.* at p. 112.)  We said:  "A departure from this fundamental principle involves the balancing of a number of considerations" including "the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved.  [Citations.]"  (*Id.* at pp. 112-113.)

On foreseeability, the California Court of Appeal in *Adams* acknowledged that Patrick's death was a foreseeable outcome of the officers' preshooting conduct, adding that in the "highly charged, volatile situation . . . almost any result

was foreseeable with the benefit of hindsight." (*Adams*, *supra*, 68 Cal.App.4th at p. 269.)  The court also noted that the link between the police officers' preshooting conduct and Patrick's decision to end his life by shooting himself in the heart was "indirect and inferential." (*Ibid.*)

On moral blame, *Adams* concluded there was none associated with the officers' preshooting conduct.  No evidence existed that the officers planned to precipitate Patrick's suicide, knew it would ensue, or acted with bad faith or reckless indifference.  (*Adams*, *supra*, 68 Cal.App.4th at pp. 270-271.)

On the policy of preventing future harm, the burden on law enforcement personnel, and the consequences to the community, *Adams* said that in a suicide situation, peace officers are appropriately concerned primarily with the public's safety and their own safety, and secondarily with the safety of the person threatening suicide.  (*Adams*, *supra*, 68 Cal.App.4th at p. 272.)

A balancing of the various considerations, *Adams* concluded, militated against imposing a legal duty on peace officers to prevent a threatened suicide from being carried out.  (*Adams*, *supra*, 68 Cal.App.4th at p. 276.)  Citing our decision in *Parsons v. Crown Disposal Co.* (1997) 15 Cal.4th 456, which applied the *Rowland* test but also deemed relevant "the social value" of the specific goal, if any, that the defendant was seeking to advance (*Parsons*, at p. 473, citing *Rowland*, *supra*, 69 Cal.2d at pp. 112-113), *Adams* noted the "extremely high" social value of protecting the lives of peace officers involved in a standoff with an armed individual.  (*Adams*, *supra*, at p. 276.)  Having concluded that the defendants had no duty to prevent Patrick's suicide, *Adams* then reversed the judgment in the plaintiffs' favor.

### C. *Munoz*

*Munoz*, *supra*, 120 Cal.App.4th 1077, involved a person who, as discussed later, was threatening her family members with a knife.  Jessie Amaya went to his daughter Lucilla Amaya's home in Union City, Alameda County, after learning from his wife that Lucilla was hallucinating.  (*Id.* at p. 1083.)  When Jessie saw Lucilla, she was holding a knife in each hand and claiming that someone was in the back room.  (*Ibid.*)  Jessie checked the room but found no one.  (*Ibid.*)  Lucilla refused to put down the knives, and she would not permit Jessie to leave the house.  Lucilla's daughter, Yvette, was also in the house, and Lucilla told her to stay away.  Yvette then went to her room.  (*Ibid.*)  Meanwhile, Lucilla's brother, J.J. Amaya, had arrived at the house and was standing outside.  After talking on the telephone to his father, who was inside the house, J.J. called the police.  (*Id.* at pp. 1083-1084.)  He said that his sister had been a "5150" in the past (referring to 72-hour psychiatric custody under Cal. Welf. & Inst. Code, § 5150), and that she had a knife.  He expressed concern that she would harm herself, her father, or her daughter.  (*Munoz*, at p. 1084.)

When officers arrived, J.J. again told them that Lucilla was agitated and had a knife, and that he was worried about his father's safety inside the house.  (*Munoz*, *supra*, 120 Cal.App.4th at p. 1085.)  He also said that his sister might be under the influence of methamphetamine.  (*Id.* at p. 1086.)  The officers saw Lucilla standing in the front doorway.  She had a knife in one hand.  The other hand was not clearly visible; according to Police Corporal Tod Woodward, Lucilla claimed to have a gun in the other hand.  When Woodward approached the front door and spoke to Lucilla, she told him to stay back.  (*Id.* at pp. 1086-1087.)  Woodward told another officer to call for the SWAT (special weapons and tactics) team.  Woodward was concerned that Lucilla would kill her father and daughter.  He could see Lucilla's father and daughter in the house, and Lucilla was

sporadically pointing the knife at her father and gesturing in a threatening manner. (*Id*. at p. 1087.)

Corporal Woodward told Lucilla's father and daughter to go to the back of the house.  As they did so, Lucilla began moving toward them.  (*Munoz*, *supra*, 120 Cal.App.4th at p. 1087.)  Woodward raised his gun and pleaded with Lucilla, "Please don't, please don't."  (*Ibid*.)  Lucilla continued toward her father and daughter, thrusting with the knife.  Thinking that Lucilla was going to kill her father and daughter, Corporal Woodward shot Lucilla, killing her.  (*Id*. at pp. 1081, 1087.)

Jessie Amaya, Yvette Munoz, and J.J. Amaya sued Union City, its police department, the chief of police, and Corporal Woodward.  Testimony at trial indicated that Woodward's tone of voice became louder and more impatient during the course of his conversation with Lucilla.  (*Munoz*, *supra*, 120 Cal.App.4th at pp. 1089-1090.)  In addition, the testimony conflicted as to whether Lucilla had told Woodward that she had a gun.  Some witnesses denied hearing Lucilla make that statement, but other witnesses corroborated Woodward's testimony that she had made the statement.  (*Ibid*.)  The jury found the defendants liable for negligence and battery (*id*. at p. 1081), and the defendants appealed.

The same panel of the California Court of Appeal that had decided *Adams*, *supra*, 68 Cal.App.4th 243 (a suicide case), also decided *Munoz* (a police shooting case), affirming the judgment in part and reversing it in part.  Relevant here is the discussion in *Munoz*, *supra*, 120 Cal.App.4th 1077, on the liability of Corporal Woodward.  (*Id*. at pp. 1093-1110.)  *Munoz* described the earlier decision in *Adams* as holding "that law enforcement officers are shielded from ordinary negligence claims based on their response to public safety emergencies when those efforts prove to be ineffective in preventing self-inflicted harm or harm caused by third parties."  (*Munoz*, at p. 1097.)  *Munoz* also noted: "Here, the focus

15

is not simply on the failure of police to prevent harm, but *police conduct that directly inflicted harm.  Adams* does not go so far as to insulate officers in crisis situations from liability for *their own* unreasonable use of deadly force." (*Munoz*, at p. 1099, italics added.)  Thus, *Munoz* correctly recognized a factual distinction between a suicide case (which was the type of case at issue in *Adams*) and a use-of-deadly-force case (as to which this court has long held that peace officers have a duty to act reasonably).

But *Munoz* went on to say that the defendants in that case *could not be held liable for their preshooting conduct*.  The court said:  "[I]f the jury's verdict was based on the theory of liability against [Corporal] Woodward that we reject (pre-shooting response at the scene) and was not based on the use of deadly force, we would be compelled to reverse and remand for retrial." (*Munoz, supra*, 120 Cal.App.4th at p. 1101.)

*Munoz*, however, upheld the jury's verdict in favor of the plaintiffs, because the jury had necessarily concluded that Corporal Woodward was negligent in his use of deadly force, not merely in his preshooting conduct.  *Munoz* said:  "Because one of the theories of liability against Woodward is factually and legally sustained, the jury's consideration of the circumstances giving rise to the shooting," although improper, "was necessarily harmless." (*Munoz, supra*, 120 Cal.App.4th at p. 1101.)

### D.  Applicability Here of *Adams* and *Munoz*

As relevant here, the main distinction between the California Court of Appeal decisions in *Adams, supra*, 68 Cal.App.4th 243, and in *Munoz, supra*, 120 Cal.App.4th 1077, is that *Adams* was a suicide case, whereas *Munoz*, like this case, was a use-of-deadly-force case.  That distinction is significant because this court has never addressed whether peace officers owe a duty of care when, without

16

any use of deadly force, they merely come to the aid of a suicidal person — the existence of such a duty is not at issue here.  This court has, however, long recognized that peace officers have a duty to act reasonably when using deadly force — a duty that is at issue here.  (*Olin*, *supra*, 24 Cal.3d 629; *Grudt*, *supra*, 2 Cal.3d 575.)

Here, although plaintiff's father, Shane, had allegedly tried to kill himself earlier in the day, his death was not self-inflicted.  Rather, holding a large knife in his raised right hand, Shane acted in an apparently threatening manner toward the two sheriff's deputies, who then simultaneously shot him.  By contrast, in *Adams*, *supra*, 68 Cal.App.4th 243, the police shooting came moments *after* the officers heard Patrick fire a gunshot, which, as discovered later, penetrated his heart and liver, resulting in his death by suicide.  (See *id.* at p. 262, fn. 16.)

Because *Adams*, *supra*, 68 Cal.App.4th 243, involved a death by suicide, not a death by police shooting, the question in *Adams* was whether peace officers could be held liable for conduct that turned out (with the benefit of hindsight) to have increased Patrick's emotional imbalance, ultimately contributing to his suicide.  As noted earlier (see pp. 12-13, *ante*), *Adams* held that under our test in *Rowland*, *supra*, 69 Cal.2d at pages 112-113, the police in *Adams* had no duty to refrain from such conduct.  Because the validity of that conclusion is not at issue in this case, which did not involve a suicide, we express no view on that holding.

Plaintiff's counsel, in briefing before this court, asserted that plaintiff's father, Shane, may have been intending suicide when he approached the two sheriff's deputies with a large knife raised in his right hand, thereby provoking the deputies to shoot him.  That assertion has no support in the record before us.  In any event, unlike the death by suicide in *Adams*, *supra*, 68 Cal.App.4th 243, here Shane's death was not self-inflicted; rather, it was the direct result of the officers' use of deadly force.

Our case law has long recognized that peace officers have a duty to act reasonably when using deadly force. (See *Olin*, *supra*, 24 Cal.3d 629; *Grudt*, *supra*, 2 Cal.3d 575.) If plaintiff (Shane's daughter) is asserting that negligence in the sheriff's deputies' preshooting conduct somehow caused Shane to seek his own death at their hands (by coming at them with a large knife), that fact-based theory falls within the totality of circumstances surrounding the shooting and can be litigated in federal court proceedings determining the reasonableness of the deputies' use of deadly force. (See *Grudt*, *supra*, 2 Cal.3d at pp. 585-588.)

The reasonableness of the deputies' preshooting conduct should not be considered in isolation, however; rather, it should be considered as *part of the totality of circumstances* surrounding the fatal shooting of Shane. We perceive no sound reason to divide plaintiff's cause of action artificially into a series of decisional moments (the two deputies' decision not to call for a psychiatric expert before entering Shane's house, their decision to enter the house, their decision to speak to Shane, their decision to use deadly force in response to Shane's apparently threatening behavior toward them with a large knife, etc.), and then to permit plaintiff to litigate each decision in isolation, when each is part of a continuum of circumstances surrounding a single use of deadly force by the deputies. Any other approach would be both inefficient and confusing, and would conflict with our past decisions on negligence. (See *Grudt*, *supra*, 2 Cal.3d at pp. 585-588 [case involving a police shooting; the decision evaluates negligence in light of the totality of circumstances, including the officers' actions preceding the use of deadly force]; see also *Kahn v. East Side Union High School Dist.*, *supra*, 31 Cal.4th at pp. 996, 1011-1013 [case involving a swimming pool accident; the decision considers the defendant coach's actions during the weeks preceding the injurious event].)

As we have noted (see p. 16, *ante*), the California Court of Appeal decision in *Munoz*, *supra*, 120 Cal.App.4th 1077, unlike that same panel's earlier decision in *Adams*, *supra*, 68 Cal.App.4th 243, was a police shooting case, not a suicide case.  (See p. 16, *ante*, regarding the significance of that distinction.)  Therefore, by concluding in *Munoz* that Corporal Woodward owed the plaintiffs in that case no preshooting duty to act reasonably, the Court of Appeal extended its prior holding in *Adams* (a suicide case) to a case involving a death directly inflicted by the police.  In doing so, the *Munoz* court may have been influenced by the rule that applies to violations of the federal Constitution's Fourth Amendment.  (See *Munoz*, at p. 1102, fn. 6 [stating that federal Fourth Amend. law is "instructive" when deciding excessive force claims].)

Fourth Amendment law protects against an "unreasonable . . . seizure[]" (U.S. Const., 4th Amend.) and thus tends to focus more narrowly than state tort law on the moment when deadly force is used, placing less emphasis on preshooting conduct (see *Billington v. Smith* (9th Cir. 2002) 292 F.3d 1177, 1190). *Munoz*, *supra*, 120 Cal.App.4th 1077, did not cite *Billington v. Smith*, but if the California Court of Appeal in *Munoz* was influenced by Fourth Amendment law in reaching its conclusion that Corporal Woodward owed no preshooting duty of care, it did not adequately consider the differences between federal constitutional liability and state tort liability.  "The Fourth Amendment's 'reasonableness' standard is not the same as the standard of 'reasonable care' under tort law, and negligent acts do not incur constitutional liability."  (*Billington v. Smith*, at p. 1190.)  Moreover, *Munoz*'s extension of *Adams*, *supra*, 68 Cal.App.4th 243, directly conflicted with our long-standing conclusion that peace officers have a duty to act reasonably when using deadly force, a duty that extends to the totality of circumstances surrounding the shooting, including the officers' preshooting conduct.  (See pp. 6-10, *ante*.)

The Ninth Circuit relied on our decision in *Hernandez*, *supra*, 46 Cal.4th 501, in concluding that we would not be likely to agree with the holdings of the state Court of Appeal in *Adams*, *supra*, 68 Cal.App.4th 243, and *Munoz*, *supra*, 120 Cal.App.4th 1077. *Hernandez* did not mention either *Adams* or *Munoz*, although those cases involved a similar issue. *Hernandez* was a police shooting case. We there considered, among other things, whether state law liability could be based on the officers' *preshooting* conduct and decisions. We expressly did not decide whether such a theory of liability was valid in the abstract. (*Hernandez*, at p. 521, fn. 18.) Instead, we reviewed the evidentiary record and determined *as a factual matter* that the officers' preshooting conduct in that case was not negligent. (*Id.* at pp. 517-521.) The Ninth Circuit in the matter now before us, however, read our decision in *Hernandez* as "strongly indicat[ing]" that we would approve preshooting negligence as a theory of potential liability, for otherwise we would not have found it necessary to pore so carefully over the preshooting evidence. (*Hayes v. County of San Diego*, *supra*, 638 F.3d at p. 696.) Hence, the Ninth Circuit concluded that we would not be likely to agree with *Adams* and *Munoz*. (*Hayes v. County of San Diego*, at p. 697.)

Certain language in *Hernandez*, *supra*, 46 Cal.4th 501, can be misunderstood. As noted (see p. 19, *ante*), state negligence law, which considers the totality of the circumstances surrounding any use of deadly force (see *Grudt*, *supra*, 2 Cal.3d at pp. 585-588), is broader than federal Fourth Amendment law, which tends to focus more narrowly on the moment when deadly force is used (see *Billington v. Smith*, *supra*, 292 F.3d at p. 1190). This court's opinion in *Hernandez*, however, can be misread as suggesting that the state and federal standards are the same. (See *Hernandez*, at p. 514 [federal law requires consideration of " 'the totality of the circumstances at the time' "; "[t]he same consideration of the totality of the circumstances is required in determining

reasonableness under California negligence law"].)  But if the state and federal standards are the same, our *Hernandez* opinion should not have separately analyzed the evidence of preshooting negligence (*id*., at pp. 517-521).  That we *did* separately analyze such evidence suggested our acknowledgment that the state and federal standards are not the same, which we now confirm.[1]

## CONCLUSION

Our response to the Ninth Circuit's question on an issue of state law, as restated by this court, is this:  Law enforcement personnel's tactical conduct and decisions preceding the use of deadly force are relevant considerations under California law in determining whether the use of deadly force gives rise to negligence liability.  Such liability can arise, for example, if the tactical conduct and decisions show, as part of the totality of circumstances, that the use of deadly force was unreasonable.  Whether defendants here acted reasonably is not for us to decide.  Our task is limited to answering the state law question of duty that the Ninth Circuit posed to us, a purely legal question; the factual question of any breach of that duty is for the federal courts to resolve in later proceedings.


KENNARD, J.

WE CONCUR:

CANTIL-SAKAUYE, C.J.
BAXTER, J.
WERDEGAR, J.
CHIN, J.
CORRIGAN, J.
LIU, J.

---

[1]     To the extent *Munoz v. City of Union City*, *supra*, 120 Cal.App.4th 1077, is inconsistent with the views stated here, we disapprove it.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** Hayes v. County of San Diego

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding** XXX on request pursuant to rule 8.458, Cal. Rules of Court
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S193997
**Date Filed:** August 19, 2013

_____

**Court:**
**County:**
**Judge:**

_____

**Counsel:**

John J. Sansone and Thomas E. Montgomery, County Counsel, and Morris G. Hill, Deputy County Counsel, for Defendants and Appellants.

Dennis J. Herrera, City Attorney (San Francisco), Joanne Hoeper, Chief Trial Deputy, and Peter J. Keith, Deputy City Attorney, for League of California Cities and California State Association of Counties as Amici Curiae on behalf of Defendants and Appellants.

Gomez Law Group and Alvin M. Gomez for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Morris G. Hill
Deputy County Counsel
1600 Pacific Highway, Room 355
San Diego, CA  92101-2469
(619) 531-4877

Alvin M. Gomez
Gomez Law Group
853 Camino Del Mar, Suite 100
Del Mar, CA  92014
(858) 552-0000